**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

JOEL M. YOUNG,
an individual,

      Plaintiff,

v.                                       No. _____

TESLA, INC.,
a Delaware Corporation,

      Defendant.

## NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441

      Defendant Tesla, Inc. ("Tesla"), through its counsel and pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, submits this timely Notice of Removal.  As grounds for removal, Tesla states as follows:

      1.      On August 18, 2021, Plaintiff Joel M. Young ("Plaintiff") filed a Complaint captioned *Joel M. Young v. Tesla, Inc.* in the Thirteenth Judicial District Court, Sandoval County, State of New Mexico, under Civil No. D-1329-CV-2021-01255.

      2.      In accordance with 28 U.S.C. § 1446(a), attached hereto as **Exhibit A** are true and correct copies of the Civil Docket Sheet and all process, pleadings, and orders served upon Tesla in the State of New Mexico Thirteenth Judicial District Court action.  No other pleadings and orders have been served upon Tesla in this action.  Tesla will comply with D.N.M.LR-Civ. 81.1(a) within the twenty-eight day period provided by that rule, to the extent Exhibit A does not accomplish that purpose.

      3.      Tesla is an American company dedicated to accelerating the world's transition to sustainable energy.  Relevant to this matter, Tesla manufactures vehicles and sells those vehicles directly to consumers.  One of the vehicles which Tesla manufactures and sells is the Model 3.

4.    The Complaint alleges that Tesla fraudulently induced Plaintiff to purchase a Model 3 with an optional feature called "Full Self-Driving Capability" that "did not actually exist and could not be delivered as promised," and that Tesla in fact failed to deliver this feature as promised.  Ex. A, Complaint at ¶¶ 1-2.  Plaintiff brings claims for breach of contract, unjust enrichment, civil conversion, negligence per se, and fraud.  *Id.* ¶¶ 89-144.  Tesla denies all of Plaintiff's material allegations and will address them substantively at the appropriate time.

5.    As demonstrated below, this Court has jurisdiction over Plaintiff's action and it is properly removed to this Court.

## Removal Is Proper Under 28 U.S.C. §§ 1332 and 1441

6.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a), because this is a civil action in which the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest, and is between citizens of different states.  Removal under 28 U.S.C. § 1441(b) is appropriate in this matter because complete diversity of citizenship exists between Plaintiff and Tesla.  *See* 28 U.S.C. § 1332(c)(1).

**Diversity of Citizenship**

7.    On information and belief, Plaintiff is a citizen of New Mexico.  For purposes of removal based on diversity of citizenship, a plaintiff's state of residence is presumptively considered to be his state of citizenship.  *State Farm Mut. Auto. Ins. Co. v. Dyer*, 19 F.3d 514, 520 (10th Cir. 1994); *see also Anderson v. Watt*, 138 U.S. 694, 706 (1891) ("The place where a person lives is taken to be his domicile until facts adduced establish the contrary.").  Here, Plaintiff alleges that he is a resident of New Mexico.  Ex. A, Complaint at ¶ 9.

8.    Tesla is, and was at the time Plaintiff commenced this action, a Delaware corporation, having its principal place of business in Palo Alto, California and, thus, for

jurisdictional purposes is a citizen of Delaware and California. *See id.* ¶ 10; **Exhibit B** (Tesla's Form 8-K Filing); *see also* Fed. R. Evid. 201(b)(2).

9.      There is complete diversity between Plaintiff and Tesla under 28 U.S.C. § 1332 because Tesla is a citizen of Delaware and California while Plaintiff is a citizen of New Mexico.

**Amount in Controversy**

10.      For diversity jurisdiction over a claim, the amount in controversy must exceed $75,000. *See* 28 U.S.C. § 1332. Plaintiff alleges that he is entitled to compensatory and punitive damages. Compl., p. 53 (Jury Demand). Tesla disputes that it is liable to Plaintiff for any damages. Nevertheless, Tesla can demonstrate that the amount in controversy exceeds $75,000 under the "preponderance of the evidence" standard. 28 U.S.C. 1446(c)(2)(B); *see Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 82 (2014).

11.      "The amount in controversy is ordinarily determined by the allegations of the complaint, or, where they are not dispositive, by the allegations in the notice of removal." *Martin v. Franklin Cap. Corp.*, 251 F.3d 1284, 1290 (10th Cir. 2001), *abrogated on other grounds by Dart Cherokee Basin*, 574 U.S. at 81. If the defendant's allegations regarding the amount in controversy are challenged, then "both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied." *Dart Cherokee Basin*, 574 U.S. at 82. At that time, "[d]iscovery may be taken with regard to that question." *Id.* at 89 (quoting H.R. Rep. No. 112–10, p. 16 (2011)).

12.      Plaintiff seeks "compensatory damages of $60,100." Compl., p. 53 (Jury Demand). Plaintiff's compensatory damages claim is based on the alleged purchase price of his vehicle. *See, e.g.*, *id.* at ¶¶ 2, 40-41.

13.     Plaintiff also seeks punitive damages. *Id.*, p. 53 (Jury Demand). "Punitive damages may be considered in determining the requisite jurisdictional amount." *Woodmen of World Life Ins. Soc'y v. Manganaro*, 342 F.3d 1213, 1218 (10th Cir. 2003). "The defendant does not have to prove that the plaintiff is more likely than not to ultimately recover punitive damages, but merely that: (1) state law permits a punitive damages award for the claims in question; and (2) the total award, including compensatory and punitive damages, could exceed [the amount-in-controversy requirement]." *Frederick v. Hartford Underwriters Ins. Co.*, 683 F.3d 1242, 1247–48 (10th Cir. 2012) (analyzing jurisdiction under Class Action Fairness Act); *see Sleep v. Schwan's Co.*, 2019 WL 2124468, *5 (D.N.M. May 15, 2019) (applying *Frederick* to $75,000 requirement under § 1332(a)). "The defendant may point to facts alleged in the complaint, the nature of the claims, or evidence in the record to demonstrate that an award of punitive damages is possible." *Frederick*, 683 F.3d at 1248.

14.     "Under New Mexico law, punitive damages may be awarded for conduct that is malicious, willful, reckless, wanton, fraudulent, or in bad faith." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 995 (10th Cir. 1999). Punitive damages are an available award for tort claims including "common-law fraud." *Id.* "Although there is no statutory limit to the amount of punitive damages a plaintiff may request, New Mexico courts generally do not allow the ratio of punitive damages to the harm to exceed ten to one where economic damages are significant and the injury is not hard to detect." *Salazar v. Cont'l Cas. Co.*, 2000 WL 36739552, *2 (D.N.M. Dec. 20, 2000) (cleaned up) (applying 10:1 ratio and finding jurisdiction because plaintiff "could meet the jurisdictional minimum with a punitive damages award far less than what he could potentially recover").

4

15.     Plaintiff seeks punitive damages "sufficient to punish and deter Tesla and any similarly situated corporations from engaging in the conduct alleged herein."  Compl., p. 53 (Jury Demand).  He alleges that significant punitive damages are warranted here because Tesla is the "single most valuable automotive manufacturer on the planet" and its officers and directors are "among the richest people on the planet."  *Id.* at ¶ 139.  He seeks punitive damages in connection with his claims of common-law fraud and negligence per se, *id.* at ¶¶ 129-144, and he alleges that Tesla acted "recklessly, wantonly, fraudulently, and in bad faith."  *Id.* at ¶ 5.  While Tesla vigorously disputes Plaintiff's claims and characterizations, punitive damages are potentially available in this case under New Mexico law.  *Woodworker's Supply*, 170 F.3d at 995.

16.     A punitive damages award of $14,900, or less than 25% of the $60,100 compensatory damages sought by Plaintiff, would satisfy the $75,000 jurisdictional minimum.  Thus, based on $60,100 in compensatory damages, along with the availability of punitive damages, the amount in controversy far exceeds $75,000.  *See Burrell v. Burrell*, 229 F.3d 1162 (10th Cir. 2000) ("A punitive award of 40% of the actual award would satisfy the jurisdictional minimum. This is far less than what [the plaintiff] requested in his complaint, and below what is potentially recoverable under the law.").

**Procedural Compliance**

17.     Plaintiff filed his Complaint on August 18, 2021 in the Thirteenth Judicial District Court, Sandoval County, State of New Mexico.  Thus, this removal is timely pursuant to 28 U.S.C. § 1446(b).

18.     The Thirteenth Judicial District Court, Sandoval County, State of New Mexico, where the action is pending, is located within the United States District Court for the District of

New Mexico.  Thus, removal to this Court is proper pursuant to 28 U.S.C. § 111, because this Court is the "district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).

19.    Pursuant to 28 U.S.C. § 1446(d), the undersigned counsel certifies that Tesla promptly will provide written notice of removal of the action to Plaintiff and promptly will file a copy of this Notice of Removal with the Clerk of the Thirteenth Judicial District Court, Sandoval County, State of New Mexico.

WHEREFORE, the above-entitled action is hereby removed from the Thirteenth Judicial District Court, Sandoval County, State of New Mexico to the United States District Court for the District of New Mexico.

September 20, 2021

Respectfully submitted,

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

TYLER M. CUFF
201 Third St. NW, Suite 2200
Albuquerque, NM 87102
(505) 768-7267
tcuff@rodey.com

*Counsel for Defendant Tesla, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 20, 2021, I filed the foregoing document electronically through the CM/ECF system, which caused all parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.


Joel M. Young
P.O. Box 424
Placitas, NM 87043
(505) 243-5696
jmyoung@swcp.com

*Plaintiff Pro Se*


RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.


By: _____
      Tyler M. Cuff

Skip to Main Content Logout My Account Search Menu Search Refine Search  Back                    Location : All Courts   Images

# REGISTER OF ACTIONS
## CASE NO. D-1329-CV-2021-01255

| | | |
|---|---|---|
| **Joel M Young v. Tesla Inc** | § | Case Type: **Contract/Debt & Money Due** |
| | § | Date Filed: **08/18/2021** |
| | § | Location: |
| | § | Judicial Officer: **Eichwald, George P.** |
| | § | |
| | § | |

### PARTY INFORMATION

| | | | | Attorneys |
|---|---|---|---|---|
| **Defendant** | **Tesla Inc**<br>3500 Deer Creek Road<br>Palo Alto, CA 94304 | | | |
| **Plaintiff** | **Young, Joel M**<br>P.O. Box 424<br>Placitas, NM 87043 | Male<br>DOB: 04/05/1960 | | **Pro Se** |

### EVENTS & ORDERS OF THE COURT

**OTHER EVENTS AND HEARINGS**

| | | | | |
|---|---|---|---|---|
| 08/18/2021 | **Cause Of Actions** | Debt and Money Due | | |
| | Action Type | Action | | |
| 08/18/2021 | **OPN: COMPLAINT** | | | |
| | *Complaint For Breach of Contract, Unjust Enrichment, Civil Conversion, Negligence Per Se and Fraud* | | | |
| 08/18/2021 | **Summons** | | | |
| | Tesla Inc | Served | 08/19/2021 | |
| | | Response Due | 09/20/2021 | |
| | | Returned | 08/19/2021 | |
| 08/19/2021 | **JURY DEMAND 12 PERSON** | | | |
| | *Jury Demand* | | | |
| 08/19/2021 | **RETURN OF SERVICE** | | | |
| | *Return of Service* | | | |

### FINANCIAL INFORMATION

| | | | | |
|---|---|---|---|---|
| | **Plaintiff** Young, Joel M | | | |
| | Total Financial Assessment | | | 432.00 |
| | Total Payments and Credits | | | 432.00 |
| | **Balance Due as of 09/20/2021** | | | **0.00** |
| 08/18/2021 | Transaction Assessment | | | 132.00 |
| 08/18/2021 | File & Serve Payment | Receipt # BERD-2021-3339 | Young, Joel M | (132.00) |
| 08/19/2021 | Transaction Assessment | | | 300.00 |
| 08/19/2021 | File & Serve Payment | Receipt # BERD-2021-3359 | Young, Joel M | (300.00) |

**Exhibit A**

FILED
13th JUDICIAL DISTRICT COURT
Sandoval County
8/18/2021 9:59 AM
AUDREY GARCIA
CLERK OF THE COURT
Mariana Torres

**STATE OF NEW MEXICO**
**COUNTY OF SANDOVAL**
**THIRTEENTH JUDICIAL DISTRICT**

**JOEL M. YOUNG,**
**an individual,**
                    **Plaintiff,**

**vs.**                                        No.    D-1329-CV-2021-01255
                                                      Eichwald, George P.

**TESLA, INC.,**
**a Delaware Corporation,**
                    **Defendant.**

### COMPLAINT FOR BREACH OF CONTRACT, UNJUST ENRICHMENT, CIVIL CONVERSION, NEGLIGENCE PER SE, AND FRAUD

COMES NOW the Plaintiff, Joel M. Young, and upon information and belief alleges the following in support of this civil action for compensatory and punitive damages due to Tesla's breach of contract, unjust enrichment, negligence per se, civil conversion, and fraud:

### INTRODUCTION

1.      This complaint arises from Tesla's deliberate and bad faith failure to perform its obligations under the Motor Vehicle Purchase Agreement ("the Agreement") that it entered into with Young on or about May 20, 2019, and from Tesla's unlawful scheme to use the lure of an optional feature called "Full Self-Driving Capability" to fraudulently induce Young to purchase a 2019 Model 3. The Agreement is attached as Exhibit A.

2.      The crux of Tesla's unlawful scheme was generating certain false impressions to induce Young to enter into the Agreement and pay the company $60,100, which included $6,000 in exchange for delivering Full Self-Driving Capability by December 31, 2019. In fact, Tesla plotted to keep Young's money indefinitely, even though it knew that the optional feature did not actually exist and could not be delivered as promised. Those impressions included:

1

**Exhibit A**

(i) Full Self-Driving Capability was equivalent to Society of Automotive Engineers ("SAE") Level 4 or 5 automated driving, whereby a vehicle can safely drive itself through traffic without intervention by a human being;

(ii) Tesla production vehicles manufactured after a specific date, such as Young's 2019 Model 3, would come fitted with all computer hardware and other equipment necessary to enable Full Self-Driving Capability; and

(iii) the only internal obstacle to fulfilling Tesla's promise to deliver Full Self-Driving Capability as an automatic software update by December 31, 2019 was final refinements to Tesla's proprietary software, which CEO Musk represented via the wires in highly specific and imperative language was certain to be complete by year's end.

3.      The truth was very different.  At least as early as when Young ordered his 2019 Model 3 but with increasing certainty as 2019 unfolded, Tesla's software and automotive engineers had demonstrated through their efforts that: (i) Tesla's proprietary software, computer hardware, or other equipment fitted to its vehicles—or more fundamentally, Tesla's vision-centered approach to achieving autonomous self-driving itself—limited Full Self-Driving Capability to an SAE Level 2 *driver-support* feature; and (ii) Tesla could not deliver *any* level of SAE *automated driving* by year's end.

4.      In short, Tesla knew that its highly specific, public representations during 2019 about the efficacy of Full Self-Driving Capability, and the company's promise to deliver the feature as an automatic software update by year's end, were false, misleading, and in bad faith.

5.      However, Tesla also knew that disclosing its engineering failures and inability to deliver Full Self-Driving Capability as promised would gut new orders, trigger an avalanche of customers demanding *en masse* the return of over a billion dollars that they had collectively paid

Exhibit A

for the non-existent feature,[1] and devastate its market share. Therefore, instead of revealing the truth, Tesla recklessly, wantonly, fraudulently, and in bad faith concealed its engineering failures and made highly specific, false, and misleading representations via the wires in order to:

(i) confuse Young about what Full Self-Driving Capability was and how Tesla's claims should be evaluated under the SAE automated driving standards used by the auto industry and government regulators, thus concealing that Tesla knew it had not developed and could not deliver *any* level of SAE automated driving by December 31, 2019;

(ii) provide a facially plausible justification for what Tesla knew would be its failure to perform as promised, and thus conceal its unlawful scheme to refuse to refund and instead to embezzle Young's money;

(iii) lull Young into a false sense of complacency to prevent him from discovering and timely seeking redress for Tesla's wrongful and unlawful scheme;

(iv) fraudulently induce tens of thousands of new customers to order Full Self-Driving Capability during 2019 through numerous acts in furtherance alleged herein,[2] including without limitation: (a) CEO Musk creating a renewed sense of urgency by announcing that the price would increase by $1,000 at midnight on November 1, 2019, or just 60 days before the non-existent feature's promised delivery by December 31, 2019; and (b) CEO Musk falsely tweeting on December 19, 2019 that the company's proprietary software merely "[n]eeds a few more days of validation[;]"[3]

---

[1] *Reuters* reports that Tesla delivered 367,200 vehicles in 2019. If only half included Full Self-Driving Capability, Tesla's fraud netted $1.1 billion in 2019. The *Reuters* article is available at: https://www.reuters.com/article/us-tesla-shares/tesla-becomes-most-valuable-automaker-in-latest-stock-rally-idUSKBN2426E8

[2] This is not a class action lawsuit. The scale of Tesla's scheme illuminates its motives for defrauding Young.

[3] Musk's tweet is available at: https://electrek.co/2019/12/19/tesla-full-self-driving-more-games-holiday-update/

(v) trigger and sustain a multi-billion dollar buying spree of Tesla's publicly traded stock, whose price would soar due to CEO Musk's fraudulent representations about the efficacy and imminent delivery of Full Self-Driving Capability, thereby vastly enriching CEO Musk, the company's largest shareholder, and members of Tesla's Board of Directors who owned large blocks of shares and would benefit in similar fashion; and

(vi) avoid the perilous undercapitalization that the company faced in 2019, and which Tesla knew would be unavoidable if the company's scam were exposed.[4]

6.     In short, Tesla's most valuable trade secret was that it had lied, cynically plotting to exploit the tension between Americans' dependence on and affinity for their automobiles, and their growing guilt over contributing to devastating climate change.  Tesla's motive for acting in furtherance of its fraudulent embezzlement scheme was the oldest and basest on earth: greed.

7.     Tesla's conduct alleged herein constitutes breach of contract, unjust enrichment, civil conversion, common law fraud, and negligence per se due to Tesla's violation of state and federal criminal statutes prohibiting fraud, embezzlement, and money laundering.[5]

8.     Pursuant to New Mexico law and the Court's public policy objectives, Young is entitled to compensatory damages and punitive damages in an amount sufficient to punish and to deter Tesla and any similarly situated corporations from engaging in the alleged conduct ever again.

**PARTIES, JURISDICTION, AND VENUE**

9.     Plaintiff Young is a resident of New Mexico and one party to the Agreement.

---

[4] The *Wall Street Journal* reported on Tesla's dwindling cash reserves in 2019: https://www.wsj.com/articles/tesla-looks-to-raise-as-much-as-2-3-billion-in-debt-and-equity-11556800692  A related *Verge* article is available online at: https://www.theverge.com/2020/1/29/21113987/tesla-q4-2019-earnings-results-profit-revenue-model-3

[5] While Tesla's conduct would appear to violate numerous state and federal criminal statutes, Young does not act under or seek a novel extension of the private attorney general doctrine.  Young does not present any claims under the United States Constitution or federal law, including without limitation 18 U.S.C. § 1964(c).

Exhibit A

10.     Defendant Tesla, Inc. is a Delaware corporation with headquarters in Palo Alto, California, and the only other party to the Agreement.

11.     Pursuant to New Mexico law, this Court has subject matter jurisdiction over Young's claims and personal jurisdiction over Tesla because of at least the following facts:

(i) Tesla is a foreign corporation transacting business pursuant to NMSA 1978 §§ 53-11-1 to 53-18-12, and under NMSA 1978 § 53-17-11 and New Mexico common law may be served through its agent registered with the New Mexico Secretary of State, summoned into this Court, and required to timely answer the Complaint;

(ii) Tesla routinely conducts business via the wires and physically within New Mexico, having advertised, sold, and delivered for valuable consideration at least 1,000 of the company's electric vehicles, related parts and accessories, maintenance and service, and auto insurance during the past several years, including but not limited to: (a) the solicitation, sale, and service of Young's 2019 Model 3 for valuable consideration; (b) the solicitation, execution, and delivery of the Agreement to Young; (c) the advertising and sale to Young of parts and accessories, vehicle maintenance, and related services for valuable consideration; (d) the advertising and delivery to Young and other New Mexicans of referral codes, whereby purchasers of its electric vehicles who distribute the codes to prospective buyers can accumulate credits that may be redeemed in exchange for features or services, such as free Supercharging through Tesla's nationwide network of proprietary electric vehicle chargers, or one of the company's electric vehicles; and (e) the routine delivery via the internet of software updates to Tesla vehicles owned by Young and other New Mexicans;

5

(iii) in lieu of a physical dealership in New Mexico, Tesla created, made available to the public, and maintains an interactive website through which it advertises and sells its products on a 24-hour-a-day basis to New Mexicans including Young, who are solicited via the wires to configure and purchase electric vehicles by tendering a credit card deposit, to purchase related parts, accessories, auto insurance, and residential solar panel and battery storage systems, and to receive referral codes redeemable for value;

(iv) in lieu of a physical repair facility in New Mexico, Tesla created, made available to the public, and maintains an interactive mobile phone application through which it routinely solicits and schedules mobile service of its electric vehicles, which is then performed for Tesla owners throughout New Mexico on a warranty basis or for valuable consideration in person or via the wires by Tesla's employees or agents;

(v) Tesla has, through its interactive website and the public statements made via the wires by its Chief Executive Officer Elon Musk, solicited and received from New Mexicans hundreds or thousands of $100 deposits for its forthcoming electric pickup truck and for its residential solar panel and battery storage systems;

(vi) Young's injuries occurred in New Mexico and resulted from Tesla's routine business activities within the state physically and via the wires, which include the fraudulent and unlawful acts and omissions alleged in this Complaint; and

(vii) on or about June 3, 2019, Young timely opted out of arbitration as provided in the Agreement, thereby reserving the right to bring this action.  Exhibits A and B.

12.    Venue is proper in the Thirteenth Judicial District because Young's injuries occurred within Sandoval County where he resides, and where:

Exhibit A

(i) Tesla fraudulently solicited Young's order for his 2019 Model 3 and $60,100 as valuable consideration for a vehicle with Full Self-Driving Capability via its interactive website, the wires, and federally regulated banking institutions;

(ii) Tesla delivered Young's first 2019 Model 3;[6]

(iii) Tesla fraudulently solicited, executed, and delivered the Agreement via its interactive website, email, and the wires;

(iv) Tesla's representations, emails, phone calls with Young, and other acts and omissions in furtherance of its fraudulent embezzlement scheme were made via the wires;

(v) Tesla via the wires and federally regulated banking institutions wrongfully and unlawfully refused to return and did in fact embezzle Young's $60,100; and where

(vi) Tesla routinely conducts business physically and via the wires with Young as alleged herein.

## FACTUAL BACKGROUND COMMON TO ALL COUNTS

13.    Sometime in 2018, Young became aware of Tesla's electric vehicles and in particular the company's representaion that they could be ordered with what Tesla labeled "Full Self-Driving Capability."

14.    According to the Merriam Webster Dictionary, the adjective "full" means "lacking restraint, check, or qualification" or "not lacking in any essential[,]" e.g., "in *full* control of your senses" or, in the instant case, *Full* Self-Driving Capability.[7]  The adjective "self" means "of the same kind ... as something with which it is used[,]" e.g., "*self* trimming" or, in the instant

---

[6] The first 2019 Model 3 that Young ordered was delivered by Tesla within Sandoval County damaged, missing a body panel over 36" wide, and in a condition the company characterized as unsafe to drive.  Young returned the vehicle per Tesla's instructions and ordered a second 2019 Model 3, which he agreed to pick up at the closest dealership in Littleton, Colorado to enable a safety inspection overseen by the facility's manager, Francisco Partida.

[7] The Merriam Webster Dictionary's definition of "full" is available online at: https://www.merriam-webster.com/dictionary/full?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (emphasis added)

Exhibit A

case, "Full *Self*-Driving Capability."[8]    The adjective "capable" means "having attributes ... required for performance or accomplishment" of a task, e.g., "*capable of* intense concentration" or, in the instant case, *capable of* full self-driving or "Full Self-Driving *Capability*."[9]

15.    A plain language reading of the term Full Self-Driving Capability thus reveals that Tesla deliberately named the optional feature to mislead prospective customers like Young to believe that it was equivalent to SAE *automated* driving, whereby "[y]ou <u>are not</u> driving when these automated driving features are engaged - even if you are seated in 'the driver's seat'":[10]



---

[8] The definition of "self" is available online at: <u>https://www.merriam-webster.com/dictionary/self</u> (emphasis added)

[9] The definition of "capable" is available online at: <u>https://www.merriam-webster.com/dictionary/capable</u> (emphasis added)

[10] The SAE driving automation criteria are available at: <u>https://www.sae.org/news/press-room/2018/12/sae-international-releases-updated-visual-chart-for-its-"levels-of-driving-automation"-standard-for-self-driving-vehicles</u>

Exhibit A

16.    However, as alleged in detail below, Tesla fraudulently represented via the wires during 2019, and successfully misled Young to believe that: (i) Full Self-Driving Capability *was* an autonomous self-driving system equivalent to SAE *Level 4 or 5* automated driving; and (ii) was *certain* to be delivered as an automatic software update before the end of 2019.

17.    On the day that Young responded to Tesla's solicitation via the wires on the company's interactive website and ordered his 2019 Model 3, remitting a credit card deposit of $2,500 that Tesla received via its interactive website, the wires, and federally regulated banking institutions, Tesla's Model 3 ordering page contained substantially the same representation repeatedly made by CEO Musk that Full Self-Driving Capability was "coming later this year."

18.    A plain language reading of Full Self-Driving Capability as equivalent to SAE automated driving and Tesla's repeated, imperative, specific representations in 2019 about the feature's efficacy and its certain delivery before year's end were collectively intended to mislead, and did in fact mislead Young to believe that the feature *was* available at the time of his order, *was* equivalent to SAE *Level 4 or 5* automated driving, and *would be* delivered before year's end.

19.    Young would not have purchased a 2019 Model 3 at all but for his reasonable and justifiable reliance on Tesla's repeated, highly specific, and imperative representations about the efficacy of Full Self-Driving Capability, and about its certain delivery before the end of 2019.

20.    Tesla did not disclose to Young during 2019 that:

(i) it intended to keep Young's $60,100 indefinitely regardless of whether: (a) it had actually developed Full Self-Driving Capability; (b) it could in fact deliver Full Self-Driving Capability as an automatic software update to Young's 2019 Model 3 as promised by December 31, 2019; and (c) Young requested a refund when Tesla failed to timely deliver a 2019 Model 3 equipped with Full Self-Driving Capability;

(ii) CEO Musk's repeated, highly specific, public representations about the feature's equivalence to SAE Level 4 or 5 automated driving were false; or that

(iii) Tesla knew it *had not* actually developed and *could not* deliver a Model 3 with *any* level of SAE automated driving by December 31, 2019.

21.     On January 1, 2020, after it failed to perform as promised, Tesla continued to conceal the above facts and others alleged herein to further its fraudulent embezzlement scheme.

22.     In furtherance of its fraudulent scheme to embezzle $60,100 from Young, Tesla committed the acts and omissions alleged herein via the wires, and deliberately, recklessly, and in bad faith misled Young to believe that:

(i) as a plain language reading of the term implies and as CEO Musk repeatedly represented in highly specific and imperative language as alleged herein, Full Self-Driving Capability was equivalent to SAE Level 4 or 5 automated driving;

(ii) Tesla production vehicles manufactured after a specific date, such as Young's 2019 Model 3, would come fitted with all computer hardware and other equipment necessary to enable Full Self-Driving Capability; and

(iii) the only internal obstacle to fulfilling Tesla's promise to deliver Full Self-Driving Capability as an automatic software update by December 31, 2019 was final refinements to Tesla's proprietary software, which CEO Musk represented via the wires in highly specific and imperative language was certain to be complete by year's end.

23.     When accepting Young's money, Tesla did not disclose that: (i) it *had not* developed and *could not* deliver *any* level of SAE automated driving by year's end; or (ii) that by year's end Full Self-Driving Capability would remain an SAE Level 2 *driver-support* feature.

24.    To the contrary, CEO Musk represented publicly via the wires in a February 19, 2019 interview with the money management firm ARK Invest, a major Tesla investor, that:

> I think we will be 'feature-complete' on full self-driving this year, **meaning** the car will be able to find you in a parking lot, pick you up, take you all the way to your destination **without an intervention this year**. I am **certain** of that. That **is not** a question mark.[11]

25.    The significance of CEO Musk's highly specific and imperative language for Tesla's culpable mental state in defrauding Young is at least sevenfold. First, under SAE's criteria, the capability to drive "all the way to your destination without an intervention" is a defining characteristic of *Level 4 and 5* automated driving and *not* Level 3 automated driving:



---

[11] The Ark Invest podcast is available at: https://ark-invest.com/podcast/on-the-road-to-full-autonomy-with-elon-musk/ (emphasis added)

Exhibit A

26.     Second, CEO Musk has a bachelor of arts degree in physics from the University of Pennsylvania.  By February 19, 2019, CEO Musk had extensively discussed Full Self-Driving Capability and the criteria for each level of SAE driving automation with Tesla's engineers and lawyers.  CEO Musk was intimately familiar with those criteria and he knew that Full Self-Driving Capability *could not* satisfy them. Without question, CEO Musk knew on or before December 31, 2019 that: (i) Full Self-Driving Capability was merely an SAE *Level 2 driver-support* system; and (ii) his public representations to the contrary during 2019 were false.

27.     Third, as Tesla's CEO and as a member of its Board of Directors, Musk had a duty to explain to the Board, and he did in fact explain the significance of the respective levels of SAE driving automation for his highly specific, imperative, public representations on behalf of Tesla on February 19, 2019 concerning: (i) the efficacy of Full Self-Driving Capability—specifically, its purported ability to "take you all the way to your destination *without an intervention*"; and (ii) the company's "certain" delivery of that particular level of functionality—namely, SAE *Level 4 or 5* automated driving— "this year," or by December 31, 2019.[12]

28.     Fourth, despite the above knowledge, Tesla fraudulently, recklessly, and in bad faith decided not to publicly disavow the company's highly specific, imperative, and false public representations about the efficacy and "certain" delivery of the feature by the end of 2019.  To the contrary, Tesla reinforced and expanded on those false representations publicly and via the wires, as reported in the *Arkansas Democrat-Gazette*:

> "[i]n April 2019, when cash was short at Tesla, [CEO] Musk said 1 million fully autonomous robotaxis would be on the road by the end of 2020, making money for their owners. A few weeks later, Tesla sold $3 billion worth of Tesla stock, solving its cash crunch."[13]

---

[12] *Ibid.* (emphasis added)

[13] The March 14, 2021 *Gazette* article is available online at:
https://www.arkansasonline.com/news/2021/mar/14/teslas-stories-said-diverge-over-fully-self-drivin/

29.     Fifth, the Board of Directors was made aware during 2019 through CEO Musk's public representations and through Tesla's internal communications—including without limitation CEO Musk's statements to the Board and the advice of Tesla's lawyer who advised it on state and federal regulatory regimes, Associate General Counsel Eric Williams—of the same things that CEO Musk knew when he made the highly specific, imperative, public representations alleged herein: namely, that Full Self-Driving Capability *was not* equivalent to *any* level of SAE automated driving and was in fact an SAE *Level 2 driver-support* feature.

30.     Sixth, Tesla thus knew during 2019 that Full Self-Driving Capability as it had been characterized via the wires on Tesla's website and by CEO Musk—specifically, as an SAE Level 4 or 5 automated driving system—*did not exist and could not be delivered by year's end*.

31.     Finally, CEO Musk, the respective members of the Board of Directors, attorney Williams, and each of them, were acting within the course and scope of their employment at all times material to Tesla's representations, solicitations, and transaction with Young, and their acts and omissions were fairly and naturally incidental to the business Tesla assigned to them and were done while engaged in Tesla's business with the view of furthering Tesla's interests as alleged herein.  In short, Tesla deliberately, recklessly, and wantonly lied about the core facts purporting to justify its solicitation and acceptance via the wires and federally regulated banking institutions of the $60,100 Young paid the company for a 2019 Model 3 featuring Full Self-Driving Capability.  At a bare minimum, Tesla rataified, accepted, or acquiesced to the bad faith, false, and fraudulent acts and omissions alleged herein, and which misled and damaged Young.

32.     Notwithstanding Tesla's knowledge that its specific, imperative, public representations on the efficacy and "certain" delivery of Full Self-Driving Capability by year's end were false, Tesla's fraudulent representations became even more specific and concrete.  For

Exhibit A

instance, CEO Musk tweeted on December 19, 2019 that Tesla's software—which he stated on February 19, 2019 was "certain" to make Full Self-Driving Capability equivalent to SAE Level 4 or 5 automated driving by December 31st—merely "[n]eeds *a few more days* of validation[.]"[14]

33.    The *Gazette* revealed still more evidence of Tesla's culpable mental state in furthering its fraud and embezzlement scheme.  Three hundred sixty-two days after the company failed to deliver *any* level of SAE automated driving by December 31, 2019, Tesla responded to a California Department of Motor Vehicles query about why it had *not even applied for a* driverless vehicle test permit, as several of its competitors had done.

34.    In a December 28, 2020 letter, Tesla Associate General Counsel Eric Williams revealed to California DMV that "*neither* Autopilot *nor* FSD [Full Self-Driving] *Capability* is an autonomous system[,]" and further revealed that "*we do **not** expect* significant enhancements" that would render Tesla production vehicles capable of autonomous self-driving.[15]

35.    Over two months later, during a March 9, 2021 teleconference with California DMV employees and Tesla representatives including attorney Williams, Tesla revealed that Full Self-Driving Capability *still* remained "firmly" an SAE *Level 2 driver-support* system.[16]

36.    Tesla's above admissions reveal its culpable mental state during 2019 for at least the following reasons:

        (i) if Tesla knew as late as March 9, **2021** that it could not improve Full Self-Driving Capability sufficiently to elevate it above an SAE ***Level 2 driver-support*** feature,

---

[14] The Ark Invest podcast is available at: https://ark-invest.com/podcast/on-the-road-to-full-autonomy-with-elon-musk/ (emphasis added).  Musk's tweet is available at: https://electrek.co/2019/12/19/tesla-full-self-driving-more-games-holiday-update/ (emphasis added)

[15] The *Gazette* article is available online at: https://www.arkansasonline.com/news/2021/mar/14/teslas-stories-said-diverge-over-fully-self-drivin/ (emphasis added)

[16] The public records request containing the California DMV documents referenced herein is available online at: https://www.plainsite.org/documents/28jcs0/california-dmv-tesla-robotaxi--fsd-notes/

then CEO Musk's claim on December 19, **2019** that Full Self-Driving Capability merely "[n]eeds a few more days of validation" to be equivalent to SAE *Level **4 or 5 automated driving*** was false, calculated to deceive and thereby further Tesla's fraudulent scheme;

(ii) if on December 28, **2020** Tesla *had not even applied* to receive regulatory approval of Full Self-Driving Capability *as an SAE automated driving system*, then regulatory approval of Tesla's approach to achieving *any* level of SAE automated driving *was not pending at any time* in **2019**, as the company had fraudulently implied through a combination description and disclaimer crafted by attorney Williams discussed below, and which was calculated to deceive and to further Tesla's fraudulent scheme; and

(iii) because Tesla knew that objective scrutiny by the California DMV would expose the feature as merely an SAE *Level 2 driver-support* system, Tesla's decision not to apply for a driverless vehicle test permit during **2020** was calculated to deceive and further Tesla's fraudulent embezzlement scheme—as was any legal counsel which Tesla received discouraging an application on the ground that an evaluation by the California DMV might expose the company's representations and promises as false or misleading.[17]

37.    Tesla's culpable mental state in defrauding Young is laid bare by the fact that Tesla's 2020 and 2021 responses to California DMV did not reflect recent or unexpected revelations. As alleged herein, at least as early as when Young ordered his 2019 Model 3, but with increasing certainty as the year unfolded, Tesla's engineers had demonstrated through their efforts that Full Self-Driving Capability was an SAE *Level 2 driver-support* feature and could not satisfy the requirements for *any* level of SAE *automated* driving. Tesla deliberately

---

[17] Any such legal advice is admissible to the jury under the crime-fraud exception to the attorney-client privilege. *See e.g. State of New Mexico v. Deutsch*, 1985-NMCA-123, 103 N.M. 752, 713 P.2d 1008.

concealed the truth and made repeated, specific, imperative, and false affirmative representations to further its fraudulent scheme to obtain and unlawfully embezzle Young's money.

38.    Instead of rewarding employees who had the integrity to question Tesla's false representations in internal communications, Tesla diminished their roles, some were fired, and still others resigned—such as the executive Stuart Bowers, who left the company after CEO Musk effectively displaced him from spearheading Tesla's automated self-driving efforts.[18]

39.    Tesla thus labored to effectively disappear, diminish, or muzzle any credible internal source of information that might reveal its engineering failures and its scheme to: (i) fraudulently induce Young to order a vehicle with the non-existent, optional feature and pay the company $60,100; and (ii) after failing to deliver Full Self-Driving Capability on December 31, 2019, to refuse to return and instead unlawfully embezzle Young's money via the wires.

40.    When he entered into the Agreement with Tesla, acting in justifiable and detrimental reliance on the company's misleading, fraudulent, and bad faith affirmative representations and material omissions alleged herein, Young paid the company $60,100 via the wires and federally regulated banking institutions in exchange for a 2019 Model 3 with Full Self-Driving Capability, which Tesla represented would by December 31, 2019 enable the vehicle to drive itself through traffic without any intervention by Young, as a plain language reading of the term implies, and as the SAE's criteria for Level 4 and 5 automated driving provide.

41.    As regards the availability and efficacy of Full Self-Driving Capability for which Young paid Tesla $60,100 in valuable consideration, the Agreement—which Tesla solicited, executed, and delivered to Young via the wires in the ordinary course of its business activities within New Mexico—states that Young's 2019 Model 3 "is priced and configured based on

---

[18] An *Electrek* article outlining related events is available online at: https://electrek.co/2019/08/21/tesla-head-autopilot-software-leaves-restructuring/

16

features and options *available at the time of order*" and it expressly provides that $6,000 of the valuable consideration was in exchange for "Full Self-Driving Capability." Exhibit A (emphasis added)

42.    On the morning that Young retrieved his 2019 Model 3 following the safety inspection at Tesla's dealership in Littleton, Colorado, the company's website contained substantially the same, specific representation that the company and CEO Musk had repeatedly made publicly via the wires to that point: namely, that Full Self-Driving Capability would be delivered via the internet as an automatic software update to Young's vehicle "later this year" or language substantially to that effect.

43.    Substantially the same representation was repeated verbally to Young by the manager of Tesla's Littleton, Colorado dealership, Francisco Partida, whom Tesla had charged with ensuring the vehicle's safety before it was released to Young, whereupon Partida excitedly extolled the 2019 Model 3's features, pointedly including Full Self-Driving Capability.

44.    At no time did anyone at the Colorado dealership disclose to Young what Tesla's engineers had demonstrated through their efforts, what Tesla had consulted its lawyers about, and what the company unquestionably knew during 2019: namely, that contrary to what Tesla repeatedly represented in highly specific and imperative language via the wires, and contrary to what a plain language reading of the term implies, Full Self-Driving Capability *was not* equivalent to *any* level of SAE *automated* driving and *could not* be delivered by year's end.

45.    Instead, throughout 2019 and with increasing specificity and feigned conviction, Tesla repeatedly represented publicly and via the wires substantially the same reckless, false, and deliberately misleading representations that it had made when soliciting and receiving Young's $60,100: namely, that Full Self-Driving Capability *was* an autonomous self-driving system

17

equivalent to SAE Level 4 or 5 automated driving, and *would be* delivered as an automatic software update "later this year" or "before the end of the year."

46.    Instead of revealing to Young that Full Self Driving Capability *was not* equivalent to *any* level of SAE automated driving and *could not* be delivered by December 31, 2019, Tesla deliberately concealed those facts to further its fraudulent scheme to induce Young to purchased a 2019 Model 3 and to embezzle Young's $60,100, which Tesla did in fact embezzle via the wires and federally regulated banking institutions as alleged herein.

47.    Young is not a shareholder of Tesla stock.  Tesla did not solicit from Young a no-interest loan of indefinite duration for $60,100 to research, develop, and deliver a car capable of SAE automated driving at some indefinite point in the future.  Instead, Young responded to Tesla's solicitation to pay the company $60,100 as valuable consideration in exchange for receiving a 2019 Model 3 equipped with a specific option by December 31, 2019—a date certain that was selected unilaterally by Tesla and without any opportunity for negotiation by Young.

48.    The click-through safety disclaimer to which a driver must agree when enabling autonomous self-driving on a Tesla vehicle identifies the software as a Beta version but *does not* purport to transform the Agreement into a research-and-development loan of indefinite duration, and *cannot* foreclose Young's legal and equitable rights to demand the return of his money if Tesla failed to perform by the end of 2019, as Tesla secretly knew that it would and labored to fraudulently conceal from Young both before and after its failure on December 31, 2019.

49.    Before entering into the Agreement on May 20, 2019, Tesla solicited Young via the wires on its website and through the representations of CEO Musk to pay the company $60,100 in exchange for a car equipped with a specific product that Tesla labeled Full Self-

Driving Capability, and Young acted in justifiable and detrimental reliance on the company's public, highly specific, imperative, and repeated representations that:

(i) the product *was* an autonomous self-driving system equivalent to SAE Level 4 or 5 automated driving, as a plain language reading of the term implies and as CEO Musk specifically represented on numerous occasions including but not limited to during February, April, November, and December of 2019 as alleged herein;

(ii) Young's 2019 Model 3 *would* come with all computer hardware and other equipment necessary to enable Full Self-Driving Capability and thereby achieve SAE Level 4 or 5 automated driving;

(iii) Full Self-Driving Capability *was* "available at the time of order[,]" Exhibit A;

(iii) SAE Level 4 or 5 automated driving *would be* delivered by the end of 2019 as CEO Musk had promised in specific and imperative language: "*I am **certain** of that. That is **not** a question mark*."[19]

50.    An integral part of Tesla's fraudulent embezzlement scheme was a misleading, hybrid description and disclaimer for Full Self-Driving Capability crafted by or with the counsel of in-house attorney Williams, shown below in its March 6, 2019 iteration on the eve of Young's purchase:

---

[19] The Ark Invest podcast is available at: https://ark-invest.com/podcast/on-the-road-to-full-autonomy-with-elon-musk/ (emphasis added)

# Full Self-Driving Capability

All new Tesla cars have the hardware needed in the future for full self-driving in almost all circumstances. The system is designed to be able to conduct short and long distance trips with no action required by the person in the driver's seat.

All you will need to do is get in and tell your car where to go. If you don't say anything, the car will look at your calendar and take you there as the assumed destination or just home if nothing is on the calendar. Your Tesla will figure out the optimal route, navigate urban streets (even without lane markings), manage complex intersections with traffic lights, stop signs and roundabouts, and handle densely packed freeways with cars moving at high speed. When you arrive at your destination, simply step out at the entrance and your car will enter park seek mode, automatically search for a spot and park itself. A tap on your phone summons it back to you.

The future use of these features without supervision is dependent on achieving reliability far in excess of human drivers as demonstrated by billions of miles of experience, as well as regulatory approval, which may take longer in some jurisdictions. As these self-driving capabilities are introduced, your car will be continuously upgraded through over-the-air software updates.

51.     The description and disclaimer's carefully crafted language, which Tesla would adjust as the months passed to further its fraudulent embezzlement scheme, was deliberately calculated to deceive and to thereby accomplish multiple specific objectives:

(i) befuddle, lull into complacency, and thus prevent Young from discovering that he had been defrauded and that Tesla plotted to unlawfully refuse to return, and thus to embezzle, his money;

(ii) manufacture a plausible explanation for what Tesla knew would be its failure to deliver Full Self-Driving Capability as promised by December 31, 2019, thereby delaying or avoiding altogether demands for refunds from New Mexicans like Young,

Exhibit A

and delaying or avoiding the initiation of criminal investigations and grand jury indictments until the statute of limitation applicable to each discrete felony had expired;[20]

(iii) delay or avoid the per annum costs projected by Tesla risk managers and lawyers of: (a) defending and paying judgments in civil actions such as this one; (b) enforcing non-disclosure agreements with current and former employees whose testimony would expose Tesla's engineering failures, related fraud, and culpable mental state; (c) defending lawsuits and paying for damages to the person or property of Tesla customers or third-party claimants whose insurance carriers presented subrogation claims arising from auto collisions; or (d) defending Tesla, CEO Musk, and other Board of Directors members or employees charged as individual defendants in criminal proceedings and indemnifying them for fines, restitution, and bail bonds;

(iv) maintain the public's suspension of disbelief in the company's reckless, fraudulent, and bad faith promises, thereby preserving through deception the company's goodwill in the market and enabling CEO Musk's efforts to trigger and sustain a multi-billion dollar buying spree of the company's publicly traded stock—of which Musk and certain Board of Directors members were among the largest shareholders—whose value Tesla plotted to and did in fact artificially inflate through its fraudulent representations about the efficacy and imminent delivery of Full Self-Driving Capability in 2019;

(v) avoid the undercapitalization that Tesla faced in 2019, and which Tesla knew would result if its fraudulent embezzlement scheme were discovered; and

(vi) transform the company's promise to deliver a specific product by a date certain into a moving target in *both temporal and qualitative senses*.

---

[20] In New Mexico, embezzling money in the amount of $60,100 is a second-degree felony charged by grand jury indictment, and is subject to a four-year statute of limitations. NMSA 1978 § 30-16-8(F)

52.    As to the latter objective, Tesla plotted to make the single most compelling aspect of owning a Tesla—a car that would drive itself—*less* definite and *more* intangible the closer it was scrutinized, until *both the definition and reality* of Full Self-Driving Capability vanished into the ether, together with the $60,100 that the company fraudulently solicited and obtained from Young, and then embezzled via the wires and federally regulated banking institutions, in violation of numerous state and federal criminal statutes.

53.    Tesla's culpable mental state is demonstrated by subtle adjustments to the language of the disclaimer, made in furtherance of the company's fraudulent scheme to obtain and embezzle Young's money.   Tesla thereby duped Young into sympathizing with the company's feigned inability to deliver a non-existent feature that it had fraudulently led him to believe it *had in fact* developed and *would in fact* deliver by December 31, 2019, as CEO Musk had repeatedly represented in highly specific and imperative language during 2019.

54.    With the new iteration of the disclaimer, Tesla thus implied that it was not *the company's* failure to develop Full Self-Driving Capability that had prevented its promised delivery by December 31, 2019.   Instead, Tesla duped customers into blaming sluggish *government regulators* for preventing delivery of the vaporous feature.  Through that deception, Tesla dodged a billion dollar avalanche of refund demands and perilous undercapitalization:

> The *activation* and use of these features are dependent on achieving reliability far in excess of human drivers as demonstrated by billions of miles of experience, *as well as regulatory approval,* which may take longer in some jurisdictions.[21]

55.    Tesla thus changed the implied actor in the disclaimer's passive language, which in March of 2019 referred to *a customer's* "*use of* these features without supervision[,]" to the

---

[21] Tesla's ordering page for the Model 3, on which the above language appeared in June of 2021, is available online at: https://www.tesla.com/model3/design#overview (emphasis added)

new language, which referred to *Tesla's* "*activation . . . of* these features" once "regulatory approval" was finally granted.

56.    Tesla's semantic sleight-of-hand was thus intended to further its fraudulent embezzlement scheme by:

(i) misleading Young to believe that Tesla *had in fact applied for* regulatory approval, which therefore *was in fact pending*; thus

(ii) misleading Young to believe that a government agency was depriving *Tesla* of the opportunity to prove the efficacy of—and receive permission to "activate"—a feature that it *had in fact successfully developed*; which in turn would

(iii) prevent Young from realizing that the company's claims about Full Self-Driving Capability and government foot-dragging were lies; and thereby

(iv) delay or avoid altogether Young's demand to return his $60,100.

57.    The truth which Tesla worked to conceal, and which the *Gazette* exposed in March of 2021, is that *twenty months after* it entered into the Agreement, fraudulently promised to deliver Full Self-Driving Capability before the end of 2019, and fraudulently implied in the disclaimer that sluggish government regulators were preventing it from fulfilling its promise, *Tesla had not even initiated the approval process* by applying for a driverless vehicle test permit.

58.    Tesla's culpable mental state in furthering its fraudulent scheme becomes unmistakable in light of Tesla's admission that Full Self-Driving Capability remained "firmly" an SAE *Level 2 driver-support* feature as of March 9, **2021**. In short, Tesla had not even applied for a driverless vehicle test permit by December 28, **2020** because CEO Musk and Associate General Counsel Williams had advised the company about four disastrous implications of subjecting Full Self-Driving Capability to an objective and transparent evaluation by the

Exhibit A

California DMV—a regulatory agency which CEO Musk and attorney Williams knew would apply the SAE's automated driving standards.

59.    The first implication was that subjecting the system to an objective and transparent evaluation by the California DMV would have revealed that Full Self-Driving Capability was not even equivalent to an SAE *Level 3* "traffic jam chauffeur":



60.    The second, related implication was that if the California DMV had revealed that what the company labeled "Full Self-Driving Capability" could not satisfy even the *entry-level* category of SAE automated driving *in 2020*, then CEO Musk's highly specific and imperative public representations about the feature's equivalency to SAE *Level 4 or 5* automated driving and its "certain" delivery *in 2019* would have been exposed for what they were: lies, calculated to dupe customers into paying Tesla $60,100 in exchange for a car that Tesla knew *would not* be able to drive itself through traffic without an intervention by December 31, 2019.

24

61.     The third implication was the financial risk of exposing the truth to the highly competitive international automotive market, which is difficult to overstate even if limited by way of example to the state of California. The Alternative Fuels Data Center reports that by June of 2020, California had 425,300 electric vehicles registered, or 42 percent of all such registrations in the United States.[22] If one quarter of those vehicles were Teslas, and just half of California Teslas were ordered with Full Self-Driving Capability, then by June of 2020 Tesla would have fraudulently solicited $3.2 billion in exchange for what it pretended were self-driving cars in that state alone:

425,300 / 4 = 106,325

106,325 / 2 = 53,162.5

53,162 * $60,100 = $3,195,036,200

62.     The Fourth implication was the risk that the United States Department of Justice and the Securities and Exchange Commission might investigate and charge the company with misleading its investors, as indeed has occurred with several electric vehicle startups.[23]

63.     Perhaps the most ironic evidence of Tesla's culpable mental state is that the company configured its software to help dupe automotive technophiles like Young into believing that what Tesla had released was *at least* equivalent to SAE Level 3 automated driving. Tesla accomplished this deception by programming the software to exhibit a defining characteristic of that level. Specifically, "[w]hen the feature requests", a human "must drive" instead of the system itself:

---

[22] The Alternative Fuels Data Center spreadsheet may be downloaded at: https://afdc.energy.gov/data/10962

[23] CNBC's recent reporting on DOJ and SEC investigations of three electric vehicle startup is available online at: https://www.cnbc.com/2021/08/02/nikola-founder-criminal-charges-puts-other-spacs-on-notice.html



64.    Accordingly, the software that Tesla released in **2019** to Young's 2019 Model 3 would request—through an auditory signal and colorful depiction of a steering wheel—that the driver must "take over immediately."  But according to the SAE's criteria, that is a defining characteristic of SAE *Level 3 automated driving*—which, as Tesla admitted to the California DMV in December of **2020**, *it had not achieved*.

65.    Tesla thus added the steering wheel graphic and audible signal to the self-driving software it released to the fleet during 2019 in order to mislead Young to believe—and Tesla did in fact mislead Young to believe—that its engineers had crossed the hugely significant boundary from SAE *driver-**support*** systems into the realm of SAE ***automated** driving* systems.

66.    The subtle way in which that false impression furthered Tesla's fraudulent embezzlement scheme thus becomes clear: convincing customers that Tesla's engineers had

26

accomplished SAE *Level 3* automated driving would make CEO Musk's representation that the delivery of SAE *Level 4 or 5* automated driving before the end of 2019 was "certain" and "not a question mark" seem plausible.[24]  Misled by Tesla's subtle technological ruse, tens of thousands of new customers would shell out $60,100 each for cars with the non-existent feature, while existing customers like Young would remain sufficiently befuddled and unsure so as to refrain from demanding refunds or, if they eventually did so and Tesla refused to comply, to refrain from contacting state or federal authorities to initiate criminal investigations.

67.     Also in furtherance of Tesla's fraudulent embezzlement scheme were CEO Musk's representations that the company not only continuously gathered data from the fleet, but that its artificial intelligence engineers had *designed and implemented* a method of computerized analysis and automatic dissemination back to the fleet of lessons learned from that data.  Tesla dubbed this its "neural network" approach.[25]

68.     Tesla thus represented via the wires through sophisticated graphics on its website and CEO Musk's related remarks that the company's artificial intelligence engineers had figured how to transform the myriad, real-world challenges that *some* of its electric vehicles encountered at various locations around the world—and which those vehicles were initially *unable* to safely negotiate—into software updates that would render *all* Tesla vehicles *able* to safely negotiate them.  The heady implication of CEO Musk's representations was that Tesla's electric vehicles were, in effect, collectively learning on an almost organic level, like some geographically far-flung but interconnected cybernetic brain.

---

[24] The Ark Invest podcast is available at: https://ark-invest.com/podcast/on-the-road-to-full-autonomy-with-elon-musk/ (emphasis added)

[25] Some of Tesla's related representations are available online at: https://www.tesla.com/autopilotAI

69.    Once again, the truth was very different.  As alleged in greater detail below, as of December 31, 2019, Young's 2019 Model 3 could not negotiate some of the most basic and predictable challenges that human drivers have faced since the First Model T Ford was released in 1908, such as operating in heavy rain or heading into the setting sun. The 2019 Model 3's vision-centered system also could not distinguish between inanimate objects and living creatures immediately behind it—like a bike rack versus a pedestrian—or in front of it—like a ball rolling from between parked cars versus a dog or a toddler scrambling after a cherished toy.

70.    Assuming that Tesla's representations about its artificial intelligence breakthrough were true, the logical deduction from the above facts is that no Tesla vehicle anywhere in the world had encountered heavy rain or a setting sun during 2019.  That is a practical impossibility, the elimination of which leaves only two possible scenarios: either Tesla's representations about its artificial intelligence breakthrough during 2019 were lies transmitted via the wires in furtherance of its fraudulent embezzlement scheme, or Tesla's representations during 2019 about the efficacy of Full Self-Driving Capability were lies transmitted via the wires in furtherance of the same fraudulent scheme.

71.    Based on Tesla's public representations, the more likely alternative is that both of the above scenarios are true.  As of June 2021, Tesla was, via its website, publicly soliciting resumes from software engineers to help it design automated self-driving software equivalent to SAE Level 4 or 5 automated driving that:

(i) CEO Musk represented on February 19, 2019 was "certain" to be delivered by December 31, 2019;

(ii) CEO Musk claimed in April 2019 would enable a fleet of fully automated robotaxis by the end of 2020;

Exhibit A

(iii) CEO Musk claimed on December 19, 2019 merely "[n]eeds a few days of validation" to be complete; but which

(iv) Tesla Associate General Counsel Eric Williams revealed to the California DMV on December 28, 2020 *did not yet exist* and *was not* anticipated;

(v) Tesla informed the California DMV on March 9th of this year that it *cannot* deliver during 2021; but which

(vi) Tesla *continues* to fraudulently, recklessly, and in bad faith claim on its Model 3 ordering page and in furtherance of its ongoing unlawful embezzlement scheme is "coming later this year."[26]

72.    Early in 2021, Young alerted Tesla via emails sent to its employees, including the Colorado dealership manager Partida and attorney Williams, that the company had failed to deliver Full Self-Driving Capability as promised before the end of 2019.  Young informed Tesla that it was in breach of the Agreement and its promises to deliver the feature, and requested a compromise refund of the $6,000 that he had paid the company in May of 2019 in exchange for receiving Full Self-Driving Capability by the end of 2019.

73.    Neither the Colorado dealership manager Partida nor attorney Williams answered Young's emails. Instead, a Tesla employee whose job title was not revealed to Young, Antoinette Scrosoppi, eventually responded via telephone and email, inquiring of Young during a phone call, "why are you dissatisfied with Full Self Driving?"

74.    Young responded that, among other things, his 2019 Model 3 could not consistently navigate many of the simplest intersections in Albuquerque.  Specifically, Young

---

[26] Tesla's related solicitations are available online at: https://www.tesla.com/autopilotAI and https://www.tesla.com/careers/search/job/senior-softwareengineeraidatainfra-44733 and https://www.tesla.com/careers/search/job/autopilot-deeplearningengineer-scientist-48414. Tesla's representation that Full Self-Driving Capability is coming "later this year" is available at: https://www.tesla.com/model3/design#overview

Exhibit A

informed Scrosoppi that the vehicle had on numerous occasions tried to steer him into median strips and concrete barriers, that it had tried to steer him around a median strip and the wrong way into oncoming traffic (an incident that occurred two blocks from a local high school), and that it routinely braked violently without warning and for no apparent reason, thus endangering Young, other motorists, cyclists, and pedestrians. Young related that by no means could his 2019 Model 3 be considered capable of autonomous self-driving, as Full Self-Driving Capability had been repeatedly represented by Tesla, as a plain-language reading of the term implies, and which the company had promised to deliver as an automatic software update by December 31, 2019.

75.     Scrosoppi promised during the phone call, which Young memorialized in emails on which Tesla Associate General Counsel Eric Williams was copied, that she would inquire with "her team" whether Tesla would abide Young's request for a compromise refund of the $6,000 that he had paid to receive Full Self-Driving Capability by December 31, 2019.

76.     After a delay of several weeks, Scrosoppi informed Young in an April 29, 2021 email, which Young forwarded to Associate General Counsel Williams, that Tesla refused to refund Young's money tendered roughly two years earlier via the wires and federally regulated banking institutions. Scrosoppi purported to justify Tesla's refusal to return Young's $6,000 by stating that "Full Self Driving *functionality* continues to pend regulatory approval," notwithstanding that:

(i) Scrosoppi had pointedly solicited an account of Young's experience with Full Self-Driving *Capability*, the specific product that Tesla had pretended to have actually developed in order to fraudulently induce Young to purchase his 2019 Model 3;

30

Exhibit A

(ii) Tesla solicited and received from Young $60,100 to deliver a Model 3 equipped with Full Self-Driving *Capability* "before the end of the year", and which CEO Musk represented on December 19, 2019 was complete, save for "a few more days of validation";[27]

(iii) CEO Musk had promised on February 19, 2019 to deliver Full Self-Driving *Capability*, which he characterized as equivalent to SAE Level 4 or 5 automated driving, by the end of 2019, stating: "*I am **certain** of that. That **is not** a question mark*[;]"[28]

(iv) attorney Williams had crafted and adjusted Tesla's hybrid description and disclaimer discussed above to fraudulently and recklessly mislead Young to believe that regulatory approval of Full Self-Driving *Capability* was in fact pending during 2019; and

(v) When forced on December 28, 2020 to explain to California DMV on behalf of Tesla why the company *had not even requested* the agency to approve Full Self-Driving *Capability* as equivalent to *any* level of SAE automated driving, Williams revealed in response that "neither Autopilot nor *FSD* [Full Self-Driving] *Capability* is an autonomous system."[29]

77.    Acting on attorney Williams' advice and counsel, Scrosoppi thus substituted the adjective "functionality" for the adjective "capability" in an attempt to distance Tesla from its own highly specific and public representations, and from the plain-language meaning of the term "Full Self-Driving Capability" discussed throughout this complaint, a term which Tesla holds out

---

[27] Musk's tweet is available at: https://electrek.co/2019/12/19/tesla-full-self-driving-more-games-holiday-update/

[28] The Ark Invest podcast is available at: https://ark-invest.com/podcast/on-the-road-to-full-autonomy-with-elon-musk/ (emphasis added)

[29] The *Gazette* article is available online at: https://www.arkansasonline.com/news/2021/mar/14/teslas-stories-said-diverge-over-fully-self-drivin/ (emphasis added)

as its trademark for the optional feature that it fraudulently solicited Young to purchase for $6,000 in 2019.

78.    By substituting the adjective "functionality" for the adjective "capability", by withholding the information alleged throughout this Complaint, and by rejecting Young's compromise offer that Tesla return the $6,000 that it had fraudulently solicited and received from Young via the wires for a product that the company *knew* it had not developed, *knew* it would fail to deliver as promised by December 31, 2019, and which the company *did in fact* fail to deliver, Tesla:

> (i) breached the company's promises made in the Agreement and via the wires;
>
> (ii) violated established community standards of decency in New Mexico;
>
> (iii) was unjustly enriched by wrongfully retaining Young's $60,100;
>
> (iv) acted in furtherance of its scheme to defraud Young and embezzle his money via the wires and federally regulated banking institutions, contrary to NMSA 1978 §§ 30-16-8 and 30-16-6, 18 U.S.C. § 1343 and 18 U.S.C. § 1956; and
>
> (v) did in fact fraudulently obtain $60,100 and then embezzle money from Young via the wires and federally regulated banking institutions, contrary to NMSA 1978 § 30-16-8 and 18 U.S.C. § 1343 and 18 U.S.C. § 1956.

79.    Notwithstanding having checked with "her team" about Young's demand for a refund of his money, Scrosoppi did not disclose and thus fraudulently concealed what Young would later learn from the *Gazette* reporting discussed above: namely, that attorney Williams—who was copied on and knew about Young's emails with Scrosoppi—had informed the California DMV on behalf of Tesla on December 28, 2020 and again on March 9, 2021 that Full Self-Driving Capability *was not*, in fact, equivalent to *any* level of SAE automated driving, and

that the company *could not* deliver SAE automated driving *for the third consecutive year*, contrary to its representations made publicly and via the wires.

80.    Instead, as late as April 29 2021, Tesla continued to act via the wires to conceal that material information from Young and to otherwise act in furtherance of Tesla's fraudulent scheme to obtain Young's $60,100 and to embezzle his money as alleged herein—in this last instance by:

(i) falsely implying that Tesla *had in fact* requested a New Mexico or United States governmental regulatory agency to *evaluate and approve* Full Self-Driving Capability as equivalent to SAE automated driving;

(ii) falsely implying that regulatory approval of Full Self-Driving Capability therefore *was in fact* pending; and thereby

(iii) fraudulently purporting to justify the company's wrongful and unlawful refusal to return, and instead to embezzle Young's money, which Tesla did in fact embezzle via the wires and federally regulated banking institutions, contrary to the New Mexico and United States criminal statutes cited herein.

81.    At no time before or after entering into the Agreement did anyone at Tesla disclose to Young that—far from being essentially complete on December 19, 2019 but for "a few more days of validation"—Full Self-Driving Capability had:

(i) proved incapable of operating under environmental conditions which every driver regularly encounters, such as heavy rain or driving into the setting sun;

(ii) proved incapable of distinguishing inanimate objects from pedestrians; and

(iii) *in the company's own assessment* had proved incapable of qualifying for *any* level of SAE automated driving; and *for that reason*

33

(iv) Tesla had decided not to apply for a driverless vehicle test permit and subject Full Self-Driving Capability to an objective and transparent evaluation by the California DMV because doing so would have exposed the feature to be an SAE Level 2 driver-support system, and thus revealed Tesla's contrary representations to be lies transmitted via the wires to further its unlawful fraudulent embezzlement scheme.

82.    Tesla concealed all of the above information in furtherance of its fraudulent scheme to induce Young to purchase the 2019 Model 3 and to then embezzle his money, contrary to the state and federal criminal statutes cited herein.

83.    When Tesla solicited Young to enter into the Agreement to purchase his 2019 Model 3 via the wires, the company did not inform Young that it intended to keep his $60,100, *regardless of* whether the company had actually developed or could deliver the feature by December 31, 2019 and *notwithstanding* Young's demand that Tesla return the payment if it failed to perform, as Tesla knew that it would.

84.    The Agreement *does not* provide that Tesla's obligation to perform upon receipt of the valuable consideration paid by Young may be delayed indefinitely absent the approval of a person or entity that is not a party to the Agreement, *or* purport to grant Tesla immunity from the United States wire fraud statute or from New Mexico's embezzlement or fraud statutes, *or* relieve the company of liability for unjust enrichment due to its refusal to refund Young's $6,000.  The Agreement is solely between Young and Tesla; it does not make the United States or New Mexico a party; and it expressly provides that Young's "Vehicle is priced and configured based on features and options *available at the time of order*[.]"  Exhibit A (emphasis added)

85.    Even if Tesla's contractual promise to deliver Full Self-Driving Capability were declared unenforceable by this Court because the United States or New Mexico government

*might have* withheld approval of an SAE driving automation system during 2019, Tesla: (i) would still have fraudulently solicited and received from Young $60,100 via the wires, including $6,000 for a feature that Tesla knew and fraudulently concealed *did not exist* in 2019 and *could not be delivered* by December 31, 2019, and (ii) would still have been unjustly enriched by refusing to return and instead embezzling $60,100 that it fraudulently solicited and received via the wires and federally regulated banking institutions in exchange for delivering a car with a feature it knew that it had not actually developed and could not deliver as promised.

86.   Neither Scrosoppi nor Associate General Counsel Williams identified any decision by any United States or New Mexico regulatory agency evaluating and denying a request by Tesla during 2019 to approve Full Self-Driving Capability as equivalent to *any* level of SAE automated driving, and no-one at Tesla identified any United States or New Mexico statute or regulation justifying Tesla's wrongful and unlawful refusal to return Young's money upon receiving his written demand.

87.   Among the New Mexico and United States statutes that do appear relevant to Tesla's wrongful and unlawful fraudulent embezzlement scheme alleged herein are:

(i)   NMSA 1978 § 30-16-6, which prohibits "the intentional misappropriation or taking of anything of value that belongs to another by means of fraudulent conduct, practices or representations";

(ii)   NMSA 1978 § 30-16-8, prohibiting embezzlement;

(iii)   18 U.S.C. § 1343, which prohibits "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . transmitted by means of wire, radio, or television communication in interstate or foreign commerce"

together with "any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice"; and

(ii) 18 U.S.C. § 1956 (laundering of monetary instruments obtained through, *inter alia*, wire fraud contrary to 18 U.S.C. § 1343).

88.     As of the date of this Complaint, Tesla continues via the wires to:

(i) fraudulently advertise on its website that Full Self-Driving Capability is "coming later this year";

(ii) fraudulently solicit the public in New Mexico to purchase the non-existent feature for valuable consideration;

(iii) fraudulently represent in sales agreements solicited, executed, and delivered via the wires in the course of its ordinary business activities within New Mexico, that Full Self-Driving Capability is "available at the time of order"; and

(iv) fraudulently conceal its intention to unlawfully retain and thus to embezzle a customer's payment for a vehicle equipped with Full Self-Driving Capability upon Tesla's failure to deliver the feature yet again by the end of 2021 and notwithstanding a customer's demand that the company return his or her money.

## COUNT I – BREACH OF CONTRACT

89.     All of the preceding paragraphs are incorporated in this Count as if pled herein in their entirety.

90.     On or about May 20, 2019, Tesla and Young entered into the Agreement, which provides in pertinent part that:

(i) Young's 2019 Model 3 "is priced and configured based on features and options available at the time of order[;]" and

36

Exhibit A

(ii) $6,000 of the $60,100 consideration paid by Young is expressly for an optional feature called "Full Self-Driving Capability." Exhibit A

91.     As a plain-language reading of the term Full Self-Driving Capability implies, the optional feature is equivalent to SAE Level 4 or 5 driving automation, whereby a vehicle can safely drive itself through traffic without intervention by a human.

92.     Young paid Tesla the $60,100 consideration that the Agreement specifies for his 2019 Model 3 in full. Exhibit A.

93.     Tesla admitted to the California DMV in December of 2020 and again in March of 2021 that Full Self-Driving Capability remains an SAE Level 2 driver-support feature. Inescapably, therefore, Full Self-Driving Capability as equivalent to SAE Level 4 or 5 driving automation *was not* "available at the time of order" on or about May 20, 2019.

94.     Young would not have purchased a 2019 Model 3 at all but for his reasonable and justifiable reliance on Tesla's repeated, highly specific, and imperative representations about the efficacy of Full Self-Driving Capability, and about its certain delivery before the end of 2019.

95.     Because of its bad faith misrepresentations and deliberate breach of its obligation in the Agreement, Tesla is liable for $60,100 in compensatory damages, plus post-judgment interest as provided by New Mexico law. Exhibit A.

96.     Notwithstanding Tesla's deliberate and bad faith misrepresentations in the Agreement and alleged herein, Young offered Tesla a compromise to cure its breach by refunding just the $6,000 he had paid for Full Self-Driving Capability, but Tesla refused.

## COUNT II – UNJUST ENRICHMENT

97.     All of the preceding paragraphs are incorporated in this Count as if pled herein in their entirety. This Count is pled in the alternative to Count I.

Exhibit A

98.     Pursuant to the Agreement of May 20, 2019, Young paid Tesla $60,100 for a vehicle equipped with Full Self-Driving Capability, which the company fraudulently represented was "available at the time of order," and which the company, through its representations made via the wires on its website and through the public statements of CEO Musk alleged herein, promised to deliver before the end of 2019.  Exhibit A.

99.     Young would not have purchased a 2019 Model 3 at all but for his reasonable and justifiable reliance on Tesla's repeated, highly specific, and imperative representations about the efficacy of Full Self-Driving Capability, and about its certain delivery before the end of 2019.

100.     Tesla has been in possession of Young's $60,100 since May of 2019 but has failed to keep its promise to deliver a vehicle equipped with Full Self-Driving Capability by December 31, 2019, and on April 29, 2021 rejected Young's compromise demand that Tesla return just the $6,000 that the company solicited and received via the wires in exchange for the non-existent feature in order to fraudulently induce him to purchase the 2019 Model 3.

101.     Tesla informed Young on April 29, 2021 that it intends to keep his money indefinitely, pending regulatory approval by an unidentified government agency, notwithstanding that as of December 28, 2020 the company had not even applied for a driverless vehicle test permit in either California or New Mexico, and notwithstanding that Tesla informed the California DMV on that date that "we *do not expect* significant enhancements" that would render Tesla's vehicles capable of autonomous self-driving,[30] and despite Tesla's admission to the same agency on March 9, 2021 that the feature was *still* an SAE Level 2 driver-support feature and that SAE automated driving *will not* be delivered yet again in 2021.

---

[30] The *Gazette* article is available online at: https://www.arkansasonline.com/news/2021/mar/14/teslas-stories-said-diverge-over-fully-self-drivin/ (emphasis added)

102.    There is no lawful or equitable justification for Tesla's refusal to abide Young's request to return, and for its decision to instead embezzle Young's money, contrary to NMSA 1978 § 30-16-8, a payment which the company fraudulently and in bad faith solicited and received via the wires and federally regulated banking institutions contrary to NMSA 1978 § 30-16-6 and 18 U.S.C. § 1343 expressly in exchange for delivering a vehicle equipped with Full Self-Driving Capability, a feature which the company:

(i) fraudulently, recklessly, and in bad faith represented via the wires to the public including Young during 2019 *was* an autonomous self-driving system equivalent to SAE Level 4 or 5 automated driving as a plain language reading of the term implies and as CEO Musk explicitly represented as alleged herein, contrary to NMSA 1978 § 30-16-6 and 18 U.S.C. § 1343;

(ii) fraudulently, recklessly, and in bad faith represented to Young in the Agreement *was* "available at the time of order" in May of 2019 and repeatedly and explicitly represented via the wires as alleged herein *would be* delivered as an automatic software update by December 31, 2019, contrary to NMSA 1978 § 30-16-6 and 18 U.S.C. § 1343. Exhibit A;

(iii) admitted to California DMV on December 28, 2020 and again on March 9, 2021 *was not* an autonomous self-driving system and was in fact "firmly" an SAE *Level 2 driver-support* feature, while deliberately, recklessly, and fraudulently withholding the same information from Young to further its unlawful embezzlement scheme, contrary to NMSA 1978 § 30-16-6 and 18 U.S.C. § 1343; and

(iv) which Tesla failed to deliver as promised, whereupon it wrongfully and unlawfully retained Young's money , contrary to NMSA 1978 § 30-16-8, and 18 U.S.C. § 1343, and 18 U.S.C. § 1956.

103.    Through its wrongful, fraudulent, and unlawful acts and omissions alleged herein, Tesla has been unjustly enriched, and Young is entitled to a judgment of $60,100 in compensatory damages, plus interest accruing since at least the time of Tesla's April 29, 2021 refusal to return Young's money, if not earlier in light of its ongoing wrongful, fraudulent, and unlawful conduct, as an equitable remedy and to avoid an unconscionable and unjust result.

## COUNT III – CIVIL CONVERSION

104.    All of the preceding paragraphs are incorporated in this Count as if pled herein in their entirety.

105.    Young paid Tesla the $60,100 consideration that the Agreement specifies for his 2019 Model 3 in full, including $6,000 expressly for Full Self-Driving Capability, an optional feature which the company recklessly and fraudulently represented in the Agreement was "available at the time of order," and which the company, through its reckless and fraudulent representations made via the wires on its website and through the public statements of CEO Musk, represented was equivalent to SAE Level 4 or 5 automated driving and which it promised to deliver before the end of 2019, contrary to NMSA 1978 § 30-16-6 and 18 U.S.C. § 1343. Exhibit A.

106.    Young would not have purchased a 2019 Model 3 at all but for his reasonable and justifiable reliance on Tesla's repeated, highly specific, and imperative representations about the efficacy of Full Self-Driving Capability, and about its certain delivery before the end of 2019.

107.    Tesla has been in possession of Young's $60,100 since May of 2019 but has failed to keep its promise to deliver Full Self-Driving Capability by December 31, 2019, and on April 29, 2021 rejected Young's compromise demand that Tesla return just the $6,000 that the company solicited and received via the wires in exchange for the non-existent feature in order to fraudulently induce him to purchase the 2019 Model 3.

108.    Tesla informed Young that it intends to keep Young's money for an indefinite period of time, pending regulatory approval by an unidentified government agency, notwithstanding that as of December 28, 2020 the company had not even applied for a driverless vehicle test permit in California or in New Mexico.

109.    There is no lawful or equitable justification for Tesla's refusal to abide Young's request to return rather than convert Young's $60,100, which the company fraudulently and in bad faith solicited and received via the wires expressly in exchange for delivering a vehicle equipped with Full Self-Driving Capability, an optional feature which the company:

(i) fraudulently, recklessly, and in bad faith represented via the wires to the public including Young during 2019 *was* an autonomous self-driving system tantamount to SAE Level 5 or 4 Automated driving, as a plain language reading of the term implies, contrary to NMSA 1978 § 30-16-6;

(ii) fraudulently, recklessly, and in bad faith represented to Young in the Agreement *was* "available at the time of order" in May of 2019 and *would be* delivered as an automatic software update by December 31, 2019, contrary to NMSA 1978 § 30-16-6. Exhibit A;

(iii) admitted to California DMV on December 28, 2020 and March 9, 2021 *was not* an autonomous self-driving system, is an SAE Level 2 *driver-support* feature, and

41

*will not* become an SAE automated driving system during 2021, while withholding the same information from Young and falsely claiming on April 29, 2021 that the system was "*continues to pend* regulatory approval"; and which

(iv) Tesla failed to deliver to Young as promised, while wrongfully and unlawfully retaining his $60,100, despite Young's compromise demand that Tesla return just the $6,000 the company solicited and received via the wires in exchange for the non-existent feature in order to fraudulently induce him to purchase the 2019 Model 3.

110.    Tesla through the acts and omissions alleged herein wrongfully and unlawfully exercised dominion and control over $60,100 belonging to Young in defiance of his rights and his express demand that Tesla return his money.

111.    Tesla has committed civil conversion and Young is entitled to a judgment of $60,100 in compensatory damages, plus interest accruing since at least the time of Tesla's April 29, 2021 refusal to return Young's money, if not earlier in light of its bad faith, reckless, fraudulent, wrongful and unlawful conduct alleged herein.

## COUNT IV – NEGLIGENCE PER SE

112.    All of the preceding paragraphs are incorporated in this Count as if pled herein in their entirety.

113.    Several New Mexico and United States statutes either explicitly prohibit Tesla's conduct alleged herein or establish a standard of conduct which Tesla violated through its acts and omissions, including without limitation: NMSA 1978 § 30-16-6(F) (fraud exceeding $20,000, a second degree felony); NMSA 1978 § 30-16-8(F) (embezzlement exceeding $20,000, a second degree felony); 18 U.S.C. § 1343 (wire fraud, punishable by fine or imprisonment of up

Exhibit A

to 20 years, or both); and 18 U.S.C. § 1956 (laundering of monetary instruments, punishable by fine or imprisonment of up to 20 years, or both).

114.    Young is in the class of persons that the United States and New Mexico Legislatures sought to protect by enacting the above statutes, and Young's injury is of the type that state and federal lawmakers sought to prevent.

115.    Young would not have purchased a 2019 Model 3 at all but for his reasonable and justifiable reliance on Tesla's repeated, highly specific, and imperative representations about the efficacy of Full Self-Driving Capability, and about its certain delivery before the end of 2019.

116.    Tesla's acts and omissions alleged herein violated the above statutes and were the proximate cause of Young's injuries.  Tesla is therefore guilty of negligence per se and Young is entitled to $60,100 in compensatory damages.

117.    Tesla defrauded Young not only to induce him to purchase the 2019 Model 3 and obtain his $60,100 payment for a vehicle equipped with Full Self-Driving Capability, an optional feature which the company knew was in fact an SAE Level 2 *driver-support* feature and not equivalent to *any* level of SAE automated driving, and which Tesla knew and deliberately concealed it *could not* deliver in 2019.  Tesla also deliberately and recklessly engaged in the unlawful conduct alleged herein to vastly and artificially increase the value of the company's publicly traded stock by means of the false or fraudulent pretenses, representations, or promises alleged herein, which Tesla transmitted via the wires to Young and to the general public in New Mexico, contrary to 18 U.S.C. § 1343, and contrary to NMSA 1978 § 30-16-6.

118.    Tesla knew the essential nature of its scheme to fraudulently induce Young to purchase the 2019 Model 3 for $60,100 and to embezzle Young's money, which it did in fact embezzle via the wires, contrary to NMSA 1978 § 30-16-8, 18 U.S.C. § 1343, and 18 U.S.C. §

1956.  Tesla intended to further its scheme through the acts and omissions alleged herein, and it was reasonably foreseeable that the wires would be used in the ordinary course of Tesla's business activities and in furtherance of the company's unlawful and fraudulent scheme, which Tesla did in fact carry out via the wires and federally regulated banking institutions, thereby harming Young as alleged herein.

119.    Tesla's conduct alleged herein reflects a culpable mental state not merely because it was intentional, malicious, willful, reckless, wanton, fraudulent or performed in bad faith in order to defraud Young and induce him to enter into the Agreement to purchase the 2019 Model 3, fraudulently obtain and unlawfully embezzle his $60,100 in violation of New Mexico and United States statutes.  Tesla also plotted to vastly and artificially increase the value of its publicly traded stock by means of the materials omissions and fraudulent representations and promises made via the wires as alleged herein.  Moreover, Tesla's conduct violated the state and federal criminal statutes listed above, which Tesla is charged with knowing and the claimed ignorance of which is no defense.

120.    Therefore, pursuant to New Mexico common law and the Court's public policy, Young is entitled not only to compensatory damages in the amount of $60,100 but to an award of punitive damages determined by a jury but in any event sufficient to punish and deter Tesla and any similarly situated corporations from ever again engaging in the conduct alleged herein.

121.    According to *Reuters* in a February 4, 2020 article, CEO Musk's 19% share of Tesla's stock was worth $30 billion.[31]  Musk's share of Tesla's stock later rose to roughly 22% and is now worth far more than $30 billion, making him one of the richest people on the planet

---

[31] The *Reuters* article may be found on the internet at: https://www.reuters.com/article/us-usa-stocks-tesla/musks-tesla-stake-worth-30-billion-after-electrifying-stock-surge-idUSKBN1ZY2Y4

and tying his personal fortune to the furtherance and concealment of Tesla's fraudulent embezzlement scheme.

122.    According to *Business Insider*, nine members of Tesla's Board of Directors made, respectively, between hundreds of thousands to as much as billions of dollars from the meteoric rise of the company's stock price, thus tying their own fortunes to the furtherance and concealment of Tesla's fraudulent embezzlement scheme.[32]

123.    According to *CNBC* in a December 14, 2020 article, Tesla's market cap was then "as much as the combined market cap of the nine largest car companies globally."[33]

124.    Punitive damages are not only warranted but are clearly necessary to accomplish the above public policy objectives because, notwithstanding that Tesla admitted to California's DMV on March 9, 2021 that Full Self-Driving remains "firmly" an SAE Level 2 driver-support feature and *will not be delivered yet again this year*, Tesla:

        (i) acted via the wires in furtherance of its fraudulent scheme to embezzle money from Young via the wires throughout 2019 *and continued to do so as late as April 29, 2021* as alleged herein, contrary to 18 U.S.C. § 1343, and 18 U.S.C. § 1956, and NMSA 1978 §§ 30-16-6, 30-16-8;

        (ii) *continues* to fraudulently, recklessly, and in bad faith advertise Full Self-Driving Capability on its website and to characterize the feature as an autonomous self-driving system through use of the misleading term and the public statements of CEO Musk, contrary to 18 U.S.C. § 1343 and NMSA 1978 § 30-16-6;

---

[32] The *Business Insider*'s June 18, 2020 article is available online at: https://markets.businessinsider.com/news/stocks/tesla-board-members-make-most-red-hot-stock-keeps-soaring-2020-6-1029321894

[33] The *CNBC* article may be found on the internet at: https://www.cnbc.com/2020/12/14/tesla-valuation-more-than-nine-largest-carmakers-combined-why.html

Exhibit A

(iii) *continues* to fraudulently, recklessly, in bad faith, and with impunity solicit New Mexicans to pay $10,000 in exchange for the non-existent feature, which Tesla plots to embezzle from unwitting customers as it did from Young via the wires, contrary to NMSA 1978 §§ 30-16-6, 30-16-8, and 18 U.S.C. § 1343, and 18 U.S.C. § 1956; and

(iv) *continues* to fraudulently, recklessly, and in bad faith claim via the wires and on its website that Full Self-Driving Capability will be delivered "later this year[,]" contrary to 18 U.S.C. § 1343, and NMSA 1978 § 30-16-6.

125.    As for the sufficiency of punitive damages to promote the above public policy objectives, tethering punitive damages to compensatory damages would create a perverse incentive for the world's wealthiest corporations, like Tesla, to ironically become the *most* likely to resort to the unconscionable, duplicitous, unlawful, and serial conduct alleged herein.

126.    When weighing Tesla's due process right to a reasonable expectation of the punitive damages award which the company would face in the event that its fraudulent embezzlement scheme were exposed, the Court should consider at a minimum the following facts revealing the reprehensibility of Tesla's conduct, which appears to be unprecedented in New Mexico:

(i) Tesla's motus operandi of using a non-existent feature to fraudulently induce New Mexicans to purchase its automobiles, and to then embezzle thousands of dollars from each customer is both illegal and lucrative precisely because of its deceptiveness, which is integral to Tesla's routine business practices in New Mexico;

(ii) Tesla cynically calculated that its enormous wealth—which it amassed through duplicity integral to its routine business practices—enabled it to easily afford the

risk of flaunting both established community standards of decency in New Mexico and the state and federal statutes cited herein with impunity; and that

(iii) Tesla is charged with knowing that its fraudulent and serial conduct would violate the state and federal felony statutes listed herein thousands of times. The claimed ignorance of those statutes is no defense.

127.    Absent a sufficient deterrent, New Mexicans would ironically be viewed as the preferred targets of immensely wealthy and unscrupulous foreign corporations like Tesla. Some quantum of more modest punitive damages awards calculated by Tesla's risk managers and lawyers would continue to be cynically viewed by CEO Musk and the Board of Directors as an acceptable, per annum cost of doing business in New Mexico.   The means of achieving the Court's public policy objective of deterring corporations like Tesla from engaging in the wrongful and unlawful conduct alleged herein would thus be rendered impotent.

128.    It is therefore critical to sufficiently empower the jury to impress upon Tesla and any similarly situated automaker that every corporation doing business in New Mexico must tell the truth, and that economic might does not make right.

## COUNT V – COMMON LAW FRAUD

129.    All of the above allegations are incorporated in this Count as if pled herein in their entirety.

130.    Young would not have purchased a 2019 Model 3 at all but for his reasonable and justifiable reliance on Tesla's repeated, highly specific, and imperative representations about the efficacy of Full Self-Driving Capability, and about its certain delivery before the end of 2019.

131.    Young was fraudulently induced to pay Tesla $60,100 in exchange for a Model 3 equipped with Full Self-Driving Capability by Tesla's deliberately misleading, false, reckless,

and bad faith acts and omissions via the wires and alleged throughout this Complaint, including but not limited to Tesla's representations that:

(i) Full Self-Driving Capability was available at the time of his order;

(ii) Full Self-Driving Capability was equivalent to SAE Level 4 or 5 automated driving, and would render Young's 2019 Model 3 capable of safely driving itself through traffic without human intervention as alleged herein;

(iii) all hardware or equipment necessary to enable Full Self-Driving Capability was installed on Young's 2019 Model 3 at the time of the Agreement and it was merely final refinements to the software that had delayed delivery of Full Self-Driving Capability as an automatic software update, and not issues the company knew it could not resolve before the end of 2019 and had fraudulently concealed from Young; and

(iv) Full Self-Driving Capability would be delivered as an automatic software update before the end of 2019.  Exhibit A.

132.    In fact, Tesla knew at least as early as May 20, 2019 that:

(i) Full Self-Driving Capability *was not* an autonomous self-driving system equivalent to *any* level of SAE driving automation; and

(ii) the company *could not* deliver on its false, fraudulent, reckless, and bad faith promises to Young via the wires to deliver Full Self-Driving equivalent to SAE Level 4 or 5 driving automation before the end of 2019.

133.    Notwithstanding that knowledge, Tesla deliberately continued during 2019 to make the false, reckless, and misleading representations or promises alleged herein via the wires, and it took numerous acts in furtherance of its fraudulent embezzlement scheme alleged herein, with its essential objects being to fraudulently induce Young to enter into the Agreement and

order Full Self-Driving Capability, and to thereby obtain and then embezzle the $60,100 which Young paid via the wires and federally regulated banking institutions in reasonable and detrimental reliance on the company's false, fraudulent, reckless, and bad faith representations, promises and material omissions.

134.    Tesla defrauded Young not only to induce him to purchase the 2019 Model 3 and to order Full Self-Driving Capability, which the company knew was in fact an SAE Level 2 *driver-support* feature and not equivalent to *any* level of SAE automated driving, which Tesla knew and deliberately concealed it *could not* deliver in 2019.    Tesla also deliberately and recklessly engaged in the unlawful conduct alleged herein to vastly and artificially increase the value of the company's publicly traded stock by means of the false or fraudulent pretenses, representations, or promises alleged herein, which Tesla transmitted via the wires to Young and to the general public in New Mexico, contrary to 18 U.S.C. § 1343, and contrary to NMSA 1978 § 30-16-6.

135.    Tesla knew the essential nature of its scheme to fraudulently induce Young to purchase the 2019 Model 3 for $60,100 and to embezzle Young's money, which it did in fact embezzle via the wires, contrary to NMSA 1978 § 30-16-8, 18 U.S.C. § 1343, and 18 U.S.C. § 1956.   Tesla intended to further its scheme through the acts and omissions alleged herein, and it was reasonably foreseeable that the wires would be used in the ordinary course of Tesla's business activities and in furtherance of the company's unlawful and fraudulent scheme, which Tesla did in fact carry out via the wires and federally regulated banking institutions, thereby harming Young as alleged herein.

136.    Tesla's conduct alleged herein reflects a culpable mental state not merely because it was intentional, malicious, willful, reckless, wanton, fraudulent or performed in bad faith in

49

order to defraud Young and induce him to enter into the Agreement to purchase the 2019 Model 3, fraudulently obtain his $60,100 and unlawfully embezzle his money, in violation of New Mexico and United States statutes. Tesla also plotted to vastly and artificially increase the value of its publicly traded stock by means of the materials omissions and fraudulent representations and promises made via the wires as alleged herein. Moreover, Tesla's conduct violated the state and federal criminal statutes listed above, which Tesla is charged with knowing and the claimed ignorance of which is no defense.

137. Young's damages were a direct and foreseeable consequence of Tesla's false, reckless, wanton, misleading, and fraudulent acts and omissions alleged herein.

138. Therefore, pursuant to New Mexico common law and the Court's public policy, Young is entitled not only to compensatory damages in the amount of $60,100 but to an award of punitive damages determined by a jury but in any event sufficient to punish and deter Tesla and any similarly situated corporations from ever again engaging in the conduct alleged herein.

139. CEO Musk's share of the company's stock is now at least 22% and is worth far more than $30 billion, making him and several of the members of Tesla's Board of Directors among the richest people on the planet and tying their personal fortunes to the furtherance and concealment of Tesla's fraudulent scheme. The company is arguably the single most valuable automotive manufacturer on the planet, at least partly if not entirely as a result of its fraudulent, unlawful, and serial conduct alleged herein.

140. Punitive damages are not only warranted but are clearly necessary to accomplish the above public policy objectives because, notwithstanding that Tesla admitted to California's DMV on March 9, 2021 that Full Self-Driving remains "firmly" an SAE Level 2 driver-support feature and *will not be delivered yet again this year*, Tesla:

(i) acted via the wires in furtherance of its scheme to defraud and embezzle money from Young throughout 2019 *and continued to do so as late as April 29, 2021* as alleged herein, contrary to 18 U.S.C. § 1343 and 18 U.S.C. § 1956, and NMSA 1978 §§ 30-16-6, 30-16-8;

(ii) *continues* to fraudulently advertise Full Self-Driving Capability on Tesla's website and to characterize the feature as an autonomous self-driving system through use of the misleading term and through the public statements of CEO Musk, contrary to 18 U.S.C. § 1343 and NMSA 1978 § 30-16-6;

(iii) *continues* to fraudulently, recklessly, in bad faith, and with impunity solicit the public in New Mexico to purchase Full Self-Driving Capability and pay $10,000 in exchange for the non-existent feature, which Tesla intends to embezzle via the wires as it did from Young contrary to 18 U.S.C. § 1343 and 18 U.S.C. § 1956, NMSA 1978 §§ 30-16-6, 30-16-8; and

(iv) *continues* to fraudulently, recklessly, and in bad faith claim via the wires and on its website that Full Self-Driving Capability will be delivered "later this year[,]" contrary to 18 U.S.C. § 1343, and NMSA 1978 § 30-16-6.

141.    As for the sufficiency of punitive damages to promote the above public policy objectives, tethering punitive damages to compensatory damages would create a perverse incentive for the world's wealthiest corporations, like Tesla, to become the *most* likely to resort to the unconscionable, duplicitous, unlawful, and serial conduct alleged herein.

142.    When weighing Tesla's due process right to a reasonable expectation of the punitive damages award which the company would face in the event that its fraudulent embezzlement scheme were exposed, the Court should consider at a minimum the following

facts revealing the reprehensibility of Tesla's conduct, which appears to be unprecedented in New Mexico:

> (i) Tesla's motus operandi of using a non-existent feature to fraudulently induce New Mexicans to purchase its automobiles, and to then embezzle thousands of dollars from each customer is both illegal and lucrative precisely because of its deceptiveness, which is integral to Tesla's routine business practices in New Mexico;

> (ii) Tesla cynically calculated that its enormous wealth—which it amassed through duplicity integral to its routine business practices—enabled it to easily afford the risk of flaunting both established community standards of decency in New Mexico and the state and federal statutes cited herein with impunity; and that

> (iii) Tesla is charged with knowing that its fraudulent and serial conduct would violate the state and federal felony statutes listed herein thousands of times. The claimed ignorance of those statutes is no defense.

143.    Absent a sufficient deterrent, New Mexicans would ironically be viewed as the preferred targets of immensely wealthy and unscrupulous foreign corporations like Tesla. Some quantum of more modest punitive damages awards calculated by Tesla's risk managers and lawyers would continue to be cynically viewed by CEO Musk and the Board of Directors as an acceptable, per annum cost of doing business in New Mexico.  The means of achieving the Court's public policy objective of deterring corporations like Tesla from engaging in the wrongful and unlawful conduct alleged herein would thus be rendered impotent.

144.    It is therefore critical to sufficiently empower the jury to impress upon Tesla and any similarly situated automaker that every corporation doing business in New Mexico must tell the truth, and that economic might does not make right.

Exhibit A

## JURY DEMAND

Pursuant to NMRA 1-038 and his rights under the New Mexico Constitution, Young demands a trial by a jury of twelve persons on Counts I, III, IV and V of this Complaint.

WHEREFORE, the Plaintiff prays for compensatory damages of $60,100, punitive damages sufficient to punish and deter Tesla and any similarly situated corporations from engaging in the conduct alleged herein, taxable costs, interest on any judgment as provided by law and equity, and for any other relief that the Court may in its discretion deem just and proper.

Respectfully submitted:

*[s] Joel M. Young*
Joel M. Young
P.O. Box 424
Placitas, NM 87043
(505) 243-5696
jmyoung@swcp.com

*Plaintiff pro se*

Exhibit A

Serial:RN109368643-01-20190521192808

**EXHIBIT A**

# T E S L A

## Motor Vehicle Purchase Agreement
### Vehicle Configuration

**Customer Information**

JOEL M YOUNG

PLACITAS, NM 87043

**VIN**

**Reservation**    RN109368643

**Order Payment**    2,500.00

**Accepted by Customer on**    5/20/2019

**Odometer**    50

Price indicated does not include taxes and governmental fees, which will be calculated as your delivery date nears. You will be responsible for these additional taxes and fees.

| Description | Total in USD |
|---|---|
| Model 3 | $35,400.00 |
| Long Range All-Wheel Drive | $14,500.00 |
| Dual Motor All-Wheel Drive | ~ |
| All Black Premium Interior | ~ |
| Pearl White Multi-Coat | $1,500.00 |
| 19" Sport Wheels | $1,500.00 |
| Autopilot | - |
| Full Self-Driving Capability | $6,000.00 |
| Premium Interior | ~ |
| Supercharger Network Access + Pay-as-you-go | ~ |
| **Subtotal** | **$58,900.00** |
| Destination Fee | $1,125.00 |
| Documentation Fee | $75.00 |
| Transportation Fee (if applicable) | $0.00 |
| Order Modification Fee (if applicable) | $0.00 |
| **Total** | **$60,100.00** |

**Exhibit A**



# MOTOR VEHICLE PURCHASE AGREEMENT
## Final Price Sheet

| DATE OF AGREEMENT | May 21, 2019 |
|---|---|
| BUYER'S AND CO-BUYER'S NAME AND ADDRESS | SELLER'S NAME AND ADDRESS |
| JOEL M YOUNG <br><br> PLACITAS, NM 87043 | TESLA INC. <br> 8401 PARK MEADOWS CENTER DRIVE #1650 <br> LONE TREE, CO 80124 |

**DESCRIPTION OF PROPERTY**

| New/Used | Year | Make | Model | Style | Vehicle Identification Number | Odometer |
|---|---|---|---|---|---|---|
| New | 2019 | TESLA | Model 3 | 4-DR | | 50 |

**PURCHASE PRICE**

| | | | | | |
|---|---|---|---|---|---|
| 1. | **Total Vehicle Price** | | | | |
| | A. | Cash price of motor vehicle, options, accessories and fees. <br> (See attached Vehicle Configuration for itemization.) | $ 60,100.00 (A) | | |
| | B. | Other: N/A | $ 0.00 (B) | | |
| | C. | Other: N/A | $ 0.00 (C) | | |
| | Total Vehicle Price (A through C) | | | $ 60,100.00 | (1) |
| 2. | **Sales Tax Calculation** | | | | |
| | A. | Trade-in tax credit (if applicable) | $ 0.00 (A) | | |
| | B. | Taxable Fees (if applicable) | $ 0.00 (B) | | |
| | C. | Subtotal of Taxable Items | $ 60,100.00 (C) | | |
| | D. | Sales Tax | | $ 0.00 | (2D) |
| | E. | Other: N/A | | $ 0.00 | (2E) |
| | Total Cash Price (1 plus 2D and 2E) | | | $ 60,100.00 | (2) |
| 3. | **Amounts Paid to Government Agencies*** | | | | |
| | A. | Registration/Transfer/Titling Fees | $ 0.00 (A) | | |
| | B. | License Fee (if applicable) | $ 0.00 (B) | | |
| | C. | Tire Fee (if applicable) | $ 0.00 (C) | | |
| | D. | Battery Fee (if applicable) | $ 0.00 (D) | | |
| | E. | Other Fee(s): Title Fee | $ 0.00 (E) | | |
| | F. | Other Fee(s): Registration Service Fee | $ 0.00 (F) | | |
| | Total Government Fees (A through F) | | | $ 0.00 | (3) |
| 4. | **Subtotal (2 plus 3)** | | | $ 60,100.00 | (4) |
| 5. | **Total Credits** | | | | |
| | A. | Deposit | $ 2,500.00 (A) | | |
| | B. | Financed Amount: N/A | $ 0.00 (B) | | |
| | C. | EV Incentive (if applicable) | $ 0.00 (C) | | |
| | D. | Trade in value applied to purchase (if applicable) | $ 0.00 (D) | | |
| | E. | Customer downpayment | $ 57,600.00 (E) | | |
| | F. | Other Credits | $ 0.00 (F) | | |
| | Total Credits (A through F) | | | $ 60,100.00 | (5) |
| 6. | **Amount Due from Buyer (4 through 5)** | | | $ 0.00 | (6) |

*Seller may retain or receive part of the amounts paid to others.

Auto Broker Fee: This transaction is not subject to a fee received by an auto broker from Seller unless this box is checked:
☐ If checked, name of auto broker receiving fee: n/a

**Exhibit A**

# T E S L A

**Motor Vehicle Order Agreement**
**Terms & Conditions**

**Documentation.** Your Model 3 Motor Vehicle Order Agreement (the "Agreement") is made up of the following documents:

1. **Vehicle Configuration:** The Vehicle Configuration describes the vehicle that you configured and ordered, including pricing (excluding taxes and official or government fees).

2. **Final Price Sheet:** The Final Price Sheet will be provided to you as your delivery date nears. It will include final pricing based on your final Vehicle Configuration and will include taxes and official or governmental fees.

3. **Terms & Conditions:** These Terms & Conditions are effective as of the date you place your order and make your Order Payment (the "Order Date").

**Agreement to Purchase.** You agree to purchase the vehicle (the "Vehicle") described in your Vehicle Configuration from Tesla, Inc. or its affiliate ("we," "us" or "our"), pursuant to the terms and conditions of this Agreement. Your Vehicle is priced and configured based on features and options available at the time of order and you can confirm availability with a Tesla representative. Options, features or hardware released after you place your order may not be included in or available for your Vehicle.

**Purchase Price, Taxes and Official Fees.** The purchase price of the Vehicle is indicated in your Vehicle Configuration. This purchase price does not include taxes and official or government fees, which could amount to up to 10% or more of the Vehicle purchase price. Because these taxes and fees are constantly changing and will depend on many factors, such as where you register the Vehicle, they will be calculated closer to the time of delivery and indicated on your Final Price Sheet. You are responsible for paying these additional taxes and fees. If you present a check for any payment, we may process the payment as a normal check transaction, or we may use information from your check to make a one-time electronic fund transfer from your account, in which case your bank account will reflect this transaction as an Electronic Fund Transfer.

**Order; Nonrefundable Order Payment; Changes.** After you submit your completed order and the options you selected become available in production, we will begin the process of matching your order to a vehicle and coordinating your Vehicle delivery. **Your Order Payment covers the cost of these activities and other processing costs and is not a deposit for the Vehicle. Your Order Payment is fully refundable only until your order is matched to a Vehicle, at which point it becomes nonrefundable.** Any changes to your Vehicle Configuration, delivery location or expected delivery time after the Order Date will be difficult, if not impossible, for us to accommodate. If you want to make changes to your order, we will try to accommodate your request. If we accept your request, you may be subject to a non-refundable $500 change fee and potential price increases for any pricing adjustments made since your original Order Date. Any changes made by you to your Vehicle Configuration, including changes to the delivery location or estimated delivery date, will be reflected in a subsequent Vehicle Configuration that will form part of this Agreement.

**Cancellation; Default.** We incur significant costs in managing your order, and locating and coordinating delivery logistics for your Vehicle. We may also incur significant costs for remarketing and reselling the Vehicle, including additional coordination, logistics and transport costs. If you cancel or default in this Agreement after your order is matched to a Vehicle, you will not be refunded your Order Payment as it has already been earned by us in taking and processing your order and preparing your Vehicle for delivery. You acknowledge that the Order Payment amount is a fair and reasonable estimate of the actual damages that we have incurred or may incur as a result of your breach of this Agreement, damages that are otherwise impracticable or extremely difficult to determine. When you take delivery of the vehicle we will provide a credit to the final purchase price of your Vehicle equivalent to the amount of the Order Payment you paid. This Order Payment and this Agreement are not made or entered into in anticipation of or pending any conditional sale contract.

**Delivery.** If you are picking up your Vehicle in a state where we are licensed to sell the Vehicle, we will notify you of when we expect your Vehicle to be ready for delivery at your local Tesla Delivery Center, or other location as we may agree to. You agree to schedule and take delivery of your Vehicle within one week of this date. If you are unable to take delivery within the specified period, your Vehicle may be made available for sale to other customers.
If you wish to pick up your Vehicle in a state where we are not licensed to sell the Vehicle, or if you and Tesla otherwise agree, Tesla will, on your behalf, coordinate the shipment of your Vehicle to you from our factory in California or another state where we are licensed to sell the Vehicle. In such a case, you agree that this is a shipment contract under which Tesla will coordinate the shipping of the Vehicle to you via a third-party common carrier. You agree that delivery of the Vehicle, including the transfer of title and risk of loss to you, will occur at the time your Vehicle is loaded onto the common carrier's transport (i.e., FOB shipping point). The carrier will insure your Vehicle while in transit and you will be the beneficiary of any claims for damage to the Vehicle or losses occurring while the Vehicle is in the possession of a common carrier.

The estimated delivery date of your Vehicle, if provided, is only an estimate as we do not guarantee when your Vehicle will actually be delivered. Your actual delivery date is dependent on many factors, including your Vehicle's configuration and manufacturing availability. To secure your final payment and performance under the terms of this Agreement, we will retain a security interest in the Vehicle and all proceeds therefrom until your obligations have been fulfilled.

**Privacy Policy; Payment Terms for Services; Supercharger Fair Use Policy.** Tesla's Customer Privacy Policy; Payment Terms for Services and Supercharger Fair Use Policy are incorporated into this Agreement and can be viewed at www.tesla.com/about/legal.

**Exhibit A**

# T ≡ 5 L ⊓

**Agreement to Arbitrate.** Please carefully read this provision, which applies to any dispute between you and Tesla, Inc. and its affiliates, (together "Tesla").

If you have a concern or dispute, please send a written notice describing it and your desired resolution to resolutions@tesla.com.

If not resolved within 60 days, you agree that any dispute arising out of or relating to any aspect of the relationship between you and Tesla will not be decided by a judge or jury but instead by a single arbitrator in an arbitration administered by the American Arbitration Association (AAA) under its Consumer Arbitration Rules. This includes claims arising before this Agreement, such as claims related to statements about our products.

We will pay all AAA fees for any arbitration, which will be held in the city or county of your residence. To learn more about the Rules and how to begin an arbitration, you may call any AAA office or go to www.adr.org.

The arbitrator may only resolve disputes between you and Tesla, and may not consolidate claims without the consent of all parties. The arbitrator cannot hear class or representative claims or requests for relief on behalf of others purchasing or leasing Tesla vehicles. In other words, you and Tesla may bring claims against the other only in your or its individual capacity and not as a plaintiff or class member in any class or representative action. If a court or arbitrator decides that any part of this agreement to arbitrate cannot be enforced as to a particular claim for relief or remedy, then that claim or remedy (and only that claim or remedy) must be brought in court and any other claims must be arbitrated.

If you prefer, you may instead take an individual dispute to small claims court.

You may opt out of arbitration within 30 days after signing this Agreement by sending a letter to: Tesla, Inc.; P.O. Box 15430; Fremont, CA 94539-7970, stating your name, Vehicle Identification Number, and intent to opt out of the arbitration provision. If you do not opt out, this agreement to arbitrate overrides any different arbitration agreement between us, including any arbitration agreement in a lease or finance contract.

**Warranty.** You will receive the Tesla New Vehicle Limited Warranty or the Tesla Preowned Limited Warranty, as applicable, at or prior to the time of Vehicle delivery or pickup. You may also obtain a written copy of your warranty from us upon request or from our website.

**Limitation of Liability.** We are not liable for any incidental, special or consequential damages arising out of this Agreement. Your sole and exclusive remedy under this Agreement will be limited to reimbursement of your Order Payment.

**No Resellers; Discontinuation; Cancellation.** Tesla and its affiliates sell cars directly to end-consumers, and we may unilaterally cancel any order that we believe has been made with a view toward resale of the Vehicle or that has otherwise been made in bad faith. We may also cancel your order and refund your Order Payment if we discontinue a product, feature or option after the time you place your order or if we determine that you are acting in bad faith.

**Governing Law; Integration; Assignment.** The terms of this Agreement are governed by, and to be interpreted according to, the laws of the State in which we are licensed to sell motor vehicles that is nearest to your address indicated on your Vehicle Configuration. Prior agreements, oral statements, negotiations, communications or representations about the Vehicle sold under this Agreement are superseded by this Agreement. Terms relating to the purchase not expressly contained herein are not binding. We may assign this Agreement at our discretion to one of our affiliated entities.

**State-Specific Provisions.** You acknowledge that you have read and understand the provisions applicable to you in the State-Specific Provisions attachment to this Agreement.

Exhibit A

# T E 5 L ☐

**State Specific Provisions**

For **NEW YORK** residents:  If the Vehicle is not delivered in accordance with the Agreement within 30 days following the estimated delivery date, you have the right to cancel the Agreement and receive a full refund, unless the delay in delivery is attributable to you.

For **MASSACHUSETTS** residents:  ATTENTION PURCHASER:  All vehicles are WARRANTED as a matter of state law. They must be fit to be driven safely on the roads and must remain in good running condition for a reasonable period of time. If you have significant problems with the Vehicle or if it will not pass a Massachusetts inspection, you should notify us immediately. We may be required to fix the car or refund your money. THIS WARRANTY IS IN ADDITION TO ANY OTHER WARRANTY GIVEN BY US.

For **WASHINGTON, D.C.** residents:

NOTICE TO PURCHASER

IF, AFTER A REASONABLE NUMBER OF ATTEMPTS, THE MANUFACTURER, ITS AGENT, OR AUTHORIZED DEALER IS UNABLE TO REPAIR OR CORRECT ANY NON-CONFORMITY, DEFECT, OR CONDITION WHICH RESULTS IN SIGNIFICANT IMPAIRMENT OF THE MOTOR VEHICLE, THE MANUFACTURER, AT THE OPTION OF THE CONSUMER, SHALL REPLACE THE MOTOR VEHICLE WITH A COMPARABLE MOTOR VEHICLE, OR ACCEPT RETURN OF THE MOTOR VEHICLE FROM THE CONSUMER AND REFUND TO THE CONSUMER THE FULL PURCHASE PRICE, INCLUDING ALL SALES TAX, LICENSE FEES, REGISTRATION FEES, AND ANY SIMILAR GOVERNMENT CHARGES. IF YOU HAVE ANY QUESTIONS CONCERNING YOUR RIGHTS, YOU MAY CONTACT THE DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS.

Seller certifies that the information contained in the itemization of the purchase price, including the Vehicle Configuration, and required by Chapter 3 (Buying, Selling and Financing Motor Vehicles) of Title 16 of the Code of D.C. Municipal Regulations, is true to the best of our knowledge.

Exhibit A

# T ≡ S L ∏

## Payment Instructions

### Electronic Check

The easiest way to pay for your Model 3 is by electronic check, also known as ACH. Prior to delivery, you'll be invited by email to make your payment on our website.

To make a payment now, please sign in to your My Tesla account at this web address:

https://www.tesla.com/teslaaccount

### Mailed Check

If you are planning to mail a check for final payment, please send it to the following address:

Attn: Funding Team
6800 Dumbarton Circle
Fremont, CA 94555

### Wire Transfer

Please include your name and your order number (RN109368643) when paying by wire transfer.

| | |
|---|---|
| Bank Name | Wells Fargo Bank, N.A. |
| Bank Address | 420 Montgomery San Francisco, CA 94104 |
| Account Name | Tesla Motors Inc. |
| Account # | ███████████ |
| ABA/Routing # | ███████████ |
| Note | *Your name*, RN109368643 |

**EXHIBIT B**

Joel M. Young
████████
Placitas, NM 87043

June 3, 2019

Tesla, Inc.
P.O. Box 15430
Fremont, CA 94539-7970

Re:    Opt out of arbitration – ████████████████

Dear Tesla:

Per the sales agreement for the above-referenced vehicle, I hereby opt out of arbitration.

Yours,

Joel M. Young.

**Exhibit A**

FILED
13th JUDICIAL DISTRICT COURT
Sandoval County
8/19/2021 3:16 PM
AUDREY GARCIA
CLERK OF THE COURT
CMK

**STATE OF NEW MEXICO**
**COUNTY OF SANDOVAL**
**THIRTEENTH JUDICIAL DISTRICT**

**JOEL M. YOUNG,**
an individual,

            **Plaintiff,**

vs.                                             No.   **D-1329-CV-2021-01255**

**TESLA, INC.,**
a Delaware Corporation,

            **Defendant.**

**<u>JURY DEMAND</u>**

Pursuant to NMRA 1-038 and his rights under the New Mexico Constitution, Young

demands a trial by a jury of twelve persons on Counts I, III, IV and V of the Complaint in this

civil action.

Respectfully submitted:

*[s] Joel M. Young*
Joel M. Young
P.O. Box 424
Placitas, NM 87043
(505) 243-5696
jmyoung@swcp.com

*Plaintiff pro se*

1

**4-206. Summons.**

[For use with District Court Civil Rule 1-004 NMRA]

FILED
13th JUDICIAL DISTRICT COURT
Sandoval County
8/19/2021 3:10 PM
AUDREY GARCIA
CLERK OF THE COURT
Mariana Torres

<table>
<tr><td colspan="2" align="center"><strong>SUMMONS</strong></td></tr>
<tr><td>District Court: ~~Sandoval~~ THIRTEENTH<br>Sandoval County, New Mexico<br>Court Address: 1500 Idalia Rd , Bernalillo, NM 87004<br>Court Telephone Number.: 505-867-2376</td><td>Case Number:    D-1329-CV-2021-01255<br><br>Judge:  George P. Eichwald</td></tr>
<tr><td>Plaintiff(s):  Young<br>v.<br>Defendant(s):    Tesla, Inc.</td><td>Defendant Name:    Tesla, Inc. <em>C/o CT Corporation System</em><br>Address: ~~3500 Deer Creek Rd, Palo Alto CA 94304~~ <em>206 S. Coronado Ave.; Espanola, N.M. 8753</em></td></tr>
</table>

**TO THE ABOVE NAMED DEFENDANT(S):** Take notice that *Espanola, N.M.*

      1.     A lawsuit has been filed against you. A copy of the lawsuit is attached. The Court issued this Summons.

      2.     You must respond to this lawsuit in writing. You must file your written response with the Court no later than thirty (30) days from the date you are served with this Summons. (The date you are considered served with the Summons is determined by Rule 1-004 NMRA) The Court's address is listed above.

      3.     You must file (in person or by mail) your written response with the Court.  When you file your response, you must give or mail a copy to the person who signed the lawsuit.

      4.     If you do not respond in writing, the Court may enter judgment against you as requested in the lawsuit.

      5.     You are entitled to a jury trial in most types of lawsuits. To ask for a jury trial, you must request one in writing and pay a jury fee.

      6.     If you need an interpreter, you must ask for one in writing.

      7.     You may wish to consult a lawyer. You may contact the State Bar of New Mexico for help finding a lawyer at www.nmbar.org; 1-800-876-6227; or 1-505-797-6066.

      Dated at ~~Placitas~~ Bernalillo_____, New Mexico, this 18th day of August_____, 20 21 .

Audrey Garcia
CLERK OF COURT

By: _/s/ Calvatrina Kinsel_____
    Deputy

SEAL
DISTRICT COURT CLERK
SANDOVAL, NEW MEXICO

Attorney for Plaintiff or
Plaintiff pro se

**Exhibit A**

| | |
|---|---|
| Name: | Joel M. Young |
| Address: | P.O. Box 424, Placitas, NM 87043 |
| Telephone No.: | 505-243-5696 |
| Fax No.: | |
| Email Address: | jmyoung@swcp.com |

THIS SUMMONS IS ISSUED PURSUANT TO RULE 1-004 NMRA OF THE NEW MEXICO
RULES OF CIVIL PROCEDURE FOR DISTRICT COURTS.

### RETURN[1]

STATE OF NEW MEXICO          )
                             )ss
COUNTY OF _Rio Arriba_       )

I, being duly sworn, on oath, state that I am over the age of eighteen (18) years and not a party to
this lawsuit, and that I served this summons in _Rio Arriba_ county on the _19_ day of
_August 2021_, by delivering a copy of this summons, with a copy of complaint
attached, in the following manner:

(**check one box and fill in appropriate blanks**)

[ ]    to the defendant _____ (*used when defendant accepts a copy of
summons and complaint or refuses to accept the summons and complaint*)

[ ]    to the defendant by [mail] [courier service] as provided by Rule 1-004 NMRA (*used
when service is by mail or commercial courier service*).

After attempting to serve the summons and complaint on the defendant by personal service or by
mail or commercial courier service, by delivering a copy of this summons, with a copy of
complaint attached, in the following manner:

[ ]    to _____, a person over fifteen (15) years of age and residing at
the usual place of abode of defendant _____, (*used when the defendant is not
presently at place of abode*) and by mailing by first class mail to the defendant at
_____ (*insert defendant's last known mailing address*) a copy of the summons
and complaint.

[ ]    to _____, the person apparently in charge at the actual place of
business or employment of the defendant and by mailing by first class mail to the defendant at
_____ (*insert defendant's business address*) and by mailing the summons
and complaint by first class mail to the defendant at _____ (*insert defendant's
last known mailing address*). _(intake Specialist)_ C T Corporation System

[X]    to _Judy Romero_____, an agent authorized to receive service of process for
_206 S. Coronado Ave._
_Espanola, N.M. 87532_

**Exhibit A**

defendant *Tesla, Inc.* .

[ ] to _____, [parent] [guardian] [custodian] [conservator] [guardian ad litem] of defendant _____ (*used when defendant is a minor or an incompetent person*).

[ ] to _____ (*name of person*), _____, (*title of person authorized to receive service. Use this alternative when the defendant is a corporation or an association subject to a suit under a common name, a land grant board of trustees, the State of New Mexico or any political subdivision*).

Fees: $135.55

_Manuel A Maestas_
Signature of person making service

_____
Title (*if any*)

Subscribed and sworn to before me this ___19___ day of ___August___, ___2021___.²

_____
Judge, notary or other officer
authorized to administer oaths
___Notary___
Official title

> OFFICIAL SEAL
> Patricia Padilla
> NOTARY PUBLIC
> STATE OF NEW MEXICO
> My Commission Expires: 11/21/21

## USE NOTE

1.     Unless otherwise ordered by the court, this return is not to be filed with the court prior to service of the summons and complaint on the defendant.

2.     If service is made by the sheriff or a deputy sheriff of a New Mexico county, the signature of the sheriff or deputy sheriff need not be notarized.

[Adopted effective August 1, 1988; as amended by Supreme Court Order 05-8300-01, effective March 1, 2005; by Supreme Court Order 07-8300-16, effective August 1, 2007; by Supreme Court Order No. 12-8300-026, effective for all cases filed or pending on or after January 7, 2013; as amended by Supreme Court Order No. 13-8300-022, effective for all cases pending or filed on or after December 31, 2013; as amended by Supreme Court Order No. 14-8300-017, effective for all cases pending or filed on or after December 31, 2014.]

**Exhibit A**

FILED
13th JUDICIAL DISTRICT COURT
Sandoval County
8/18/2021 9:59 AM
AUDREY GARCIA
CLERK OF THE COURT
Mariana Torres

**STATE OF NEW MEXICO**
**COUNTY OF SANDOVAL**
**THIRTEENTH JUDICIAL DISTRICT**

**JOEL M. YOUNG,**
**an individual,**
                    **Plaintiff,**
**vs.**                                No.   D-1329-CV-2021-01255
                                            Eichwald, George P.
**TESLA, INC.,**
**a Delaware Corporation,**
                    **Defendant.**

## COMPLAINT FOR BREACH OF CONTRACT, UNJUST ENRICHMENT, CIVIL CONVERSION, NEGLIGENCE PER SE, AND FRAUD

COMES NOW the Plaintiff, Joel M. Young, and upon information and belief alleges the following in support of this civil action for compensatory and punitive damages due to Tesla's breach of contract, unjust enrichment, negligence per se, civil conversion, and fraud:

### INTRODUCTION

1.      This complaint arises from Tesla's deliberate and bad faith failure to perform its obligations under the Motor Vehicle Purchase Agreement ("the Agreement") that it entered into with Young on or about May 20, 2019, and from Tesla's unlawful scheme to use the lure of an optional feature called "Full Self-Driving Capability" to fraudulently induce Young to purchase a 2019 Model 3. The Agreement is attached as Exhibit A.

2.      The crux of Tesla's unlawful scheme was generating certain false impressions to induce Young to enter into the Agreement and pay the company $60,100, which included $6,000 in exchange for delivering Full Self-Driving Capability by December 31, 2019. In fact, Tesla plotted to keep Young's money indefinitely, even though it knew that the optional feature did not actually exist and could not be delivered as promised. Those impressions included:

1

**Exhibit A**

(i) Full Self-Driving Capability was equivalent to Society of Automotive Engineers ("SAE") Level 4 or 5 automated driving, whereby a vehicle can safely drive itself through traffic without intervention by a human being;

(ii) Tesla production vehicles manufactured after a specific date, such as Young's 2019 Model 3, would come fitted with all computer hardware and other equipment necessary to enable Full Self-Driving Capability; and

(iii) the only internal obstacle to fulfilling Tesla's promise to deliver Full Self-Driving Capability as an automatic software update by December 31, 2019 was final refinements to Tesla's proprietary software, which CEO Musk represented via the wires in highly specific and imperative language was certain to be complete by year's end.

3.      The truth was very different.  At least as early as when Young ordered his 2019 Model 3 but with increasing certainty as 2019 unfolded, Tesla's software and automotive engineers had demonstrated through their efforts that: (i) Tesla's proprietary software, computer hardware, or other equipment fitted to its vehicles—or more fundamentally, Tesla's vision-centered approach to achieving autonomous self-driving itself—limited Full Self-Driving Capability to an SAE Level 2 *driver-support* feature; and (ii) Tesla could not deliver *any* level of SAE *automated driving* by year's end.

4.      In short, Tesla knew that its highly specific, public representations during 2019 about the efficacy of Full Self-Driving Capability, and the company's promise to deliver the feature as an automatic software update by year's end, were false, misleading, and in bad faith.

5.      However, Tesla also knew that disclosing its engineering failures and inability to deliver Full Self-Driving Capability as promised would gut new orders, trigger an avalanche of customers demanding *en masse* the return of over a billion dollars that they had collectively paid

Exhibit A

for the non-existent feature,[1] and devastate its market share. Therefore, instead of revealing the truth, Tesla recklessly, wantonly, fraudulently, and in bad faith concealed its engineering failures and made highly specific, false, and misleading representations via the wires in order to:

(i) confuse Young about what Full Self-Driving Capability was and how Tesla's claims should be evaluated under the SAE automated driving standards used by the auto industry and government regulators, thus concealing that Tesla knew it had not developed and could not deliver *any* level of SAE automated driving by December 31, 2019;

(ii) provide a facially plausible justification for what Tesla knew would be its failure to perform as promised, and thus conceal its unlawful scheme to refuse to refund and instead to embezzle Young's money;

(iii) lull Young into a false sense of complacency to prevent him from discovering and timely seeking redress for Tesla's wrongful and unlawful scheme;

(iv) fraudulently induce tens of thousands of new customers to order Full Self-Driving Capability during 2019 through numerous acts in furtherance alleged herein,[2] including without limitation: (a) CEO Musk creating a renewed sense of urgency by announcing that the price would increase by $1,000 at midnight on November 1, 2019, or just 60 days before the non-existent feature's promised delivery by December 31, 2019; and (b) CEO Musk falsely tweeting on December 19, 2019 that the company's proprietary software merely "[n]eeds a few more days of validation[;]"[3]

---

[1] *Reuters* reports that Tesla delivered 367,200 vehicles in 2019. If only half included Full Self-Driving Capability, Tesla's fraud netted $1.1 billion in 2019. The *Reuters* article is available at: https://www.reuters.com/article/us-tesla-shares/tesla-becomes-most-valuable-automaker-in-latest-stock-rally-idUSKBN2426E8

[2] This is not a class action lawsuit. The scale of Tesla's scheme illuminates its motives for defrauding Young.

[3] Musk's tweet is available at: https://electrek.co/2019/12/19/tesla-full-self-driving-more-games-holiday-update/

(v) trigger and sustain a multi-billion dollar buying spree of Tesla's publicly traded stock, whose price would soar due to CEO Musk's fraudulent representations about the efficacy and imminent delivery of Full Self-Driving Capability, thereby vastly enriching CEO Musk, the company's largest shareholder, and members of Tesla's Board of Directors who owned large blocks of shares and would benefit in similar fashion; and

(vi) avoid the perilous undercapitalization that the company faced in 2019, and which Tesla knew would be unavoidable if the company's scam were exposed.[4]

6.      In short, Tesla's most valuable trade secret was that it had lied, cynically plotting to exploit the tension between Americans' dependence on and affinity for their automobiles, and their growing guilt over contributing to devastating climate change.  Tesla's motive for acting in furtherance of its fraudulent embezzlement scheme was the oldest and basest on earth: greed.

7.      Tesla's conduct alleged herein constitutes breach of contract, unjust enrichment, civil conversion, common law fraud, and negligence per se due to Tesla's violation of state and federal criminal statutes prohibiting fraud, embezzlement, and money laundering.[5]

8.      Pursuant to New Mexico law and the Court's public policy objectives, Young is entitled to compensatory damages and punitive damages in an amount sufficient to punish and to deter Tesla and any similarly situated corporations from engaging in the alleged conduct ever again.

**PARTIES, JURISDICTION, AND VENUE**

9.      Plaintiff Young is a resident of New Mexico and one party to the Agreement.

---

[4] The *Wall Street Journal* reported on Tesla's dwindling cash reserves in 2019: https://www.wsj.com/articles/tesla-looks-to-raise-as-much-as-2-3-billion-in-debt-and-equity-11556800692  A related *Verge* article is available online at: https://www.theverge.com/2020/1/29/21113987/tesla-q4-2019-earnings-results-profit-revenue-model-3

[5] While Tesla's conduct would appear to violate numerous state and federal criminal statutes, Young does not act under or seek a novel extension of the private attorney general doctrine.  Young does not present any claims under the United States Constitution or federal law, including without limitation 18 U.S.C. § 1964(c).

10.    Defendant Tesla, Inc. is a Delaware corporation with headquarters in Palo Alto, California, and the only other party to the Agreement.

11.    Pursuant to New Mexico law, this Court has subject matter jurisdiction over Young's claims and personal jurisdiction over Tesla because of at least the following facts:

(i) Tesla is a foreign corporation transacting business pursuant to NMSA 1978 §§ 53-11-1 to 53-18-12, and under NMSA 1978 § 53-17-11 and New Mexico common law may be served through its agent registered with the New Mexico Secretary of State, summoned into this Court, and required to timely answer the Complaint;

(ii) Tesla routinely conducts business via the wires and physically within New Mexico, having advertised, sold, and delivered for valuable consideration at least 1,000 of the company's electric vehicles, related parts and accessories, maintenance and service, and auto insurance during the past several years, including but not limited to: (a) the solicitation, sale, and service of Young's 2019 Model 3 for valuable consideration; (b) the solicitation, execution, and delivery of the Agreement to Young; (c) the advertising and sale to Young of parts and accessories, vehicle maintenance, and related services for valuable consideration; (d) the advertising and delivery to Young and other New Mexicans of referral codes, whereby purchasers of its electric vehicles who distribute the codes to prospective buyers can accumulate credits that may be redeemed in exchange for features or services, such as free Supercharging through Tesla's nationwide network of proprietary electric vehicle chargers, or one of the company's electric vehicles; and (e) the routine delivery via the internet of software updates to Tesla vehicles owned by Young and other New Mexicans;

5

(iii) in lieu of a physical dealership in New Mexico, Tesla created, made available to the public, and maintains an interactive website through which it advertises and sells its products on a 24-hour-a-day basis to New Mexicans including Young, who are solicited via the wires to configure and purchase electric vehicles by tendering a credit card deposit, to purchase related parts, accessories, auto insurance, and residential solar panel and battery storage systems, and to receive referral codes redeemable for value;

(iv) in lieu of a physical repair facility in New Mexico, Tesla created, made available to the public, and maintains an interactive mobile phone application through which it routinely solicits and schedules mobile service of its electric vehicles, which is then performed for Tesla owners throughout New Mexico on a warranty basis or for valuable consideration in person or via the wires by Tesla's employees or agents;

(v) Tesla has, through its interactive website and the public statements made via the wires by its Chief Executive Officer Elon Musk, solicited and received from New Mexicans hundreds or thousands of $100 deposits for its forthcoming electric pickup truck and for its residential solar panel and battery storage systems;

(vi) Young's injuries occurred in New Mexico and resulted from Tesla's routine business activities within the state physically and via the wires, which include the fraudulent and unlawful acts and omissions alleged in this Complaint; and

(vii) on or about June 3, 2019, Young timely opted out of arbitration as provided in the Agreement, thereby reserving the right to bring this action. Exhibits A and B.

12.     Venue is proper in the Thirteenth Judicial District because Young's injuries occurred within Sandoval County where he resides, and where:

(i) Tesla fraudulently solicited Young's order for his 2019 Model 3 and $60,100 as valuable consideration for a vehicle with Full Self-Driving Capability via its interactive website, the wires, and federally regulated banking institutions;

(ii) Tesla delivered Young's first 2019 Model 3;[6]

(iii) Tesla fraudulently solicited, executed, and delivered the Agreement via its interactive website, email, and the wires;

(iv) Tesla's representations, emails, phone calls with Young, and other acts and omissions in furtherance of its fraudulent embezzlement scheme were made via the wires;

(v) Tesla via the wires and federally regulated banking institutions wrongfully and unlawfully refused to return and did in fact embezzle Young's $60,100; and where

(vi) Tesla routinely conducts business physically and via the wires with Young as alleged herein.

## FACTUAL BACKGROUND COMMON TO ALL COUNTS

13.    Sometime in 2018, Young became aware of Tesla's electric vehicles and in particular the company's representaion that they could be ordered with what Tesla labeled "Full Self-Driving Capability."

14.    According to the Merriam Webster Dictionary, the adjective "full" means "lacking restraint, check, or qualification" or "not lacking in any essential[,]" e.g., "in *full* control of your senses" or, in the instant case, *Full* Self-Driving Capability.[7]  The adjective "self" means "of the same kind … as something with which it is used[,]" e.g., "*self* trimming" or, in the instant

---

[6] The first 2019 Model 3 that Young ordered was delivered by Tesla within Sandoval County damaged, missing a body panel over 36" wide, and in a condition the company characterized as unsafe to drive.  Young returned the vehicle per Tesla's instructions and ordered a second 2019 Model 3, which he agreed to pick up at the closest dealership in Littleton, Colorado to enable a safety inspection overseen by the facility's manager, Francisco Partida.

[7] The Merriam Webster Dictionary's definition of "full" is available online at: https://www.merriam-webster.com/dictionary/full?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (emphasis added)

Exhibit A

case, "Full *Self*-Driving Capability."[8]   The adjective "capable" means "having attributes ... required for performance or accomplishment" of a task, e.g., "*capable of* intense concentration" or, in the instant case, *capable of* full self-driving or "Full Self-Driving *Capability*."[9]

15.    A plain language reading of the term Full Self-Driving Capability thus reveals that Tesla deliberately named the optional feature to mislead prospective customers like Young to believe that it was equivalent to SAE *automated* driving, whereby "[y]ou <u>are not</u> driving when these automated driving features are engaged - even if you are seated in 'the driver's seat'":[10]



---

[8] The definition of "self" is available online at: <u>https://www.merriam-webster.com/dictionary/self</u> (emphasis added)

[9] The definition of "capable" is available online at: <u>https://www.merriam-webster.com/dictionary/capable</u> (emphasis added)

[10] The SAE driving automation criteria are available at: <u>https://www.sae.org/news/press-room/2018/12/sae-international-releases-updated-visual-chart-for-its-"levels-of-driving-automation"-standard-for-self-driving-vehicles</u>

**Exhibit A**

16.     However, as alleged in detail below, Tesla fraudulently represented via the wires during 2019, and successfully misled Young to believe that: (i) Full Self-Driving Capability *was* an autonomous self-driving system equivalent to SAE *Level 4 or 5* automated driving; and (ii) was *certain* to be delivered as an automatic software update before the end of 2019.

17.     On the day that Young responded to Tesla's solicitation via the wires on the company's interactive website and ordered his 2019 Model 3, remitting a credit card deposit of $2,500 that Tesla received via its interactive website, the wires, and federally regulated banking institutions, Tesla's Model 3 ordering page contained substantially the same representation repeatedly made by CEO Musk that Full Self-Driving Capability was "coming later this year."

18.     A plain language reading of Full Self-Driving Capability as equivalent to SAE automated driving and Tesla's repeated, imperative, specific representations in 2019 about the feature's efficacy and its certain delivery before year's end were collectively intended to mislead, and did in fact mislead Young to believe that the feature *was* available at the time of his order, *was* equivalent to SAE *Level 4 or 5* automated driving, and *would be* delivered before year's end.

19.     Young would not have purchased a 2019 Model 3 at all but for his reasonable and justifiable reliance on Tesla's repeated, highly specific, and imperative representations about the efficacy of Full Self-Driving Capability, and about its certain delivery before the end of 2019.

20.     Tesla did not disclose to Young during 2019 that:

(i) it intended to keep Young's $60,100 indefinitely regardless of whether: (a) it had actually developed Full Self-Driving Capability; (b) it could in fact deliver Full Self-Driving Capability as an automatic software update to Young's 2019 Model 3 as promised by December 31, 2019; and (c) Young requested a refund when Tesla failed to timely deliver a 2019 Model 3 equipped with Full Self-Driving Capability;

(ii) CEO Musk's repeated, highly specific, public representations about the feature's equivalence to SAE Level 4 or 5 automated driving were false; or that

(iii) Tesla knew it *had not* actually developed and *could not* deliver a Model 3 with *any* level of SAE automated driving by December 31, 2019.

21.     On January 1, 2020, after it failed to perform as promised, Tesla continued to conceal the above facts and others alleged herein to further its fraudulent embezzlement scheme.

22.     In furtherance of its fraudulent scheme to embezzle $60,100 from Young, Tesla committed the acts and omissions alleged herein via the wires, and deliberately, recklessly, and in bad faith misled Young to believe that:

(i) as a plain language reading of the term implies and as CEO Musk repeatedly represented in highly specific and imperative language as alleged herein, Full Self-Driving Capability was equivalent to SAE Level 4 or 5 automated driving;

(ii) Tesla production vehicles manufactured after a specific date, such as Young's 2019 Model 3, would come fitted with all computer hardware and other equipment necessary to enable Full Self-Driving Capability; and

(iii) the only internal obstacle to fulfilling Tesla's promise to deliver Full Self-Driving Capability as an automatic software update by December 31, 2019 was final refinements to Tesla's proprietary software, which CEO Musk represented via the wires in highly specific and imperative language was certain to be complete by year's end.

23.     When accepting Young's money, Tesla did not disclose that: (i) it *had not* developed and *could not* deliver *any* level of SAE automated driving by year's end; or (ii) that by year's end Full Self-Driving Capability would remain an SAE Level 2 *driver-support* feature.

24.    To the contrary, CEO Musk represented publicly via the wires in a February 19, 2019 interview with the money management firm ARK Invest, a major Tesla investor, that:

> *I think we will be 'feature-complete' on full self-driving this year,* **meaning** *the car will be able to find you in a parking lot, pick you up, take you all the way to your destination* **without an intervention this year**. *I am* **certain** *of that. That* **is not** *a question mark.*[11]

25.    The significance of CEO Musk's highly specific and imperative language for Tesla's culpable mental state in defrauding Young is at least sevenfold.  First, under SAE's criteria, the capability to drive "all the way to your destination without an intervention" is a defining characteristic of *Level 4 and 5* automated driving and *not* Level 3 automated driving:



---

[11] The Ark Invest podcast is available at: https://ark-invest.com/podcast/on-the-road-to-full-autonomy-with-elon-musk/ (emphasis added)

11

26.     Second, CEO Musk has a bachelor of arts degree in physics from the University of Pennsylvania.  By February 19, 2019, CEO Musk had extensively discussed Full Self-Driving Capability and the criteria for each level of SAE driving automation with Tesla's engineers and lawyers.  CEO Musk was intimately familiar with those criteria and he knew that Full Self-Driving Capability *could not* satisfy them.  Without question, CEO Musk knew on or before December 31, 2019 that: (i) Full Self-Driving Capability was merely an SAE *Level 2 driver-support* system; and (ii) his public representations to the contrary during 2019 were false.

27.     Third, as Tesla's CEO and as a member of its Board of Directors, Musk had a duty to explain to the Board, and he did in fact explain the significance of the respective levels of SAE driving automation for his highly specific, imperative, public representations on behalf of Tesla on February 19, 2019 concerning: (i) the efficacy of Full Self-Driving Capability—specifically, its purported ability to "take you all the way to your destination *without an intervention*"; and (ii) the company's "certain" delivery of that particular level of functionality—namely, SAE *Level 4 or 5* automated driving— "this year," or by December 31, 2019.[12]

28.     Fourth, despite the above knowledge, Tesla fraudulently, recklessly, and in bad faith decided not to publicly disavow the company's highly specific, imperative, and false public representations about the efficacy and "certain" delivery of the feature by the end of 2019.  To the contrary, Tesla reinforced and expanded on those false representations publicly and via the wires, as reported in the *Arkansas Democrat-Gazette*:

> "[i]n April 2019, when cash was short at Tesla, [CEO] Musk said 1 million fully autonomous robotaxis would be on the road by the end of 2020, making money for their owners. A few weeks later, Tesla sold $3 billion worth of Tesla stock, solving its cash crunch."[13]

---

[12] *Ibid.* (emphasis added)

[13] The March 14, 2021 *Gazette* article is available online at:
https://www.arkansasonline.com/news/2021/mar/14/teslas-stories-said-diverge-over-fully-self-drivin/

29.     Fifth, the Board of Directors was made aware during 2019 through CEO Musk's public representations and through Tesla's internal communications—including without limitation CEO Musk's statements to the Board and the advice of Tesla's lawyer who advised it on state and federal regulatory regimes, Associate General Counsel Eric Williams—of the same things that CEO Musk knew when he made the highly specific, imperative, public representations alleged herein: namely, that Full Self-Driving Capability *was not* equivalent to *any* level of SAE automated driving and was in fact an SAE *Level 2 driver-support* feature.

30.     Sixth, Tesla thus knew during 2019 that Full Self-Driving Capability as it had been characterized via the wires on Tesla's website and by CEO Musk—specifically, as an SAE Level 4 or 5 automated driving system—*did not exist and could not be delivered by year's end.*

31.     Finally, CEO Musk, the respective members of the Board of Directors, attorney Williams, and each of them, were acting within the course and scope of their employment at all times material to Tesla's representations, solicitations, and transaction with Young, and their acts and omissions were fairly and naturally incidental to the business Tesla assigned to them and were done while engaged in Tesla's business with the view of furthering Tesla's interests as alleged herein.  In short, Tesla deliberately, recklessly, and wantonly lied about the core facts purporting to justify its solicitation and acceptance via the wires and federally regulated banking institutions of the $60,100 Young paid the company for a 2019 Model 3 featuring Full Self-Driving Capability.  At a bare minimum, Tesla rataified, accepted, or acquiesced to the bad faith, false, and fraudulent acts and omissions alleged herein, and which misled and damaged Young.

32.     Notwithstanding Tesla's knowledge that its specific, imperative, public representations on the efficacy and "certain" delivery of Full Self-Driving Capability by year's end were false, Tesla's fraudulent representations became even more specific and concrete.  For

instance, CEO Musk tweeted on December 19, 2019 that Tesla's software—which he stated on February 19, 2019 was "certain" to make Full Self-Driving Capability equivalent to SAE Level 4 or 5 automated driving by December 31st—merely "[n]eeds *a few more days* of validation[.]"[14]

33.    The *Gazette* revealed still more evidence of Tesla's culpable mental state in furthering its fraud and embezzlement scheme.  Three hundred sixty-two days after the company failed to deliver *any* level of SAE automated driving by December 31, 2019, Tesla responded to a California Department of Motor Vehicles query about why it had *not even applied for* a driverless vehicle test permit, as several of its competitors had done.

34.    In a December 28, 2020 letter, Tesla Associate General Counsel Eric Williams revealed to California DMV that "*neither* Autopilot *nor* FSD [Full Self-Driving] *Capability* is an autonomous system[,]" and further revealed that "*we do not expect* significant enhancements" that would render Tesla production vehicles capable of autonomous self-driving.[15]

35.    Over two months later, during a March 9, 2021 teleconference with California DMV employees and Tesla representatives including attorney Williams, Tesla revealed that Full Self-Driving Capability *still* remained "firmly" an SAE *Level 2 driver-support* system.[16]

36.    Tesla's above admissions reveal its culpable mental state during 2019 for at least the following reasons:

(i) if Tesla knew as late as March 9, **2021** that it could not improve Full Self-Driving Capability sufficiently to elevate it above an SAE **Level 2 driver-support** feature,

---

[14] The Ark Invest podcast is available at: https://ark-invest.com/podcast/on-the-road-to-full-autonomy-with-elon-musk/ (emphasis added).  Musk's tweet is available at: https://electrek.co/2019/12/19/tesla-full-self-driving-more-games-holiday-update/ (emphasis added)

[15] The *Gazette* article is available online at: https://www.arkansasonline.com/news/2021/mar/14/teslas-stories-said-diverge-over-fully-self-drivin/ (emphasis added)

[16] The public records request containing the California DMV documents referenced herein is available online at: https://www.plainsite.org/documents/28jcs0/california-dmv-tesla-robotaxi--fsd-notes/

then CEO Musk's claim on December 19, **2019** that Full Self-Driving Capability merely "[n]eeds a few more days of validation" to be equivalent to SAE *Level **4 or 5 automated driving*** was false, calculated to deceive and thereby further Tesla's fraudulent scheme;

(ii) if on December 28, **2020** Tesla *had not even applied* to receive regulatory approval of Full Self-Driving Capability *as an SAE automated driving system*, then regulatory approval of Tesla's approach to achieving *any* level of SAE automated driving *was not pending at any time* in **2019**, as the company had fraudulently implied through a combination description and disclaimer crafted by attorney Williams discussed below, and which was calculated to deceive and to further Tesla's fraudulent scheme; and

(iii) because Tesla knew that objective scrutiny by the California DMV would expose the feature as merely an SAE *Level 2 driver-support* system, Tesla's decision not to apply for a driverless vehicle test permit during **2020** was calculated to deceive and further Tesla's fraudulent embezzlement scheme—as was any legal counsel which Tesla received discouraging an application on the ground that an evaluation by the California DMV might expose the company's representations and promises as false or misleading.[17]

37.    Tesla's culpable mental state in defrauding Young is laid bare by the fact that Tesla's 2020 and 2021 responses to California DMV did not reflect recent or unexpected revelations. As alleged herein, at least as early as when Young ordered his 2019 Model 3, but with increasing certainty as the year unfolded, Tesla's engineers had demonstrated through their efforts that Full Self-Driving Capability was an SAE *Level 2 driver-support* feature and could not satisfy the requirements for *any* level of SAE *automated* driving. Tesla deliberately

---

[17] Any such legal advice is admissible to the jury under the crime-fraud exception to the attorney-client privilege. *See e.g. State of New Mexico v. Deutsch*, 1985-NMCA-123, 103 N.M. 752, 713 P.2d 1008.

concealed the truth and made repeated, specific, imperative, and false affirmative representations to further its fraudulent scheme to obtain and unlawfully embezzle Young's money.

38.     Instead of rewarding employees who had the integrity to question Tesla's false representations in internal communications, Tesla diminished their roles, some were fired, and still others resigned—such as the executive Stuart Bowers, who left the company after CEO Musk effectively displaced him from spearheading Tesla's automated self-driving efforts.[18]

39.     Tesla thus labored to effectively disappear, diminish, or muzzle any credible internal source of information that might reveal its engineering failures and its scheme to: (i) fraudulently induce Young to order a vehicle with the non-existent, optional feature and pay the company $60,100; and (ii) after failing to deliver Full Self-Driving Capability on December 31, 2019, to refuse to return and instead unlawfully embezzle Young's money via the wires.

40.     When he entered into the Agreement with Tesla, acting in justifiable and detrimental reliance on the company's misleading, fraudulent, and bad faith affirmative representations and material omissions alleged herein, Young paid the company $60,100 via the wires and federally regulated banking institutions in exchange for a 2019 Model 3 with Full Self-Driving Capability, which Tesla represented would by December 31, 2019 enable the vehicle to drive itself through traffic without any intervention by Young, as a plain language reading of the term implies, and as the SAE's criteria for Level 4 and 5 automated driving provide.

41.     As regards the availability and efficacy of Full Self-Driving Capability for which Young paid Tesla $60,100 in valuable consideration, the Agreement—which Tesla solicited, executed, and delivered to Young via the wires in the ordinary course of its business activities within New Mexico—states that Young's 2019 Model 3 "is priced and configured based on

---

[18] An *Electrek* article outlining related events is available online at: https://electrek.co/2019/08/21/tesla-head-autopilot-software-leaves-restructuring/

Exhibit A

features and options *available at the time of order*" and it expressly provides that $6,000 of the valuable consideration was in exchange for "Full Self-Driving Capability." Exhibit A (emphasis added)

42.    On the morning that Young retrieved his 2019 Model 3 following the safety inspection at Tesla's dealership in Littleton, Colorado, the company's website contained substantially the same, specific representation that the company and CEO Musk had repeatedly made publicly via the wires to that point: namely, that Full Self-Driving Capability would be delivered via the internet as an automatic software update to Young's vehicle "later this year" or language substantially to that effect.

43.    Substantially the same representation was repeated verbally to Young by the manager of Tesla's Littleton, Colorado dealership, Francisco Partida, whom Tesla had charged with ensuring the vehicle's safety before it was released to Young, whereupon Partida excitedly extolled the 2019 Model 3's features, pointedly including Full Self-Driving Capability.

44.    At no time did anyone at the Colorado dealership disclose to Young what Tesla's engineers had demonstrated through their efforts, what Tesla had consulted its lawyers about, and what the company unquestionably knew during 2019: namely, that contrary to what Tesla repeatedly represented in highly specific and imperative language via the wires, and contrary to what a plain language reading of the term implies, Full Self-Driving Capability *was not* equivalent to *any* level of SAE *automated* driving and *could not* be delivered by year's end.

45.    Instead, throughout 2019 and with increasing specificity and feigned conviction, Tesla repeatedly represented publicly and via the wires substantially the same reckless, false, and deliberately misleading representations that it had made when soliciting and receiving Young's $60,100: namely, that Full Self-Driving Capability *was* an autonomous self-driving system

17

equivalent to SAE Level 4 or 5 automated driving, and *would be* delivered as an automatic software update "later this year" or "before the end of the year."

46.    Instead of revealing to Young that Full Self Driving Capability *was not* equivalent to *any* level of SAE automated driving and *could not* be delivered by December 31, 2019, Tesla deliberately concealed those facts to further its fraudulent scheme to induce Young to purchased a 2019 Model 3 and to embezzle Young's $60,100, which Tesla did in fact embezzle via the wires and federally regulated banking institutions as alleged herein.

47.     Young is not a shareholder of Tesla stock.  Tesla did not solicit from Young a no-interest loan of indefinite duration for $60,100 to research, develop, and deliver a car capable of SAE automated driving at some indefinite point in the future.   Instead, Young responded to Tesla's solicitation to pay the company $60,100 as valuable consideration in exchange for receiving a 2019 Model 3 equipped with a specific option by December 31, 2019—a date certain that was selected unilaterally by Tesla and without any opportunity for negotiation by Young.

48.    The click-through safety disclaimer to which a driver must agree when enabling autonomous self-driving on a Tesla vehicle identifies the software as a Beta version but *does not* purport to transform the Agreement into a research-and-development loan of indefinite duration, and *cannot* foreclose Young's legal and equitable rights to demand the return of his money if Tesla failed to perform by the end of 2019, as Tesla secretly knew that it would and labored to fraudulently conceal from Young both before and after its failure on December 31, 2019.

49.    Before entering into the Agreement on May 20, 2019, Tesla solicited Young via the wires on its website and through the representations of CEO Musk to pay the company $60,100 in exchange for a car equipped with a specific product that Tesla labeled Full Self-

Driving Capability, and Young acted in justifiable and detrimental reliance on the company's public, highly specific, imperative, and repeated representations that:

(i) the product *was* an autonomous self-driving system equivalent to SAE Level 4 or 5 automated driving, as a plain language reading of the term implies and as CEO Musk specifically represented on numerous occasions including but not limited to during February, April, November, and December of 2019 as alleged herein;

(ii) Young's 2019 Model 3 *would* come with all computer hardware and other equipment necessary to enable Full Self-Driving Capability and thereby achieve SAE Level 4 or 5 automated driving;

(iii) Full Self-Driving Capability *was* "available at the time of order[,]" Exhibit A;

(iii) SAE Level 4 or 5 automated driving *would be* delivered by the end of 2019 as CEO Musk had promised in specific and imperative language: "*I am **certain** of that. That **is not** a question mark.*"[19]

50.     An integral part of Tesla's fraudulent embezzlement scheme was a misleading, hybrid description and disclaimer for Full Self-Driving Capability crafted by or with the counsel of in-house attorney Williams, shown below in its March 6, 2019 iteration on the eve of Young's purchase:

---

[19] The Ark Invest podcast is available at: https://ark-invest.com/podcast/on-the-road-to-full-autonomy-with-elon-musk/ (emphasis added)

# Full Self-Driving Capability

All new Tesla cars have the hardware needed in the future for full self-driving in almost all circumstances. The system is designed to be able to conduct short and long distance trips with no action required by the person in the driver's seat.

All you will need to do is get in and tell your car where to go. If you don't say anything, the car will look at your calendar and take you there as the assumed destination or just home if nothing is on the calendar. Your Tesla will figure out the optimal route, navigate urban streets (even without lane markings), manage complex intersections with traffic lights, stop signs and roundabouts, and handle densely packed freeways with cars moving at high speed. When you arrive at your destination, simply step out at the entrance and your car will enter park seek mode, automatically search for a spot and park itself. A tap on your phone summons it back to you.

The future use of these features without supervision is dependent on achieving reliability far in excess of human drivers as demonstrated by billions of miles of experience, as well as regulatory approval, which may take longer in some jurisdictions. As these self-driving capabilities are introduced, your car will be continuously upgraded through over-the-air software updates.

51.     The description and disclaimer's carefully crafted language, which Tesla would adjust as the months passed to further its fraudulent embezzlement scheme, was deliberately calculated to deceive and to thereby accomplish multiple specific objectives:

(i) befuddle, lull into complacency, and thus prevent Young from discovering that he had been defrauded and that Tesla plotted to unlawfully refuse to return, and thus to embezzle, his money;

(ii) manufacture a plausible explanation for what Tesla knew would be its failure to deliver Full Self-Driving Capability as promised by December 31, 2019, thereby delaying or avoiding altogether demands for refunds from New Mexicans like Young,

Exhibit A

and delaying or avoiding the initiation of criminal investigations and grand jury indictments until the statute of limitation applicable to each discrete felony had expired;[20]

(iii) delay or avoid the per annum costs projected by Tesla risk managers and lawyers of: (a) defending and paying judgments in civil actions such as this one; (b) enforcing non-disclosure agreements with current and former employees whose testimony would expose Tesla's engineering failures, related fraud, and culpable mental state; (c) defending lawsuits and paying for damages to the person or property of Tesla customers or third-party claimants whose insurance carriers presented subrogation claims arising from auto collisions; or (d) defending Tesla, CEO Musk, and other Board of Directors members or employees charged as individual defendants in criminal proceedings and indemnifying them for fines, restitution, and bail bonds;

(iv) maintain the public's suspension of disbelief in the company's reckless, fraudulent, and bad faith promises, thereby preserving through deception the company's goodwill in the market and enabling CEO Musk's efforts to trigger and sustain a multi-billion dollar buying spree of the company's publicly traded stock—of which Musk and certain Board of Directors members were among the largest shareholders—whose value Tesla plotted to and did in fact artificially inflate through its fraudulent representations about the efficacy and imminent delivery of Full Self-Driving Capability in 2019;

(v) avoid the undercapitalization that Tesla faced in 2019, and which Tesla knew would result if its fraudulent embezzlement scheme were discovered; and

(vi) transform the company's promise to deliver a specific product by a date certain into a moving target in *both temporal and qualitative senses*.

---

[20] In New Mexico, embezzling money in the amount of $60,100 is a second-degree felony charged by grand jury indictment, and is subject to a four-year statute of limitations.  NMSA 1978 § 30-16-8(F)

52.    As to the latter objective, Tesla plotted to make the single most compelling aspect of owning a Tesla—a car that would drive itself—*less* definite and *more* intangible the closer it was scrutinized, until *both the definition and reality* of Full Self-Driving Capability vanished into the ether, together with the $60,100 that the company fraudulently solicited and obtained from Young, and then embezzled via the wires and federally regulated banking institutions, in violation of numerous state and federal criminal statutes.

53.    Tesla's culpable mental state is demonstrated by subtle adjustments to the language of the disclaimer, made in furtherance of the company's fraudulent scheme to obtain and embezzle Young's money.   Tesla thereby duped Young into sympathizing with the company's feigned inability to deliver a non-existent feature that it had fraudulently led him to believe it *had in fact* developed and *would in fact* deliver by December 31, 2019, as CEO Musk had repeatedly represented in highly specific and imperative language during 2019.

54.    With the new iteration of the disclaimer, Tesla thus implied that it was not *the company's* failure to develop Full Self-Driving Capability that had prevented its promised delivery by December 31, 2019.   Instead, Tesla duped customers into blaming sluggish *government regulators* for preventing delivery of the vaporous feature.  Through that deception, Tesla dodged a billion dollar avalanche of refund demands and perilous undercapitalization:

> The *activation* and use of these features are dependent on achieving reliability far in excess of human drivers as demonstrated by billions of miles of experience, *as well as regulatory approval,* which may take longer in some jurisdictions.[21]

55.    Tesla thus changed the implied actor in the disclaimer's passive language, which in March of 2019 referred to <u>*a customer's*</u> "*use of* these features without supervision[,]" to the

---

[21] Tesla's ordering page for the Model 3, on which the above language appeared in June of 2021, is available online at: <u>https://www.tesla.com/model3/design#overview</u> (emphasis added)

Exhibit A

new language, which referred to *Tesla's* "activation . . . of these features" once "regulatory approval" was finally granted.

56.    Tesla's semantic sleight-of-hand was thus intended to further its fraudulent embezzlement scheme by:

(i) misleading Young to believe that Tesla *had in fact applied for* regulatory approval, which therefore *was in fact pending*; thus

(ii) misleading Young to believe that a government agency was depriving *Tesla* of the opportunity to prove the efficacy of—and receive permission to "activate"—a feature that it *had in fact successfully developed*; which in turn would

(iii) prevent Young from realizing that the company's claims about Full Self-Driving Capability and government foot-dragging were lies; and thereby

(iv) delay or avoid altogether Young's demand to return his $60,100.

57.    The truth which Tesla worked to conceal, and which the *Gazette* exposed in March of 2021, is that *twenty months after* it entered into the Agreement, fraudulently promised to deliver Full Self-Driving Capability before the end of 2019, and fraudulently implied in the disclaimer that sluggish government regulators were preventing it from fulfilling its promise, *Tesla had not even initiated the approval process* by applying for a driverless vehicle test permit.

58.    Tesla's culpable mental state in furthering its fraudulent scheme becomes unmistakable in light of Tesla's admission that Full Self-Driving Capability remained "firmly" an SAE *Level 2 driver-support* feature as of March 9, **2021**. In short, Tesla had not even applied for a driverless vehicle test permit by December 28, **2020** because CEO Musk and Associate General Counsel Williams had advised the company about four disastrous implications of subjecting Full Self-Driving Capability to an objective and transparent evaluation by the

California DMV—a regulatory agency which CEO Musk and attorney Williams knew would apply the SAE's automated driving standards.

59.    The first implication was that subjecting the system to an objective and transparent evaluation by the California DMV would have revealed that Full Self-Driving Capability was not even equivalent to an SAE *Level 3* "traffic jam chauffeur":



60.    The second, related implication was that if the California DMV had revealed that what the company labeled "Full Self-Driving Capability" could not satisfy even the *entry-level* category of SAE automated driving *in 2020*, then CEO Musk's highly specific and imperative public representations about the feature's equivalency to SAE *Level 4 or 5* automated driving and its "certain" delivery *in 2019* would have been exposed for what they were: lies, calculated to dupe customers into paying Tesla $60,100 in exchange for a car that Tesla knew *would not* be able to drive itself through traffic without an intervention by December 31, 2019.

24

61.     The third implication was the financial risk of exposing the truth to the highly competitive international automotive market, which is difficult to overstate even if limited by way of example to the state of California.  The Alternative Fuels Data Center reports that by June of 2020, California had 425,300 electric vehicles registered, or 42 percent of all such registrations in the United States.[22]  If one quarter of those vehicles were Teslas, and just half of California Teslas were ordered with Full Self-Driving Capability, then by June of 2020 Tesla would have fraudulently solicited $3.2 billion in exchange for what it pretended were self-driving cars in that state alone:

425,300 / 4 = 106,325

106,325 / 2 = 53,162.5

53,162 * $60,100 = $3,195,036,200

62.     The Fourth implication was the risk that the United States Department of Justice and the Securities and Exchange Commission might investigate and charge the company with misleading its investors, as indeed has occurred with several electric vehicle startups.[23]

63.     Perhaps the most ironic evidence of Tesla's culpable mental state is that the company configured its software to help dupe automotive technophiles like Young into believing that what Tesla had released was *at least* equivalent to SAE Level 3 automated driving. Tesla accomplished this deception by programming the software to exhibit a defining characteristic of that level.  Specifically, "[w]hen the feature requests", a human "must drive" instead of the system itself:

---

[22] The Alternative Fuels Data Center spreadsheet may be downloaded at: https://afdc.energy.gov/data/10962

[23] CNBC's recent reporting on DOJ and SEC investigations of three electric vehicle startup is available online at: https://www.cnbc.com/2021/08/02/nikola-founder-criminal-charges-puts-other-spacs-on-notice.html

Exhibit A



64.    Accordingly, the software that Tesla released in **2019** to Young's 2019 Model 3 would request—through an auditory signal and colorful depiction of a steering wheel—that the driver must "take over immediately."  But according to the SAE's criteria, that is a defining characteristic of SAE *Level 3 automated driving*—which, as Tesla admitted to the California DMV in December of **2020**, *it had not achieved*.

65.    Tesla thus added the steering wheel graphic and audible signal to the self-driving software it released to the fleet during 2019 in order to mislead Young to believe—and Tesla did in fact mislead Young to believe—that its engineers had crossed the hugely significant boundary from SAE *driver-support* systems into the realm of SAE *automated driving* systems.

66.    The subtle way in which that false impression furthered Tesla's fraudulent embezzlement scheme thus becomes clear: convincing customers that Tesla's engineers had

accomplished SAE *Level 3* automated driving would make CEO Musk's representation that the delivery of SAE *Level 4 or 5* automated driving before the end of 2019 was "certain" and "not a question mark" seem plausible.[24]  Misled by Tesla's subtle technological ruse, tens of thousands of new customers would shell out $60,100 each for cars with the non-existent feature, while existing customers like Young would remain sufficiently befuddled and unsure so as to refrain from demanding refunds or, if they eventually did so and Tesla refused to comply, to refrain from contacting state or federal authorities to initiate criminal investigations.

67.    Also in furtherance of Tesla's fraudulent embezzlement scheme were CEO Musk's representations that the company not only continuously gathered data from the fleet, but that its artificial intelligence engineers had *designed and implemented* a method of computerized analysis and automatic dissemination back to the fleet of lessons learned from that data.  Tesla dubbed this its "neural network" approach.[25]

68.    Tesla thus represented via the wires through sophisticated graphics on its website and CEO Musk's related remarks that the company's artificial intelligence engineers had figured how to transform the myriad, real-world challenges that *some* of its electric vehicles encountered at various locations around the world—and which those vehicles were initially *unable* to safely negotiate—into software updates that would render *all* Tesla vehicles *able* to safely negotiate them.  The heady implication of CEO Musk's representations was that Tesla's electric vehicles were, in effect, collectively learning on an almost organic level, like some geographically far-flung but interconnected cybernetic brain.

---

[24] The Ark Invest podcast is available at: https://ark-invest.com/podcast/on-the-road-to-full-autonomy-with-elon-musk/ (emphasis added)

[25] Some of Tesla's related representations are available online at: https://www.tesla.com/autopilotAI

69.    Once again, the truth was very different.  As alleged in greater detail below, as of December 31, 2019, Young's 2019 Model 3 could not negotiate some of the most basic and predictable challenges that human drivers have faced since the First Model T Ford was released in 1908, such as operating in heavy rain or heading into the setting sun. The 2019 Model 3's vision-centered system also could not distinguish between inanimate objects and living creatures immediately behind it—like a bike rack versus a pedestrian—or in front of it—like a ball rolling from between parked cars versus a dog or a toddler scrambling after a cherished toy.

70.    Assuming that Tesla's representations about its artificial intelligence breakthrough were true, the logical deduction from the above facts is that no Tesla vehicle anywhere in the world had encountered heavy rain or a setting sun during 2019.  That is a practical impossibility, the elimination of which leaves only two possible scenarios: either Tesla's representations about its artificial intelligence breakthrough during 2019 were lies transmitted via the wires in furtherance of its fraudulent embezzlement scheme, or Tesla's representations during 2019 about the efficacy of Full Self-Driving Capability were lies transmitted via the wires in furtherance of the same fraudulent scheme.

71.    Based on Tesla's public representations, the more likely alternative is that both of the above scenarios are true.  As of June 2021, Tesla was, via its website, publicly soliciting resumes from software engineers to help it design automated self-driving software equivalent to SAE Level 4 or 5 automated driving that:

(i) CEO Musk represented on February 19, 2019 was "certain" to be delivered by December 31, 2019;

(ii) CEO Musk claimed in April 2019 would enable a fleet of fully automated robotaxis by the end of 2020;

28

(iii) CEO Musk claimed on December 19, 2019 merely "[n]eeds a few days of validation" to be complete; but which

(iv) Tesla Associate General Counsel Eric Williams revealed to the California DMV on December 28, 2020 *did not yet exist* and *was not* anticipated;

(v) Tesla informed the California DMV on March 9th of this year that it *cannot* deliver during 2021; but which

(vi) Tesla *continues* to fraudulently, recklessly, and in bad faith claim on its Model 3 ordering page and in furtherance of its ongoing unlawful embezzlement scheme is "coming later this year."[26]

72.    Early in 2021, Young alerted Tesla via emails sent to its employees, including the Colorado dealership manager Partida and attorney Williams, that the company had failed to deliver Full Self-Driving Capability as promised before the end of 2019.  Young informed Tesla that it was in breach of the Agreement and its promises to deliver the feature, and requested a compromise refund of the $6,000 that he had paid the company in May of 2019 in exchange for receiving Full Self-Driving Capability by the end of 2019.

73.    Neither the Colorado dealership manager Partida nor attorney Williams answered Young's emails. Instead, a Tesla employee whose job title was not revealed to Young, Antoinette Scrosoppi, eventually responded via telephone and email, inquiring of Young during a phone call, "why are you dissatisfied with Full Self Driving?"

74.    Young responded that, among other things, his 2019 Model 3 could not consistently navigate many of the simplest intersections in Albuquerque.  Specifically, Young

---

[26] Tesla's related solicitations are available online at: https://www.tesla.com/autopilotAI and https://www.tesla.com/careers/search/job/senior-softwareengineeraidatainfra-44733 and https://www.tesla.com/careers/search/job/autopilot-deeplearningengineer-scientist-48414. Tesla's representation that Full Self-Driving Capability is coming "later this year" is available at: https://www.tesla.com/model3/design#overview

informed Scrosoppi that the vehicle had on numerous occasions tried to steer him into median strips and concrete barriers, that it had tried to steer him around a median strip and the wrong way into oncoming traffic (an incident that occurred two blocks from a local high school), and that it routinely braked violently without warning and for no apparent reason, thus endangering Young, other motorists, cyclists, and pedestrians.  Young related that by no means could his 2019 Model 3 be considered capable of autonomous self-driving, as Full Self-Driving Capability had been repeatedly represented by Tesla, as a plain-language reading of the term implies, and which the company had promised to deliver as an automatic software update by December 31, 2019.

75.     Scrosoppi promised during the phone call, which Young memorialized in emails on which Tesla Associate General Counsel Eric Williams was copied, that she would inquire with "her team" whether Tesla would abide Young's request for a compromise refund of the $6,000 that he had paid to receive Full Self-Driving Capability by December 31, 2019.

76.     After a delay of several weeks, Scrosoppi informed Young in an April 29, 2021 email, which Young forwarded to Associate General Counsel Williams, that Tesla refused to refund Young's money tendered roughly two years earlier via the wires and federally regulated banking institutions.  Scrosoppi purported to justify Tesla's refusal to return Young's $6,000 by stating that "Full Self Driving *functionality* continues to pend regulatory approval," notwithstanding that:

(i) Scrosoppi had pointedly solicited an account of Young's experience with Full Self-Driving *Capability*, the specific product that Tesla had pretended to have actually developed in order to fraudulently induce Young to purchase his 2019 Model 3;

(ii) Tesla solicited and received from Young $60,100 to deliver a Model 3 equipped with Full Self-Driving *Capability* "before the end of the year", and which CEO Musk represented on December 19, 2019 was complete, save for "a few more days of validation";[27]

(iii) CEO Musk had promised on February 19, 2019 to deliver Full Self-Driving *Capability*, which he characterized as equivalent to SAE Level 4 or 5 automated driving, by the end of 2019, stating: "*I am certain of that. That is not a question mark*[;]"[28]

(iv) attorney Williams had crafted and adjusted Tesla's hybrid description and disclaimer discussed above to fraudulently and recklessly mislead Young to believe that regulatory approval of Full Self-Driving *Capability* was in fact pending during 2019; and

(v) When forced on December 28, 2020 to explain to California DMV on behalf of Tesla why the company *had not even requested* the agency to approve Full Self-Driving *Capability* as equivalent to *any* level of SAE automated driving, Williams revealed in response that "neither Autopilot nor *FSD* [Full Self-Driving] *Capability* is an autonomous system."[29]

77.    Acting on attorney Williams' advice and counsel, Scrosoppi thus substituted the adjective "functionality" for the adjective "capability" in an attempt to distance Tesla from its own highly specific and public representations, and from the plain-language meaning of the term "Full Self-Driving Capability" discussed throughout this complaint, a term which Tesla holds out

---

[27] Musk's tweet is available at: https://electrek.co/2019/12/19/tesla-full-self-driving-more-games-holiday-update/

[28] The Ark Invest podcast is available at: https://ark-invest.com/podcast/on-the-road-to-full-autonomy-with-elon-musk/ (emphasis added)

[29] The *Gazette* article is available online at: https://www.arkansasonline.com/news/2021/mar/14/teslas-stories-said-diverge-over-fully-self-drivin/ (emphasis added)

as its trademark for the optional feature that it fraudulently solicited Young to purchase for $6,000 in 2019.

78.    By substituting the adjective "functionality" for the adjective "capability", by withholding the information alleged throughout this Complaint, and by rejecting Young's compromise offer that Tesla return the $6,000 that it had fraudulently solicited and received from Young via the wires for a product that the company *knew* it had not developed, *knew* it would fail to deliver as promised by December 31, 2019, and which the company *did in fact* fail to deliver, Tesla:

> (i) breached the company's promises made in the Agreement and via the wires;

> (ii) violated established community standards of decency in New Mexico;

> (iii) was unjustly enriched by wrongfully retaining Young's $60,100;

> (iv) acted in furtherance of its scheme to defraud Young and embezzle his money via the wires and federally regulated banking institutions, contrary to NMSA 1978 §§ 30-16-8 and 30-16-6, 18 U.S.C. § 1343 and 18 U.S.C. § 1956; and

> (v) did in fact fraudulently obtain $60,100 and then embezzle money from Young via the wires and federally regulated banking institutions, contrary to NMSA 1978 § 30-16-8 and 18 U.S.C. § 1343 and 18 U.S.C. § 1956.

79.    Notwithstanding having checked with "her team" about Young's demand for a refund of his money, Scrosoppi did not disclose and thus fraudulently concealed what Young would later learn from the *Gazette* reporting discussed above: namely, that attorney Williams— who was copied on and knew about Young's emails with Scrosoppi—had informed the California DMV on behalf of Tesla on December 28, 2020 and again on March 9, 2021 that Full Self-Driving Capability *was not*, in fact, equivalent to *any* level of SAE automated driving, and

that the company *could not* deliver SAE automated driving *for the third consecutive year*, contrary to its representations made publicly and via the wires.

80.     Instead, as late as April 29 2021, Tesla continued to act via the wires to conceal that material information from Young and to otherwise act in furtherance of Tesla's fraudulent scheme to obtain Young's $60,100 and to embezzle his money as alleged herein—in this last instance by:

(i) falsely implying that Tesla *had in fact* requested a New Mexico or United States governmental regulatory agency to *evaluate and approve* Full Self-Driving Capability as equivalent to SAE automated driving;

(ii) falsely implying that regulatory approval of Full Self-Driving Capability therefore *was in fact* pending; and thereby

(iii) fraudulently purporting to justify the company's wrongful and unlawful refusal to return, and instead to embezzle Young's money, which Tesla did in fact embezzle via the wires and federally regulated banking institutions, contrary to the New Mexico and United States criminal statutes cited herein.

81.     At no time before or after entering into the Agreement did anyone at Tesla disclose to Young that—far from being essentially complete on December 19, 2019 but for "a few more days of validation"—Full Self-Driving Capability had:

(i) proved incapable of operating under environmental conditions which every driver regularly encounters, such as heavy rain or driving into the setting sun;

(ii) proved incapable of distinguishing inanimate objects from pedestrians; and

(iii) *in the company's own assessment* had proved incapable of qualifying for *any* level of SAE automated driving; and *for that reason*

(iv) Tesla had decided not to apply for a driverless vehicle test permit and subject Full Self-Driving Capability to an objective and transparent evaluation by the California DMV because doing so would have exposed the feature to be an SAE Level 2 driver-support system, and thus revealed Tesla's contrary representations to be lies transmitted via the wires to further its unlawful fraudulent embezzlement scheme.

82.    Tesla concealed all of the above information in furtherance of its fraudulent scheme to induce Young to purchase the 2019 Model 3 and to then embezzle his money, contrary to the state and federal criminal statutes cited herein.

83.    When Tesla solicited Young to enter into the Agreement to purchase his 2019 Model 3 via the wires, the company did not inform Young that it intended to keep his $60,100, *regardless of* whether the company had actually developed or could deliver the feature by December 31, 2019 and *notwithstanding* Young's demand that Tesla return the payment if it failed to perform, as Tesla knew that it would.

84.    The Agreement *does not* provide that Tesla's obligation to perform upon receipt of the valuable consideration paid by Young may be delayed indefinitely absent the approval of a person or entity that is not a party to the Agreement, *or* purport to grant Tesla immunity from the United States wire fraud statute or from New Mexico's embezzlement or fraud statutes, *or* relieve the company of liability for unjust enrichment due to its refusal to refund Young's $6,000. The Agreement is solely between Young and Tesla; it does not make the United States or New Mexico a party; and it expressly provides that Young's "Vehicle is priced and configured based on features and options *available at the time of order*[.]" Exhibit A (emphasis added)

85.    Even if Tesla's contractual promise to deliver Full Self-Driving Capability were declared unenforceable by this Court because the United States or New Mexico government

*might have* withheld approval of an SAE driving automation system during 2019, Tesla: (i) would still have fraudulently solicited and received from Young $60,100 via the wires, including $6,000 for a feature that Tesla knew and fraudulently concealed *did not exist* in 2019 and *could not be delivered* by December 31, 2019, and (ii) would still have been unjustly enriched by refusing to return and instead embezzling $60,100 that it fraudulently solicited and received via the wires and federally regulated banking institutions in exchange for delivering a car with a feature it knew that it had not actually developed and could not deliver as promised.

86.     Neither Scrosoppi nor Associate General Counsel Williams identified any decision by any United States or New Mexico regulatory agency evaluating and denying a request by Tesla during 2019 to approve Full Self-Driving Capability as equivalent to *any* level of SAE automated driving, and no-one at Tesla identified any United States or New Mexico statute or regulation justifying Tesla's wrongful and unlawful refusal to return Young's money upon receiving his written demand.

87.     Among the New Mexico and United States statutes that do appear relevant to Tesla's wrongful and unlawful fraudulent embezzlement scheme alleged herein are:

(i)   NMSA 1978 § 30-16-6, which prohibits "the intentional misappropriation or taking of anything of value that belongs to another by means of fraudulent conduct, practices or representations";

(ii)  NMSA 1978 § 30-16-8, prohibiting embezzlement;

(iii) 18 U.S.C. § 1343, which prohibits "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . transmitted by means of wire, radio, or television communication in interstate or foreign commerce"

together with "any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice"; and

(ii) 18 U.S.C. § 1956 (laundering of monetary instruments obtained through, *inter alia*, wire fraud contrary to 18 U.S.C. § 1343).

88.    As of the date of this Complaint, Tesla continues via the wires to:

(i) fraudulently advertise on its website that Full Self-Driving Capability is "coming later this year";

(ii) fraudulently solicit the public in New Mexico to purchase the non-existent feature for valuable consideration;

(iii) fraudulently represent in sales agreements solicited, executed, and delivered via the wires in the course of its ordinary business activities within New Mexico, that Full Self-Driving Capability is "available at the time of order"; and

(iv) fraudulently conceal its intention to unlawfully retain and thus to embezzle a customer's payment for a vehicle equipped with Full Self-Driving Capability upon Tesla's failure to deliver the feature yet again by the end of 2021 and notwithstanding a customer's demand that the company return his or her money.

## COUNT I – BREACH OF CONTRACT

89.    All of the preceding paragraphs are incorporated in this Count as if pled herein in their entirety.

90.    On or about May 20, 2019, Tesla and Young entered into the Agreement, which provides in pertinent part that:

(i) Young's 2019 Model 3 "is priced and configured based on features and options available at the time of order[;]" and

(ii) $6,000 of the $60,100 consideration paid by Young is expressly for an optional feature called "Full Self-Driving Capability." Exhibit A

91.     As a plain-language reading of the term Full Self-Driving Capability implies, the optional feature is equivalent to SAE Level 4 or 5 driving automation, whereby a vehicle can safely drive itself through traffic without intervention by a human.

92.     Young paid Tesla the $60,100 consideration that the Agreement specifies for his 2019 Model 3 in full. Exhibit A.

93.     Tesla admitted to the California DMV in December of 2020 and again in March of 2021 that Full Self-Driving Capability remains an SAE Level 2 driver-support feature. Inescapably, therefore, Full Self-Driving Capability as equivalent to SAE Level 4 or 5 driving automation *was not* "available at the time of order" on or about May 20, 2019.

94.     Young would not have purchased a 2019 Model 3 at all but for his reasonable and justifiable reliance on Tesla's repeated, highly specific, and imperative representations about the efficacy of Full Self-Driving Capability, and about its certain delivery before the end of 2019.

95.     Because of its bad faith misrepresentations and deliberate breach of its obligation in the Agreement, Tesla is liable for $60,100 in compensatory damages, plus post-judgment interest as provided by New Mexico law. Exhibit A.

96.     Notwithstanding Tesla's deliberate and bad faith misrepresentations in the Agreement and alleged herein, Young offered Tesla a compromise to cure its breach by refunding just the $6,000 he had paid for Full Self-Driving Capability, but Tesla refused.

## COUNT II – UNJUST ENRICHMENT

97.     All of the preceding paragraphs are incorporated in this Count as if pled herein in their entirety. This Count is pled in the alternative to Count I.

Exhibit A

98.     Pursuant to the Agreement of May 20, 2019, Young paid Tesla $60,100 for a vehicle equipped with Full Self-Driving Capability, which the company fraudulently represented was "available at the time of order," and which the company, through its representations made via the wires on its website and through the public statements of CEO Musk alleged herein, promised to deliver before the end of 2019.  Exhibit A.

99.     Young would not have purchased a 2019 Model 3 at all but for his reasonable and justifiable reliance on Tesla's repeated, highly specific, and imperative representations about the efficacy of Full Self-Driving Capability, and about its certain delivery before the end of 2019.

100.     Tesla has been in possession of Young's $60,100 since May of 2019 but has failed to keep its promise to deliver a vehicle equipped with Full Self-Driving Capability by December 31, 2019, and on April 29, 2021 rejected Young's compromise demand that Tesla return just the $6,000 that the company solicited and received via the wires in exchange for the non-existent feature in order to fraudulently induce him to purchase the 2019 Model 3.

101.     Tesla informed Young on April 29, 2021 that it intends to keep his money indefinitely, pending regulatory approval by an unidentified government agency, notwithstanding that as of December 28, 2020 the company had not even applied for a driverless vehicle test permit in either California or New Mexico, and notwithstanding that Tesla informed the California DMV on that date that "we *do not expect* significant enhancements" that would render Tesla's vehicles capable of autonomous self-driving,[30] and despite Tesla's admission to the same agency on March 9, 2021 that the feature was *still* an SAE Level 2 driver-support feature and that SAE automated driving *will not* be delivered yet again in 2021.

---

[30] The *Gazette* article is available online at: https://www.arkansasonline.com/news/2021/mar/14/teslas-stories-said-diverge-over-fully-self-drivin/ (emphasis added)

102.    There is no lawful or equitable justification for Tesla's refusal to abide Young's request to return, and for its decision to instead embezzle Young's money, contrary to NMSA 1978 § 30-16-8, a payment which the company fraudulently and in bad faith solicited and received via the wires and federally regulated banking institutions contrary to NMSA 1978 § 30-16-6 and 18 U.S.C. § 1343 expressly in exchange for delivering a vehicle equipped with Full Self-Driving Capability, a feature which the company:

(i) fraudulently, recklessly, and in bad faith represented via the wires to the public including Young during 2019 *was* an autonomous self-driving system equivalent to SAE Level 4 or 5 automated driving as a plain language reading of the term implies and as CEO Musk explicitly represented as alleged herein, contrary to NMSA 1978 § 30-16-6 and 18 U.S.C. § 1343;

(ii) fraudulently, recklessly, and in bad faith represented to Young in the Agreement *was* "available at the time of order" in May of 2019 and repeatedly and explicitly represented via the wires as alleged herein *would be* delivered as an automatic software update by December 31, 2019, contrary to NMSA 1978 § 30-16-6 and 18 U.S.C. § 1343. Exhibit A;

(iii) admitted to California DMV on December 28, 2020 and again on March 9, 2021 *was not* an autonomous self-driving system and was in fact "firmly" an SAE *Level 2 driver-support* feature, while deliberately, recklessly, and fraudulently withholding the same information from Young to further its unlawful embezzlement scheme, contrary to NMSA 1978 § 30-16-6 and 18 U.S.C. § 1343; and

Exhibit A

(iv) which Tesla failed to deliver as promised, whereupon it wrongfully and unlawfully retained Young's money , contrary to NMSA 1978 § 30-16-8, and 18 U.S.C. § 1343, and 18 U.S.C. § 1956.

103.   Through its wrongful, fraudulent, and unlawful acts and omissions alleged herein, Tesla has been unjustly enriched, and Young is entitled to a judgment of $60,100 in compensatory damages, plus interest accruing since at least the time of Tesla's April 29, 2021 refusal to return Young's money, if not earlier in light of its ongoing wrongful, fraudulent, and unlawful conduct, as an equitable remedy and to avoid an unconscionable and unjust result.

## COUNT III – CIVIL CONVERSION

104.   All of the preceding paragraphs are incorporated in this Count as if pled herein in their entirety.

105.   Young paid Tesla the $60,100 consideration that the Agreement specifies for his 2019 Model 3 in full, including $6,000 expressly for Full Self-Driving Capability, an optional feature which the company recklessly and fraudulently represented in the Agreement was "available at the time of order," and which the company, through its reckless and fraudulent representations made via the wires on its website and through the public statements of CEO Musk, represented was equivalent to SAE Level 4 or 5 automated driving and which it promised to deliver before the end of 2019, contrary to NMSA 1978 § 30-16-6 and 18 U.S.C. § 1343. Exhibit A.

106.   Young would not have purchased a 2019 Model 3 at all but for his reasonable and justifiable reliance on Tesla's repeated, highly specific, and imperative representations about the efficacy of Full Self-Driving Capability, and about its certain delivery before the end of 2019.

40

Exhibit A

107.    Tesla has been in possession of Young's $60,100 since May of 2019 but has failed to keep its promise to deliver Full Self-Driving Capability by December 31, 2019, and on April 29, 2021 rejected Young's compromise demand that Tesla return just the $6,000 that the company solicited and received via the wires in exchange for the non-existent feature in order to fraudulently induce him to purchase the 2019 Model 3.

108.    Tesla informed Young that it intends to keep Young's money for an indefinite period of time, pending regulatory approval by an unidentified government agency, notwithstanding that as of December 28, 2020 the company had not even applied for a driverless vehicle test permit in California or in New Mexico.

109.    There is no lawful or equitable justification for Tesla's refusal to abide Young's request to return rather than convert Young's $60,100, which the company fraudulently and in bad faith solicited and received via the wires expressly in exchange for delivering a vehicle equipped with Full Self-Driving Capability, an optional feature which the company:

(i) fraudulently, recklessly, and in bad faith represented via the wires to the public including Young during 2019 *was* an autonomous self-driving system tantamount to SAE Level 5 or 4 Automated driving, as a plain language reading of the term implies, contrary to NMSA 1978 § 30-16-6;

(ii) fraudulently, recklessly, and in bad faith represented to Young in the Agreement *was* "available at the time of order" in May of 2019 and *would be* delivered as an automatic software update by December 31, 2019, contrary to NMSA 1978 § 30-16-6. Exhibit A;

(iii) admitted to California DMV on December 28, 2020 and March 9, 2021 *was not* an autonomous self-driving system, is an SAE Level 2 *driver-support* feature, and

41

*will not* become an SAE automated driving system during 2021, while withholding the same information from Young and falsely claiming on April 29, 2021 that the system was "*continues to pend* regulatory approval"; and which

(iv) Tesla failed to deliver to Young as promised, while wrongfully and unlawfully retaining his $60,100, despite Young's compromise demand that Tesla return just the $6,000 the company solicited and received via the wires in exchange for the non-existent feature in order to fraudulently induce him to purchase the 2019 Model 3.

110.    Tesla through the acts and omissions alleged herein wrongfully and unlawfully exercised dominion and control over $60,100 belonging to Young in defiance of his rights and his express demand that Tesla return his money.

111.    Tesla has committed civil conversion and Young is entitled to a judgment of $60,100 in compensatory damages, plus interest accruing since at least the time of Tesla's April 29, 2021 refusal to return Young's money, if not earlier in light of its bad faith, reckless, fraudulent, wrongful and unlawful conduct alleged herein.

## COUNT IV – NEGLIGENCE PER SE

112.    All of the preceding paragraphs are incorporated in this Count as if pled herein in their entirety.

113.    Several New Mexico and United States statutes either explicitly prohibit Tesla's conduct alleged herein or establish a standard of conduct which Tesla violated through its acts and omissions, including without limitation: NMSA 1978 § 30-16-6(F) (fraud exceeding $20,000, a second degree felony); NMSA 1978 § 30-16-8(F) (embezzlement exceeding $20,000, a second degree felony); 18 U.S.C. § 1343 (wire fraud, punishable by fine or imprisonment of up

to 20 years, or both); and 18 U.S.C. § 1956 (laundering of monetary instruments, punishable by fine or imprisonment of up to 20 years, or both).

114.    Young is in the class of persons that the United States and New Mexico Legislatures sought to protect by enacting the above statutes, and Young's injury is of the type that state and federal lawmakers sought to prevent.

115.    Young would not have purchased a 2019 Model 3 at all but for his reasonable and justifiable reliance on Tesla's repeated, highly specific, and imperative representations about the efficacy of Full Self-Driving Capability, and about its certain delivery before the end of 2019.

116.    Tesla's acts and omissions alleged herein violated the above statutes and were the proximate cause of Young's injuries.  Tesla is therefore guilty of negligence per se and Young is entitled to $60,100 in compensatory damages.

117.    Tesla defrauded Young not only to induce him to purchase the 2019 Model 3 and obtain his $60,100 payment for a vehicle equipped with Full Self-Driving Capability, an optional feature which the company knew was in fact an SAE Level 2 *driver-support* feature and not equivalent to *any* level of SAE automated driving, and which Tesla knew and deliberately concealed it *could not* deliver in 2019.  Tesla also deliberately and recklessly engaged in the unlawful conduct alleged herein to vastly and artificially increase the value of the company's publicly traded stock by means of the false or fraudulent pretenses, representations, or promises alleged herein, which Tesla transmitted via the wires to Young and to the general public in New Mexico, contrary to 18 U.S.C. § 1343, and contrary to NMSA 1978 § 30-16-6.

118.    Tesla knew the essential nature of its scheme to fraudulently induce Young to purchase the 2019 Model 3 for $60,100 and to embezzle Young's money, which it did in fact embezzle via the wires, contrary to NMSA 1978 § 30-16-8, 18 U.S.C. § 1343, and 18 U.S.C. §

1956.  Tesla intended to further its scheme through the acts and omissions alleged herein, and it was reasonably foreseeable that the wires would be used in the ordinary course of Tesla's business activities and in furtherance of the company's unlawful and fraudulent scheme, which Tesla did in fact carry out via the wires and federally regulated banking institutions, thereby harming Young as alleged herein.

119.    Tesla's conduct alleged herein reflects a culpable mental state not merely because it was intentional, malicious, willful, reckless, wanton, fraudulent or performed in bad faith in order to defraud Young and induce him to enter into the Agreement to purchase the 2019 Model 3, fraudulently obtain and unlawfully embezzle his $60,100 in violation of New Mexico and United States statutes.  Tesla also plotted to vastly and artificially increase the value of its publicly traded stock by means of the materials omissions and fraudulent representations and promises made via the wires as alleged herein.  Moreover, Tesla's conduct violated the state and federal criminal statutes listed above, which Tesla is charged with knowing and the claimed ignorance of which is no defense.

120.    Therefore, pursuant to New Mexico common law and the Court's public policy, Young is entitled not only to compensatory damages in the amount of $60,100 but to an award of punitive damages determined by a jury but in any event sufficient to punish and deter Tesla and any similarly situated corporations from ever again engaging in the conduct alleged herein.

121.    According to *Reuters* in a February 4, 2020 article, CEO Musk's 19% share of Tesla's stock was worth $30 billion.[31]  Musk's share of Tesla's stock later rose to roughly 22% and is now worth far more than $30 billion, making him one of the richest people on the planet

---

[31] The *Reuters* article may be found on the internet at: https://www.reuters.com/article/us-usa-stocks-tesla/musks-tesla-stake-worth-30-billion-after-electrifying-stock-surge-idUSKBN1ZY2Y4

Exhibit A

and tying his personal fortune to the furtherance and concealment of Tesla's fraudulent embezzlement scheme.

122.    According to *Business Insider*, nine members of Tesla's Board of Directors made, respectively, between hundreds of thousands to as much as billions of dollars from the meteoric rise of the company's stock price, thus tying their own fortunes to the furtherance and concealment of Tesla's fraudulent embezzlement scheme.[32]

123.    According to *CNBC* in a December 14, 2020 article, Tesla's market cap was then "as much as the combined market cap of the nine largest car companies globally."[33]

124.    Punitive damages are not only warranted but are clearly necessary to accomplish the above public policy objectives because, notwithstanding that Tesla admitted to California's DMV on March 9, 2021 that Full Self-Driving remains "firmly" an SAE Level 2 driver-support feature and *will not be delivered yet again this year*, Tesla:

  (i) acted via the wires in furtherance of its fraudulent scheme to embezzle money from Young via the wires throughout 2019 *and continued to do so as late as April 29, 2021* as alleged herein, contrary to 18 U.S.C. § 1343, and 18 U.S.C. § 1956, and NMSA 1978 §§ 30-16-6, 30-16-8;

  (ii) *continues* to fraudulently, recklessly, and in bad faith advertise Full Self-Driving Capability on its website and to characterize the feature as an autonomous self-driving system through use of the misleading term and the public statements of CEO Musk, contrary to 18 U.S.C. § 1343 and NMSA 1978 § 30-16-6;

---

[32] The *Business Insider*'s June 18, 2020 article is available online at: https://markets.businessinsider.com/news/stocks/tesla-board-members-make-most-red-hot-stock-keeps-soaring-2020-6-1029321894

[33] The *CNBC* article may be found on the internet at: https://www.cnbc.com/2020/12/14/tesla-valuation-more-than-nine-largest-carmakers-combined-why.html

(iii) *continues* to fraudulently, recklessly, in bad faith, and with impunity solicit New Mexicans to pay $10,000 in exchange for the non-existent feature, which Tesla plots to embezzle from unwitting customers as it did from Young via the wires, contrary to NMSA 1978 §§ 30-16-6, 30-16-8, and 18 U.S.C. § 1343, and 18 U.S.C. § 1956; and

(iv) *continues* to fraudulently, recklessly, and in bad faith claim via the wires and on its website that Full Self-Driving Capability will be delivered "later this year[,]" contrary to 18 U.S.C. § 1343, and NMSA 1978 § 30-16-6.

125.  As for the sufficiency of punitive damages to promote the above public policy objectives, tethering punitive damages to compensatory damages would create a perverse incentive for the world's wealthiest corporations, like Tesla, to ironically become the *most* likely to resort to the unconscionable, duplicitous, unlawful, and serial conduct alleged herein.

126.  When weighing Tesla's due process right to a reasonable expectation of the punitive damages award which the company would face in the event that its fraudulent embezzlement scheme were exposed, the Court should consider at a minimum the following facts revealing the reprehensibility of Tesla's conduct, which appears to be unprecedented in New Mexico:

(i) Tesla's motus operandi of using a non-existent feature to fraudulently induce New Mexicans to purchase its automobiles, and to then embezzle thousands of dollars from each customer is both illegal and lucrative precisely because of its deceptiveness, which is integral to Tesla's routine business practices in New Mexico;

(ii) Tesla cynically calculated that its enormous wealth—which it amassed through duplicity integral to its routine business practices—enabled it to easily afford the

risk of flaunting both established community standards of decency in New Mexico and the state and federal statutes cited herein with impunity; and that

(iii) Tesla is charged with knowing that its fraudulent and serial conduct would violate the state and federal felony statutes listed herein thousands of times. The claimed ignorance of those statutes is no defense.

127.    Absent a sufficient deterrent, New Mexicans would ironically be viewed as the preferred targets of immensely wealthy and unscrupulous foreign corporations like Tesla. Some quantum of more modest punitive damages awards calculated by Tesla's risk managers and lawyers would continue to be cynically viewed by CEO Musk and the Board of Directors as an acceptable, per annum cost of doing business in New Mexico.   The means of achieving the Court's public policy objective of deterring corporations like Tesla from engaging in the wrongful and unlawful conduct alleged herein would thus be rendered impotent.

128.    It is therefore critical to sufficiently empower the jury to impress upon Tesla and any similarly situated automaker that every corporation doing business in New Mexico must tell the truth, and that economic might does not make right.

## COUNT V – COMMON LAW FRAUD

129.    All of the above allegations are incorporated in this Count as if pled herein in their entirety.

130.    Young would not have purchased a 2019 Model 3 at all but for his reasonable and justifiable reliance on Tesla's repeated, highly specific, and imperative representations about the efficacy of Full Self-Driving Capability, and about its certain delivery before the end of 2019.

131.    Young was fraudulently induced to pay Tesla $60,100 in exchange for a Model 3 equipped with Full Self-Driving Capability by Tesla's deliberately misleading, false, reckless,

and bad faith acts and omissions via the wires and alleged throughout this Complaint, including but not limited to Tesla's representations that:

(i) Full Self-Driving Capability was available at the time of his order;

(ii) Full Self-Driving Capability was equivalent to SAE Level 4 or 5 automated driving, and would render Young's 2019 Model 3 capable of safely driving itself through traffic without human intervention as alleged herein;

(iii) all hardware or equipment necessary to enable Full Self-Driving Capability was installed on Young's 2019 Model 3 at the time of the Agreement and it was merely final refinements to the software that had delayed delivery of Full Self-Driving Capability as an automatic software update, and not issues the company knew it could not resolve before the end of 2019 and had fraudulently concealed from Young; and

(iv) Full Self-Driving Capability would be delivered as an automatic software update before the end of 2019.  Exhibit A.

132.    In fact, Tesla knew at least as early as May 20, 2019 that:

(i) Full Self-Driving Capability *was not* an autonomous self-driving system equivalent to *any* level of SAE driving automation; and

(ii) the company *could not* deliver on its false, fraudulent, reckless, and bad faith promises to Young via the wires to deliver Full Self-Driving equivalent to SAE Level 4 or 5 driving automation before the end of 2019.

133.    Notwithstanding that knowledge, Tesla deliberately continued during 2019 to make the false, reckless, and misleading representations or promises alleged herein via the wires, and it took numerous acts in furtherance of its fraudulent embezzlement scheme alleged herein, with its essential objects being to fraudulently induce Young to enter into the Agreement and

order Full Self-Driving Capability, and to thereby obtain and then embezzle the $60,100 which Young paid via the wires and federally regulated banking institutions in reasonable and detrimental reliance on the company's false, fraudulent, reckless, and bad faith representations, promises and material omissions.

134.    Tesla defrauded Young not only to induce him to purchase the 2019 Model 3 and to order Full Self-Driving Capability, which the company knew was in fact an SAE Level 2 *driver-support* feature and not equivalent to *any* level of SAE automated driving, which Tesla knew and deliberately concealed it *could not* deliver in 2019.    Tesla also deliberately and recklessly engaged in the unlawful conduct alleged herein to vastly and artificially increase the value of the company's publicly traded stock by means of the false or fraudulent pretenses, representations, or promises alleged herein, which Tesla transmitted via the wires to Young and to the general public in New Mexico, contrary to 18 U.S.C. § 1343, and contrary to NMSA 1978 § 30-16-6.

135.    Tesla knew the essential nature of its scheme to fraudulently induce Young to purchase the 2019 Model 3 for $60,100 and to embezzle Young's money, which it did in fact embezzle via the wires, contrary to NMSA 1978 § 30-16-8, 18 U.S.C. § 1343, and 18 U.S.C. § 1956.    Tesla intended to further its scheme through the acts and omissions alleged herein, and it was reasonably foreseeable that the wires would be used in the ordinary course of Tesla's business activities and in furtherance of the company's unlawful and fraudulent scheme, which Tesla did in fact carry out via the wires and federally regulated banking institutions, thereby harming Young as alleged herein.

136.    Tesla's conduct alleged herein reflects a culpable mental state not merely because it was intentional, malicious, willful, reckless, wanton, fraudulent or performed in bad faith in

49

order to defraud Young and induce him to enter into the Agreement to purchase the 2019 Model 3, fraudulently obtain his $60,100 and unlawfully embezzle his money, in violation of New Mexico and United States statutes. Tesla also plotted to vastly and artificially increase the value of its publicly traded stock by means of the materials omissions and fraudulent representations and promises made via the wires as alleged herein. Moreover, Tesla's conduct violated the state and federal criminal statutes listed above, which Tesla is charged with knowing and the claimed ignorance of which is no defense.

137.    Young's damages were a direct and foreseeable consequence of Tesla's false, reckless, wanton, misleading, and fraudulent acts and omissions alleged herein.

138.    Therefore, pursuant to New Mexico common law and the Court's public policy, Young is entitled not only to compensatory damages in the amount of $60,100 but to an award of punitive damages determined by a jury but in any event sufficient to punish and deter Tesla and any similarly situated corporations from ever again engaging in the conduct alleged herein.

139.    CEO Musk's share of the company's stock is now at least 22% and is worth far more than $30 billion, making him and several of the members of Tesla's Board of Directors among the richest people on the planet and tying their personal fortunes to the furtherance and concealment of Tesla's fraudulent scheme. The company is arguably the single most valuable automotive manufacturer on the planet, at least partly if not entirely as a result of its fraudulent, unlawful, and serial conduct alleged herein.

140.    Punitive damages are not only warranted but are clearly necessary to accomplish the above public policy objectives because, notwithstanding that Tesla admitted to California's DMV on March 9, 2021 that Full Self-Driving remains "firmly" an SAE Level 2 driver-support feature and *will not be delivered yet again this year*, Tesla:

(i) acted via the wires in furtherance of its scheme to defraud and embezzle money from Young throughout 2019 *and continued to do so as late as April 29, 2021* as alleged herein, contrary to 18 U.S.C. § 1343 and 18 U.S.C. § 1956, and NMSA 1978 §§ 30-16-6, 30-16-8;

(ii) *continues* to fraudulently advertise Full Self-Driving Capability on Tesla's website and to characterize the feature as an autonomous self-driving system through use of the misleading term and through the public statements of CEO Musk, contrary to 18 U.S.C. § 1343 and NMSA 1978 § 30-16-6;

(iii) *continues* to fraudulently, recklessly, in bad faith, and with impunity solicit the public in New Mexico to purchase Full Self-Driving Capability and pay $10,000 in exchange for the non-existent feature, which Tesla intends to embezzle via the wires as it did from Young contrary to 18 U.S.C. § 1343 and 18 U.S.C. § 1956, NMSA 1978 §§ 30-16-6, 30-16-8; and

(iv) *continues* to fraudulently, recklessly, and in bad faith claim via the wires and on its website that Full Self-Driving Capability will be delivered "later this year[,]" contrary to 18 U.S.C. § 1343, and NMSA 1978 § 30-16-6.

141.    As for the sufficiency of punitive damages to promote the above public policy objectives, tethering punitive damages to compensatory damages would create a perverse incentive for the world's wealthiest corporations, like Tesla, to become the *most* likely to resort to the unconscionable, duplicitous, unlawful, and serial conduct alleged herein.

142.    When weighing Tesla's due process right to a reasonable expectation of the punitive damages award which the company would face in the event that its fraudulent embezzlement scheme were exposed, the Court should consider at a minimum the following

facts revealing the reprehensibility of Tesla's conduct, which appears to be unprecedented in New Mexico:

(i) Tesla's motus operandi of using a non-existent feature to fraudulently induce New Mexicans to purchase its automobiles, and to then embezzle thousands of dollars from each customer is both illegal and lucrative precisely because of its deceptiveness, which is integral to Tesla's routine business practices in New Mexico;

(ii) Tesla cynically calculated that its enormous wealth—which it amassed through duplicity integral to its routine business practices—enabled it to easily afford the risk of flaunting both established community standards of decency in New Mexico and the state and federal statutes cited herein with impunity; and that

(iii) Tesla is charged with knowing that its fraudulent and serial conduct would violate the state and federal felony statutes listed herein thousands of times. The claimed ignorance of those statutes is no defense.

143.    Absent a sufficient deterrent, New Mexicans would ironically be viewed as the preferred targets of immensely wealthy and unscrupulous foreign corporations like Tesla. Some quantum of more modest punitive damages awards calculated by Tesla's risk managers and lawyers would continue to be cynically viewed by CEO Musk and the Board of Directors as an acceptable, per annum cost of doing business in New Mexico.  The means of achieving the Court's public policy objective of deterring corporations like Tesla from engaging in the wrongful and unlawful conduct alleged herein would thus be rendered impotent.

144.    It is therefore critical to sufficiently empower the jury to impress upon Tesla and any similarly situated automaker that every corporation doing business in New Mexico must tell the truth, and that economic might does not make right.

52

## JURY DEMAND

Pursuant to NMRA 1-038 and his rights under the New Mexico Constitution, Young demands a trial by a jury of twelve persons on Counts I, III, IV and V of this Complaint.

WHEREFORE, the Plaintiff prays for compensatory damages of $60,100, punitive damages sufficient to punish and deter Tesla and any similarly situated corporations from engaging in the conduct alleged herein, taxable costs, interest on any judgment as provided by law and equity, and for any other relief that the Court may in its discretion deem just and proper.

Respectfully submitted:

*[s] Joel M. Young*
Joel M. Young
P.O. Box 424
Placitas, NM 87043
(505) 243-5696
jmyoung@swcp.com

*Plaintiff pro se*

Serial:RN109368643-01-20190521192808

**EXHIBIT A**

# TESLA

## Motor Vehicle Purchase Agreement
### Vehicle Configuration

**Customer Information**

JOEL M YOUNG

PLACITAS, NM 87043

| | |
|---|---|
| **VIN** | |
| **Reservation** | RN109368643 |
| **Order Payment** | 2,500.00 |
| **Accepted by Customer on** | 5/20/2019 |
| **Odometer** | 50 |

Price indicated does not include taxes and governmental fees, which will be calculated as your delivery date nears. You will be responsible for these additional taxes and fees.

| Description | Total in USD |
|---|---|
| Model 3 | $35,400.00 |
| Long Range All-Wheel Drive | $14,500.00 |
| Dual Motor All-Wheel Drive | - |
| All Black Premium Interior | - |
| Pearl White Multi-Coat | $1,500.00 |
| 19" Sport Wheels | $1,500.00 |
| Autopilot | - |
| Full Self-Driving Capability | $6,000.00 |
| Premium Interior | - |
| Supercharger Network Access + Pay-as-you-go | - |
| **Subtotal** | **$58,900.00** |
| Destination Fee | $1,125.00 |
| Documentation Fee | $75.00 |
| Transportation Fee (if applicable) | $0.00 |
| Order Modification Fee (if applicable) | $0.00 |
| **Total** | **$60,100.00** |

Exhibit A



# MOTOR VEHICLE PURCHASE AGREEMENT
### Final Price Sheet

| DATE OF AGREEMENT | May 21, 2019 |
|---|---|
| BUYER'S AND CO-BUYER'S NAME AND ADDRESS | SELLER'S NAME AND ADDRESS |
| JOEL M YOUNG | TESLA INC. |
|  | 8401 PARK MEADOWS CENTER DRIVE #1650 |
| PLACITAS, NM 87043 | LONE TREE, CO 80124 |

### DESCRIPTION OF PROPERTY

| New/Used | Year | Make | Model | Style | Vehicle Identification Number | Odometer |
|---|---|---|---|---|---|---|
| New | 2019 | TESLA | Model 3 | 4-DR |  | 50 |

### PURCHASE PRICE

| | | | |
|---|---|---|---|
| **1.** | **Total Vehicle Price** | | |
| | A. Cash price of motor vehicle, options, accessories and fees. | | |
| | (See attached Vehicle Configuration for itemization.) | $ 60,100.00 (A) | |
| | B. Other: N/A | $ 0.00 (B) | |
| | C. Other: N/A | $ 0.00 (C) | |
| | Total Vehicle Price (A through C) | | $ 60,100.00 (1) |
| **2.** | **Sales Tax Calculation** | | |
| | A. Trade-in tax credit (if applicable) | $ 0.00 (A) | |
| | B. Taxable Fees (if applicable) | $ 0.00 (B) | |
| | C. Subtotal of Taxable Items | $ 60,100.00 (C) | |
| | D. Sales Tax | | $ 0.00 (2D) |
| | E. Other: N/A | | $ 0.00 (2E) |
| | Total Cash Price (1 plus 2D and 2E) | | $ 60,100.00 (2) |
| **3.** | **Amounts Paid to Government Agencies\*** | | |
| | A. Registration/Transfer/Titling Fees | $ 0.00 (A) | |
| | B. License Fee (if applicable) | $ 0.00 (B) | |
| | C. Tire Fee (if applicable) | $ 0.00 (C) | |
| | D. Battery Fee (if applicable) | $ 0.00 (D) | |
| | E. Other Fee(s): Title Fee | $ 0.00 (E) | |
| | F. Other Fee(s): Registration Service Fee | $ 0.00 (F) | |
| | Total Government Fees (A through F) | | $ 0.00 (3) |
| **4.** | **Subtotal (2 plus 3)** | | $ 60,100.00 (4) |
| **5.** | **Total Credits** | | |
| | A. Deposit | $ 2,500.00 (A) | |
| | B. Financed Amount: N/A | $ 0.00 (B) | |
| | C. EV Incentive (if applicable) | $ 0.00 (C) | |
| | D. Trade in value applied to purchase (if applicable) | $ 0.00 (D) | |
| | E. Customer downpayment | $ 57,600.00 (E) | |
| | F. Other Credits | $ 0.00 (F) | |
| | Total Credits (A through F) | | $ 60,100.00 (5) |
| **6.** | **Amount Due from Buyer (4 through 5)** | | $ 0.00 (6) |

*Seller may retain or receive part of the amounts paid to others.

Auto Broker Fee: This transaction is not subject to a fee received by an auto broker from Seller unless this box is checked.
☐ If checked, name of auto broker receiving fee: n/a

**Exhibit A**

# T E 5 L ក

**Motor Vehicle Order Agreement**
**Terms & Conditions**

**Documentation.** Your Model 3 Motor Vehicle Order Agreement (the "Agreement") is made up of the following documents:

1. **Vehicle Configuration:** The Vehicle Configuration describes the vehicle that you configured and ordered, including pricing (excluding taxes and official or government fees).

2. **Final Price Sheet:** The Final Price Sheet will be provided to you as your delivery date nears. It will include final pricing based on your final Vehicle Configuration and will include taxes and official or governmental fees.

3. **Terms & Conditions:** These Terms & Conditions are effective as of the date you place your order and make your Order Payment (the "Order Date").

**Agreement to Purchase.** You agree to purchase the vehicle (the "Vehicle") described in your Vehicle Configuration from Tesla, Inc. or its affiliate ("we," "us" or "our"), pursuant to the terms and conditions of this Agreement. Your Vehicle is priced and configured based on features and options available at the time of order and you can confirm availability with a Tesla representative. Options, features or hardware released after you place your order may not be included in or available for your Vehicle.

**Purchase Price, Taxes and Official Fees.** The purchase price of the Vehicle is indicated in your Vehicle Configuration. This purchase price does not include taxes and official or government fees, which could amount to up to 10% or more of the Vehicle purchase price. Because these taxes and fees are constantly changing and will depend on many factors, such as where you register the Vehicle, they will be calculated closer to the time of delivery and indicated on your Final Price Sheet. You are responsible for paying these additional taxes and fees. If you present a check for any payment, we may process the payment as a normal check transaction, or we may use information from your check to make a one-time electronic fund transfer from your account, in which case your bank account will reflect this transaction as an Electronic Fund Transfer.

**Order; Nonrefundable Order Payment; Changes.** After you submit your completed order and the options you selected become available in production, we will begin the process of matching your order to a vehicle and coordinating your Vehicle delivery. **Your Order Payment covers the cost of these activities and other processing costs and is not a deposit for the Vehicle. Your Order Payment is fully refundable only until your order is matched to a Vehicle, at which point it becomes nonrefundable.** Any changes to your Vehicle Configuration, delivery location or expected delivery time after the Order Date will be difficult, if not impossible, for us to accommodate. If you want to make changes to your order, we will try to accommodate your request. If we accept your request, you may be subject to a non-refundable $500 change fee and potential price increases for any pricing adjustments made since your original Order Date. Any changes made by you to your Vehicle Configuration, including changes to the delivery location or estimated delivery date, will be reflected in a subsequent Vehicle Configuration that will form part of this Agreement.

**Cancellation; Default.** We incur significant costs in managing your order, and locating and coordinating delivery logistics for your Vehicle. We may also incur significant costs for remarketing and reselling the Vehicle, including additional coordination, logistics and transport costs. If you cancel or default in this Agreement after your order is matched to a Vehicle, you will not be refunded your Order Payment as it has already been earned by us in taking and processing your order and preparing your Vehicle for delivery. You acknowledge that the Order Payment amount is a fair and reasonable estimate of the actual damages that we have incurred or may incur as a result of your breach of this Agreement, damages that are otherwise impracticable or extremely difficult to determine. When you take delivery of the vehicle we will provide a credit to the final purchase price of your Vehicle equivalent to the amount of the Order Payment you paid. This Order Payment and this Agreement are not made or entered into in anticipation of or pending any conditional sale contract.

**Delivery.** If you are picking up your Vehicle in a state where we are licensed to sell the Vehicle, we will notify you of when we expect your Vehicle to be ready for delivery at your local Tesla Delivery Center, or other location as we may agree to. You agree to schedule and take delivery of your Vehicle within one week of this date. If you are unable to take delivery within the specified period, your Vehicle may be made available for sale to other customers.
If you wish to pick up your Vehicle in a state where we are not licensed to sell the Vehicle, or if you and Tesla otherwise agree, Tesla will, on your behalf, coordinate the shipment of your Vehicle to you from our factory in California or another state where we are licensed to sell the Vehicle. In such a case, you agree that this is a shipment contract under which Tesla will coordinate the shipping of the Vehicle to you via a third-party common carrier. You agree that delivery of the Vehicle, including the transfer of title and risk of loss to you, will occur at the time your Vehicle is loaded onto the common carrier's transport (i.e., FOB shipping point). The carrier will insure your Vehicle while in transit and you will be the beneficiary of any claims for damage to the Vehicle or losses occurring while the Vehicle is in the possession of a common carrier.

The estimated delivery date of your Vehicle, if provided, is only an estimate as we do not guarantee when your Vehicle will actually be delivered. Your actual delivery date is dependent on many factors, including your Vehicle's configuration and manufacturing availability. To secure your final payment and performance under the terms of this Agreement, we will retain a security interest in the Vehicle and all proceeds therefrom until your obligations have been fulfilled.

**Privacy Policy; Payment Terms for Services; Supercharger Fair Use Policy.** Tesla's Customer Privacy Policy; Payment Terms for Services and Supercharger Fair Use Policy are incorporated into this Agreement and can be viewed at www.tesla.com/about/legal.

**Exhibit A**

# T ≡ 5 L ⌐

**Agreement to Arbitrate.** Please carefully read this provision, which applies to any dispute between you and Tesla, Inc. and its affiliates, (together "Tesla").

If you have a concern or dispute, please send a written notice describing it and your desired resolution to resolutions@tesla.com.

If not resolved within 60 days, you agree that any dispute arising out of or relating to any aspect of the relationship between you and Tesla will not be decided by a judge or jury but instead by a single arbitrator in an arbitration administered by the American Arbitration Association (AAA) under its Consumer Arbitration Rules. This includes claims arising before this Agreement, such as claims related to statements about our products.

We will pay all AAA fees for any arbitration, which will be held in the city or county of your residence. To learn more about the Rules and how to begin an arbitration, you may call any AAA office or go to www.adr.org.

The arbitrator may only resolve disputes between you and Tesla, and may not consolidate claims without the consent of all parties. The arbitrator cannot hear class or representative claims or requests for relief on behalf of others purchasing or leasing Tesla vehicles. In other words, you and Tesla may bring claims against the other only in your or its individual capacity and not as a plaintiff or class member in any class or representative action. If a court or arbitrator decides that any part of this agreement to arbitrate cannot be enforced as to a particular claim for relief or remedy, then that claim or remedy (and only that claim or remedy) must be brought in court and any other claims must be arbitrated.

If you prefer, you may instead take an individual dispute to small claims court.

You may opt out of arbitration within 30 days after signing this Agreement by sending a letter to: Tesla, Inc.; P.O. Box 15430; Fremont, CA 94539-7970, stating your name, Vehicle Identification Number, and intent to opt out of the arbitration provision. If you do not opt out, this agreement to arbitrate overrides any different arbitration agreement between us, including any arbitration agreement in a lease or finance contract.

**Warranty.** You will receive the Tesla New Vehicle Limited Warranty or the Tesla Preowned Limited Warranty, as applicable, at or prior to the time of Vehicle delivery or pickup. You may also obtain a written copy of your warranty from us upon request or from our website.

**Limitation of Liability.** We are not liable for any incidental, special or consequential damages arising out of this Agreement. Your sole and exclusive remedy under this Agreement will be limited to reimbursement of your Order Payment.

**No Resellers; Discontinuation; Cancellation.** Tesla and its affiliates sell cars directly to end-consumers, and we may unilaterally cancel any order that we believe has been made with a view toward resale of the Vehicle or that has otherwise been made in bad faith. We may also cancel your order and refund your Order Payment if we discontinue a product, feature or option after the time you place your order or if we determine that you are acting in bad faith.

**Governing Law; Integration; Assignment.** The terms of this Agreement are governed by, and to be interpreted according to, the laws of the State in which we are licensed to sell motor vehicles that is nearest to your address indicated on your Vehicle Configuration. Prior agreements, oral statements, negotiations, communications or representations about the Vehicle sold under this Agreement are superseded by this Agreement. Terms relating to the purchase not expressly contained herein are not binding. We may assign this Agreement at our discretion to one of our affiliated entities.

**State-Specific Provisions.** You acknowledge that you have read and understand the provisions applicable to you in the State-Specific Provisions attachment to this Agreement.

**Exhibit A**

# T E S L A

**State Specific Provisions**

For **NEW YORK** residents:  If the Vehicle is not delivered in accordance with the Agreement within 30 days following the estimated delivery date, you have the right to cancel the Agreement and receive a full refund, unless the delay in delivery is attributable to you.

For **MASSACHUSETTS** residents:  ATTENTION PURCHASER:  All vehicles are WARRANTED as a matter of state law. They must be fit to be driven safely on the roads and must remain in good running condition for a reasonable period of time. If you have significant problems with the Vehicle or if it will not pass a Massachusetts inspection, you should notify us immediately. We may be required to fix the car or refund your money. THIS WARRANTY IS IN ADDITION TO ANY OTHER WARRANTY GIVEN BY US.

For **WASHINGTON, D.C.** residents:

NOTICE TO PURCHASER

IF, AFTER A REASONABLE NUMBER OF ATTEMPTS, THE MANUFACTURER, ITS AGENT, OR AUTHORIZED DEALER IS UNABLE TO REPAIR OR CORRECT ANY NON-CONFORMITY, DEFECT, OR CONDITION WHICH RESULTS IN SIGNIFICANT IMPAIRMENT OF THE MOTOR VEHICLE, THE MANUFACTURER, AT THE OPTION OF THE CONSUMER, SHALL REPLACE THE MOTOR VEHICLE WITH A COMPARABLE MOTOR VEHICLE, OR ACCEPT RETURN OF THE MOTOR VEHICLE FROM THE CONSUMER AND REFUND TO THE CONSUMER THE FULL PURCHASE PRICE, INCLUDING ALL SALES TAX, LICENSE FEES, REGISTRATION FEES, AND ANY SIMILAR GOVERNMENT CHARGES. IF YOU HAVE ANY QUESTIONS CONCERNING YOUR RIGHTS, YOU MAY CONTACT THE DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS.

Seller certifies that the information contained in the itemization of the purchase price, including the Vehicle Configuration, and required by Chapter 3 (Buying, Selling and Financing Motor Vehicles) of Title 16 of the Code of D.C. Municipal Regulations, is true to the best of our knowledge.

**Exhibit A**

# T ≡ 5 L ⊓

## Payment Instructions

**Electronic Check**

The easiest way to pay for your Model 3 is by electronic check, also known as ACH. Prior to delivery, you'll be invited by email to make your payment on our website.

To make a payment now, please sign in to your My Tesla account at this web address:

https://www.tesla.com/teslaaccount

**Mailed Check**

If you are planning to mail a check for final payment, please send it to the following address:

Attn: Funding Team
6800 Dumbarton Circle
Fremont, CA 94555

**Wire Transfer**

Please include your name and your order number (RN109368643) when paying by wire transfer.

| | |
|---|---|
| Bank Name | Wells Fargo Bank, N.A. |
| Bank Address | 420 Montgomery San Francisco, CA 94104 |
| Account Name | Tesla Motors Inc. |
| Account # | ███████████ |
| ABA/Routing # | ███████████ |
| Note | *Your name*, RN109368643 |

**EXHIBIT B**

Joel M. Young
████████████
Placitas, NM 87043

June 3, 2019

Tesla, Inc.
P.O. Box 15430
Fremont, CA 94539-7970

Re:    Opt out of arbitration – ████████████

Dear Tesla:

Per the sales agreement for the above-referenced vehicle, I hereby opt out of arbitration.

Yours,

Joel M. Young.

**Exhibit A**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

---

# FORM 8-K

---

### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the
### Securities Exchange Act of 1934

### Date of report (Date of earliest event reported): August 27, 2021

---

# Tesla, Inc.
#### (Exact Name of Registrant as Specified in Charter)

---

| Delaware | 001-34756 | 91-2197729 |
|---|---|---|
| **(State or Other Jurisdiction of Incorporation)** | **(Commission File Number)** | **(I.R.S. Employer Identification No.)** |

**3500 Deer Creek Road**
**Palo Alto, California 94304**
#### (Address of Principal Executive Offices, and Zip Code)

**(650) 681-5000**
#### Registrant's Telephone Number, Including Area Code

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐   Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communication pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communication pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock | TSLA | The Nasdaq Global Select Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

---

**Exhibit B**

**Item 1.01**          **Entry into a Material Definitive Agreement.**

On August 27, 2021, Tesla Energy Operations, Inc. and The Research Foundation for the State University of New York entered into Amendment #12 to the Amended and Restated Agreement for Research & Development Alliance on Triex Module Technology (the "<u>Agreement</u>"), to memorialize an update of job and investment milestones required pursuant to the Agreement as a result of the COVID-19 pandemic.

**Exhibit B**

**SIGNATURES**

    Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**TESLA, INC.**

By:  /s/ Zachary J. Kirkhorn
       **Zachary J. Kirkhorn**
       **Chief Financial**
       **Officer**

Date: August 30, 2021

**Exhibit B**