**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

JOEL M. YOUNG,
an individual,

      Plaintiff,

v.                                        Case No. 21-cv-00917

TESLA, INC.,
a Delaware Corporation,

      Defendant.


**<u>DEFENDANT TESLA, INC.'S MOTION TO DISMISS THE COMPLAINT</u>**

Plaintiff's Complaint is premised on an alleged promise Tesla never made: that Plaintiff's Model 3 vehicle would be fully autonomous by the end of 2019.  Like all vehicles sold at the time, Plaintiff's car came equipped with the advanced hardware needed to enable Tesla's proprietary Autopilot (driver assistance) features and full-self driving *in the future*. Plaintiff selected the optional "Full Self Driving Capability" (FSDC) package, giving him access to even more advanced driver-assist features, plus the right to receive future over-the-air software updates that will one day enable full autonomy. Tesla made clear, however, that existing features require active driver supervision, and that Tesla would release autonomous driving features *in the future*—through over-the-air software updates designed to improve functionality over time. Tesla did not promise autonomy on any specific timeline, instead explaining that the deployment of such features would depend on achieving software development and regulatory approval milestones.

Plaintiff's Complaint tries, but fails, to manufacture a supposed "promise" by Tesla to deliver a fully autonomous car by 2019, and should be dismissed in its entirety.

First, Plaintiff's breach of contract claim fails because he cannot point to any contract term stating his vehicle would be able to drive autonomously by the end of 2019.  As Tesla explained— in a vehicle purchase screen that Plaintiff cites in the Complaint but fails to attach—the current FSDC features at the time of Plaintiff's purchase "***require active driver supervision and do not make the vehicle autonomous.***"  Request For Judicial Notice, Ex. 1 (emphasis added).[1]  And any *future* upgrades towards fully autonomous driving would depend on "achieving reliability far in excess of human drivers as demonstrated by billions of miles of experience, as well as regulatory approval, which may take longer in some jurisdiction." *Id.*[2]

Second, Plaintiff's Second (Unjust Enrichment), Third (Civil Conversion), and Fourth (Negligence Per Se) causes of action all fail because, as a matter of law, Plaintiff cannot use these tort theories to manufacture obligations that exceed the express contract terms to which he agreed.

Third, Plaintiff's fraud claim also fails because he pleads none of the required elements, and fails entirely to meet the heightened pleading standard applicable under Rule 9(b).  Indeed, Plaintiff does not allege he actually saw or heard any of the alleged misstatements before buying his vehicle, nor does he allege any facts suggesting that Tesla supposedly intended to defraud him.

---

[1] Tesla has filed a Request for Judicial Notice concurrently with this Motion so this Court may consider the full text of the documents Plaintiff relies on.  As explained further in the RJN, a court may consider an indisputably authentic copy of a document that "is referred to in the complaint and is central to the plaintiff's claim," even where that document is not attached to the complaint. *MacArthur v. San Juan Cty.*, 309 F.3d 1216, 1221 (10th Cir. 2002) (quoting *Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir. 2001), *rev'd*, 537 U.S. 79 (2002)).

[2] Exhibit 1 is the May 2019 version of the webpage referenced in the Complaint, which is available on the Internet Archive's Wayback Machine at:
https://web.archive.org/web/20190520040503/https://www.tesla.com/model3/design#autopilot

257962131

Moreover, when the purported misstatements are put in context—as opposed to Plaintiff's partial and misleading quotations—it is clear Tesla did not promise (or even suggest) that Plaintiff's car would be fully autonomous by the end of 2019.

Fourth, Plaintiff's final claim of negligence per se should be dismissed because it is based on purported violations of criminal law statutes that no New Mexico court has ever found to support such a claim. And Plaintiff offers no reason why this Court should be the first to do so.

In sum, Plaintiff's Complaint seeks to impose liability based on an unsupported—and entirely fictional—claim that Tesla promised him a fully autonomous vehicle by 2019. Tesla did no such thing, and Plaintiff's Complaint should be dismissed in its entirety.

## I.   BACKGROUND

### A.   The Parties & Agreement

Tesla is an American company dedicated to accelerating the world's transition to sustainable energy through electric vehicles, solar energy solutions, and other technologies.

Plaintiff Joel M. Young is a resident of New Mexico who purchased a Model 3 vehicle from Tesla on or about May 20, 2019. (No. 21-cv-00917, Compl. ¶¶ 1, 9.) As part of the transaction, Plaintiff entered into a Motor Vehicle Purchase Agreement ("Agreement") with Tesla.[3] *See* Complaint Ex. A. As shown on the "Vehicle Configuration" page of the Agreement, Plaintiff agreed to purchase a 2019 Model 3 for $60,100. *Id.* at Ex. A p.1. Plaintiff selected and paid $6,000 for an optional package called "Full Self-Driving Capability," which included a set of

---

[3] The Agreement contains an "Agreement to Arbitrate" which Tesla is not presently seeking to invoke in light of Plaintiff's representation that he timely opted out of the arbitration clause, Compl. ¶ 11(vii), but Tesla reserves the right to do so at a later time, particularly in the event additional information shows that Plaintiff in fact did not timely opt out of arbitration.

advanced driver assistance features such as Auto Lane Change and Autopark, and the ability to receive ongoing over-the-air software updates to enable additional features, including autonomous driving features, in the future. *Id.*

The Agreement explains that Plaintiff "agree[d] to purchase the vehicle … described in [his] Vehicle Configuration." *Id.* at Ex. A p.3. It also states that the vehicle was "priced and configured based on features and options available at the time of order and [he could] confirm availability with a Tesla representative." *Id.*

The Agreement contains an "Integration" clause providing that "[p]rior agreements, oral statements, negotiations, communications or representations about the Vehicle sold under this Agreement are superseded by this Agreement"; and that "[t]erms relating to the purchase not expressly contained herein are not binding." *Id.*[4]

## B.   Tesla's Disclosures

Plaintiff cherry-picks several statements on Tesla's website to give the impression that it promised fully autonomous driving by the end of 2019. First, Plaintiff points to an unidentified page on Tesla's website at Paragraph 50 of the Complaint. Yet, as Plaintiff's Complaint concedes, this page explains that Tesla vehicles have "the hardware needed ***in the future*** for full self-driving" and cautions that future implementation of FSDC features would depend on achieving additional development and regulatory milestones: "the future use of these features without supervision is dependent on achieving reliability far in excess of human drivers as demonstrated by billions of miles of experience, as well as regulatory approval, which may take longer in some jurisdictions."

---

[4] The Agreement also contains a "Limitation of Liability" clause stating that Tesla is "not liable for any incidental, special or consequential damages arising out of this Agreement"; and that Plaintiff's "sole and exclusive remedy under this Agreement will be limited to reimbursement of [his] Order Payment." *Id.*

(Compl. ¶ 50.)

Second, Plaintiff refers to "Tesla's ordering page for the Model 3" that he presumably saw when purchasing his vehicle. *Id* at ¶ 54, fn. 21. Plaintiff quotes from this page in alleging that Tesla promised "Full Self-Driving Capability is 'coming later this year.'" *Id.* at ¶¶ 17, 88(i). The Complaint, however, misrepresents and distorts Tesla's use of that phrase. The complete relevant excerpt states as follows:

### Full Self-Driving Capability

- Navigate on Autopilot: automatic driving from highway on-ramp to off-ramp including interchanges and overtaking slower cars.

- Auto Lane Change: automatic lane changes while driving on the highway.

- Autopark: both parallel and perpendicular spaces.

- Summon: your parked car will come find you anywhere in a parking lot. Really.

Coming later this year:

- Recognize and respond to traffic lights and stop signs.

- Automatic driving on city streets.

| Select Option | $6,000 |

**Includes the Full Self Driving Computer**

$8,000 upgrade if added after delivery

The currently enabled features require active driver supervision and do not make the vehicle autonomous. The activation and use of these features are dependent on achieving reliability far in excess of human drivers as demonstrated by billions of miles of experience, as well as regulatory approval, which may take longer in some jurisdictions. As these self-driving features evolve, your car will be continuously upgraded through over-the-air software updates.

RJN, Ex. 1.  As shown, Tesla explained that FSDC consisted of certain specifically identified driver assistance features (Auto Lane Change, Autopark, etc.) and that those "currently enabled features **require active driver supervision and do not make the vehicle autonomous.**"  As to potential future FSDC features, Tesla advised that any such features would necessarily depend on "regulatory approval" and other developments, consistent with the other Tesla web page referenced above.

### C.      The Podcast & Tweet

The Complaint also relies in significant part on a partial quotation of a February 19, 2019 interview of Tesla CEO Elon Musk on the Ark Invest podcast. *See, e.g.*, Compl. at ¶ 24.  According to the Complaint, Mr. Musk said: "I think we will be 'feature-complete' on full self-driving this year, meaning the car will be able to find you in a parking lot, pick you up, take you all the way to your destination without an intervention this year.  I am certain of that.  That is not a question mark."  *Id.*  As quoted, Mr. Musk expressed his belief about what a Tesla vehicle "will be able to" do from an engineering standpoint and made no promise of what features might actually be made available to drivers.  Indeed, Mr. Musk made that distinction unmistakably clear in the remainder of the podcast, which Plaintiff omits from the Complaint:

> [I]n defining autonomy or full self-driving, I think we will be "feature-complete" on full self-driving this year, meaning the car will be able to find you in a parking lot, pick you up, take you all the way to your destination without an intervention this year. I would say that I am certain of that. That is not a question mark.
>
> However, people sometimes will extrapolate that to mean now it works with 100% certainty requiring no observation perfectly.  This is not the case. Once it is feature complete, then you're sort of, kind of the "march of 9s," like how many 9s of reliability do you want it to be.  **And then when do regulators agree that it is that reliable.**

So, there's feature-complete plus full self-driving, this year, with certainty. This is something we control, and I manage autopilot engineering directly every week in detail. So I'm certain of this. ***Then, when will regulators allow us even to have these features turned on with human oversight. That is a veritable wish we have limited control over. Then, it's when will regulators agree that these things can be done without human oversight, and that is another level beyond that.*** So, these are externalities we don't quite control, and the conservatism of regulators varies a lot from one jurisdiction to another.

RJN Exhibit 2.[5] When Plaintiff's selective quotation is put in context, it is clear Mr. Musk made no promise that full autonomous driving without human intervention would be available to Tesla owners in 2019. He instead remarked that even after the threshold of "feature complete" was passed, meaning the vehicle had the capacity for full self-driving, the issue of reliability remained. *Id.* ("Once it is feature complete, then you're sort of, kind of a march of nines. Like, how many nines of reliability do you -- do you want it to be?") He also cautioned it was uncertain when regulators would even allow "these features turned on with human oversight" and any use "without human oversight" would require "another level beyond that," in terms of additional approvals.

The Complaint also makes reference to a December 19, 2019 tweet from Mr. Musk—which postdated Plaintiff's purchase—alleging that Mr. Musk stated that FSDC would be fully autonomous and "merely 'needs a few more days of validation[.]" (Compl. ¶¶ 32, 71(iii).) However, Plaintiff misleadingly omits that the tweet is part of a series, with the first tweet stating that "Tesla holiday software update has FSD sneak preview, Stardew Valley, Lost Backgammon & a few other things[.]" RJN Exhibit 3. In response to that tweet, one Twitter user asked to receive the software update on the same day, so that he could talk about it on an upcoming podcast. *Id.*

---

[5] Exhibit 2 is a certified transcript of the podcast cited in the Complaint, which is available at https://ark-invest.com/podcast/on-the-road-to-full-autonomy-with-elon-musk/.

Mr. Musk responded "Needs a few more days of validation, then early access, then wide release." *Id.* In context, Mr. Musk plainly was not promising a full release of FSDC in December, but instead was discussing the timing for just a "sneak preview" of FSDC features, plus a host of unrelated features, including games (like Lost Backgammon) that customers can play on the vehicle's touchscreen.

> **D.      Plaintiff's Claims.**

Plaintiff's Complaint includes claims for breach of contract, unjust enrichment, civil conversion, negligence *per se*, and common law fraud. *Id.* ¶¶ 89-144. All claims are predicated on the same core allegation that Tesla allegedly promised that Plaintiff's Model 3 vehicle would have fully autonomous driving functions "equivalent to Society of Automotive Engineers ('SAE') Level 4 or 5 automated driving, whereby a vehicle can safely drive itself through traffic without intervention by a human being" by no later than the end of 2019. *Id.* ¶ 2.

## LEGAL STANDARD

A complaint must be dismissed if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Rather, a complaint "must contain sufficient factual matter, accepted as true, to state a claim … that is plausible on its face." *Id.* (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (cleaned up).

## ARGUMENT

### I.    PLAINTIFF'S BREACH OF CONTRACT CLAIM FAILS AS A MATTER OF LAW.

Plaintiff's breach of contract claim fails because the purported obligations he seeks to enforce are found nowhere in the Agreement.  Specifically, Plaintiff claims Tesla was required to deliver a Model 3 vehicle that could drive itself autonomously with no human intervention before the end of 2019 (Compl. ¶¶ 15, 16), but points to no term in the Agreement to that effect.  This alone mandates dismissal of Plaintiff's claim.  *See President and Fellows of Harvard Coll. v. Elmore*, 222 F. Supp. 3d 1050 (D.N.M. 2016) (dismissing breach of contract claim where contract on its face did not contain the obligation plaintiff sought to impose and plaintiff "allege[d] no extrinsic evidence to show that the parties intended a broader meaning" for the express terms in the contract).

Plaintiff refers to an interview in a podcast, an article from a newspaper in Arkansas, and a tweet that supposedly gave the "impression[]" that FSDC means autonomous driving "without intervention by a human being."  Compl. ¶ 2.  But those extra-contractual statements, some from after he purchased his vehicle, do not support Plaintiff's effort to impose additional contractual obligations on Tesla.  First, Plaintiff does not allege that he actually saw or heard these statements before purchasing his vehicle (as detailed in Section III below) so there is no basis to conclude that the statements in any way informed his contractual expectations.  *See C.R. Anthony Co. v. Loretto Mall Partners*, 817 P.2d 238, 243 (N.M. 1991) (extrinsic evidence must show "the meaning … attached to a particular term or expression ***at the time the parties agreed to those provisions***." ) emphasis added)).

Second, the statements referenced in the Complaint did ***not*** promise that Tesla vehicles would be able to drive completely autonomously without human intervention by 2019.  As detailed above, Tesla explained in no uncertain terms, in the purchase screens that Plaintiff refers to in the Complaint, that (1) the "currently enabled features" at the time of Plaintiff's purchase "***require active driver supervision and do not make the vehicle autonomous***" and (2) any future FSD features would depend on further developments, including meeting stringent milestones of reliability and obtaining "regulatory approval."  RJN Ex. 1.  Similarly, Mr. Musk's February 2019 interview, upon which Plaintiff heavily relies, emphasized that even after FSD was "feature complete" significant work remained to ensure that the feature was reliable.  RJN Ex. 2.  And that any future deployment of FSDC features "without human oversight" would require multiple levels of additional approvals.  *Id.*  And the December 19, 2019 tweet by Mr. Musk, equally made clear that the December release was a "sneak preview" and not a full roll out of FSDC.  RJN Ex. 3.

Third, even if Plaintiff had seen Tesla's alleged statements before purchasing his vehicle (which he does not allege) and even if they contained the promises that Plaintiff claims (they do not), Plaintiff's contract claim would still fail because the Agreement is an integrated contract, which provides: "Prior agreements, oral statements, negotiations, communications or representations about the Vehicle sold under this Agreement ***are superseded by this Agreement***."  Compl. Ex. A at 4.  Any expectations Plaintiff allegedly formed from Tesla's website or from Elon Musk's February 2019 statements were thus superseded by the express terms of the Agreement, which contains no promise that the FSDC features of Plaintiff's Model 3 would include fully autonomous driving without human intervention by the end of 2019.

257962131

Ultimately, Plaintiff's contract claim is not supported by any actual contract term in the Agreement and rests, at most, on his subjective belief that his Model 3 would be capable of fully autonomous driving in 2019. Plaintiff's subjective beliefs, however, cannot override the express terms of the Agreement, and his contract claim must be dismissed as a matter of law. *See Environmental Control, Inc. v. City of Santa Fe*, 131 N.M. 450, 456 (N.M. App. 2001) (rejecting contract interpretation based on the plaintiff's "subjective impressions" and "private intentions").

## II.   THE TORT AND QUASI CONTRACT CLAIMS FAIL AS A MATTER OF LAW

### A.   Plaintiff's Tort Claims Fail Because the Parties' Rights and Duties Are Defined by the Contract

Plaintiff's three tort claims—civil conversion, negligence,[6] and common law fraud—all fail because the dispute between the parties is governed by their Agreement. Under well-established New Mexico law, the existence of a contract that specifically defines the rights and duties of the parties, as the Agreement does here, precludes tort liability based on alleged breach of those rights and duties. *See Elliott Industries*, 407 F.3d 1091, 1116 (10th Cir. 2005); *see also Utah Int'l, Inc. v. Caterpillar Tractor Co.*, 108 N.M. 539, 542 (1989). In *Elliott Industries*, the Tenth Circuit affirmed the dismissal of fraud, constructive fraud, and conversion claims in a dispute over natural gas royalties. *Id.* The Court explained that under New Mexico law, these tort claims were "precluded" by the written agreements between the parties:

> [W]hen a contract specifically define[s] the rights and duties of the parties[,] any claimed breach of an extracontractual tort duty is precluded. This is because parties should be bound by the terms of written agreements to which they freely commit

---

[6] Plaintiff styles his negligence claim "negligence *per se*." Complaint ¶ 116. But "[n]egligence *per se* is not technically a separate cause of action." *Gatewood v. Est. of Thompson*, 2019 WL 4889161, at *2 (D.N.M. Oct. 3, 2019) (citation and quotation marks omitted). Rather, it is a method of proving an ordinary negligence claim. "The doctrine of negligence *per se* allows the plaintiff to establish a breach of duty without satisfying the usual 'reasonable care' standard, by showing instead that the defendant was in violation of a statute or other law and that this violation caused the plaintiff's harm." *Id.*

257962131

themselves.

*Id.* (citations and quotation marks omitted); *see also Isler v. Tex. Oil and Gas Corp.*, 749 F.2d 22, 24 (10th Cir. 1984) (holding that "the contract specifically defined the rights and duties of the parties regarding rental payments and notice, thereby precluding any extracontractual tort duty regarding such payments"); *Anderson Living Tr. v. ConocoPhillips Co.*, 952 F. Supp. 2d 979, 1045 (D.N.M. 2013) (dismissing fraud and conversion claims because "[t]he parties' leases preclude the Plaintiffs from bringing claims in tort for the violation of duties covered by the parties' leases"); *see also In re Consol. Vista Hills Retaining Wall Litig.*, 119 N.M. 542, 550 (1995) (acknowledging the "bedrock principle that contract damages be limited to those within the contemplation and control of the parties in framing their agreement" and "the parties should not be allowed to use tort law to alter or avoid the bargain struck in the contract." (citations and quotation marks omitted)).

This established doctrine mandates dismissal of Plaintiff's tort claims. Stripped of their rhetorical trappings, the tort claims all share the same basic premise as Plaintiff's contract claim: that Tesla breached the Agreement by failing to deliver an autonomous vehicle capable of driving with no human intervention by the end of 2019. For example, Plaintiff claims conversion on the basis that he "paid Tesla the $60,100 consideration that the Agreement specifies," but Tesla "failed to deliver [an autonomous self-driving system] to Young as promised, while wrongfully and unlawfully retaining his $60,100." Compl. ¶¶ 105, 109. Likewise, the negligence *per se* claim centers on Plaintiff's payment of $60,100 "for a vehicle with Full Self-Driving Capability" that Tesla allegedly failed to deliver "before the end of 2019," as the Agreement allegedly required. *Id.* ¶¶ 115, 117. Similarly, Plaintiff's fraud claim alleges that Tesla induced him to pay "$60,100 in exchange for a Model 3 equipped with Full Self-Driving Capability" that "would be delivered

as an automatic software update before the end of 2019." *Id.* ¶ 131. These allegations merely repackage the contractual theory that Tesla allegedly failed to honor its obligations in the Agreement. Plaintiff's conversion, negligence *per se*, and fraud claims must therefore be dismissed since Plaintiff and Tesla expressly contracted for their respective liability. *See Anderson Living Tr.*, 952 F. Supp. 2d at 1044 ("The Court will not allow the Plaintiffs to overcome the contractual provisions to which the parties have bound themselves by alleging, in tort, that the Defendants' conduct was fraudulent."); *Kachina Rentals LLC v. Mobile Storage Group Inc.*, 2009 WL 10666359, *3 (D.N.M. 2009) (dismissing fraudulent misrepresentation and other torts because plaintiff's duty to defendant "arises solely from the [c]ontract" and "[t]here is no relationship between the parties other than the commercial relationship as a result of the [c]ontract"); *Fogelson v. Wallace*, 406 P.3d 1012, 1032 (N.M.App. 2017) (affirming dismissal of conversion claim premised on contract because the contract "expressly entitled [Plaintiffs] to remedies articulated therein.")

## B. The Unjust Enrichment Claim Fails for Similar Reasons.

Under New Mexico law, the "'hornbook rule [is] that quasi-contractual remedies ... are not to be created when an enforceable express contract regulates the relations of the parties with respect to the disputed issue.'" *Anderson Living Tr.*, 952 F. Supp. 2d at 1033 (quoting *Elliott Indus.*, 407 F.3d at 1117). Thus, "a party cannot assert an unjust enrichment claim against another party where the parties are in privity of contract." *Walker v. Emergency Staffing Sols., Inc.*, 2017 WL 3206641, at *4 (D.N.M. Feb. 2, 2017). Here, Plaintiff alleges he and Tesla are in privity of contract and concedes their Agreement governs the issue in dispute. *See* Complaint ¶¶ 89-96. As such, quasi-contractual remedies are barred, and the unjust enrichment claim must be dismissed.

257962131

*Anderson Livin Tr.*, 952 F. Supp. 2d at 1033.

## III.   PLAINTIFF'S FRAUD-BASED CLAIM ALSO FAILS FOR ADDITIONAL REASONS.

Plaintiff's fraud claim also fails because Plaintiff does not adequately allege the necessary elements of fraud, which require: "(1) a misrepresentation of fact, (2) either knowledge of the falsity of the representation or recklessness on the part of the party making the misrepresentation, (3) intent to deceive and to induce reliance on the misrepresentation, and (4) detrimental reliance on the misrepresentation." *Williams v. Stewart*, 137 N.M. 420, 429 (2005).

Further, a complaint "must state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), which generally requires fact allegations demonstrating "the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *George v. Urb. Settlement Servs.*, 833 F.3d 1242, 1254 (10th Cir. 2016). The heightened pleading standard of Rule 9(b) applies to all elements of fraud, including a plaintiff's allegations of detrimental reliance.   *See Sandau v. Old*, 2021 WL 3403644, at *1 (D.N.M. Aug. 4, 2021) (dismissing fraud claim where plaintiffs "do not allege with particularity the consequences of their reliance on [the defendant's] alleged misrepresentations," "do not set forth factual allegations stating with particularity that they detrimentally relied on [the] misrepresentations," and do not specify "whether any of the alleged statements were … relied upon by [p]laintiffs *before*" they acted to their detriment (emphasis in original)).   Plaintiff's Complaint fails to allege these required elements.

First, Plaintiff does not allege facts to show he actually relied on any Tesla statement that promised his Model 3 would be fully autonomous and capable of driving itself with no human intervention by the end of 2019.  While the Complaint refers to various alleged statements that

Plaintiff says promised as such—which are all misquoted and taken out of context as discussed above—Plaintiff does not allege facts to show that he ever heard, saw, or relied on these statements before purchasing his vehicle.   Instead, Plaintiff's reliance allegations consist only of vague assertions and conclusory statements, as summarized below:

| Paragraph | Deficiencies |
|---|---|
| 13. "Sometime in 2018, Young became aware of Tesla's electric vehicles and in particular the company's representation that they could be ordered with what Tesla labeled "Full Self-Driving Capability." | This vague allegation gives no indication of what Plaintiff reviewed and says nothing to suggest Tesla promised fully autonomous driving without human intervention by the end of 2019. |
| 19. "Young would not have purchased a 2019 Model 3 at all but for his reasonable and justifiable reliance on Tesla's repeated, highly specific, and imperative representations about the efficacy of Full Self-Driving Capability, and about its certain delivery before the end of 2019." (*See also* Compl. ¶¶ 4, 18, 41, 94, 99, 106, 115, and 130) | This allegation does not identify what Tesla statements Plaintiff purportedly relied on, and the vague reference to statements about "the efficacy" of FSDC does not suggest that Tesla promised autonomous driving without human intervention by the end of 2019. |
| 40. "When he entered into the Agreement with Tesla, acting in justifiable and detrimental reliance on the company's misleading, fraudulent, and bad faith affirmative representations and material omissions alleged herein, Young paid the company $60,100 via the wires and federally regulated banking institutions in exchange for a 2019 Model 3 with Full Self-Driving Capability, which Tesla represented would by December 31, 2019 enable the vehicle to drive itself through traffic without any intervention by Young, *as a plain language reading of the term implies*, and as the SAE's criteria for Level 4 and 5 automated driving provide." (emphasis added.) | This allegation also does not identify what Tesla statements Plaintiff purportedly relied on and indicates that Plaintiff simply assumed based on "a plain language reading of the term" FSDC that his vehicle would be autonomous by the end of 2019, when "the term" itself suggests nothing about when such capabilities might become available. |
| 42. "On the morning that Young retrieved his 2019 Model 3 following the safety inspection at Tesla's dealership in Littleton, Colorado, the | This allegation refers to Elon Musk's March 2019 statements, as referenced elsewhere in the Complaint, and certain unidentified pages |

| Paragraph | Deficiencies |
|---|---|
| company's website contained substantially the same, specific representation that the company and CEO Musk had repeatedly made publicly via the wires to that point: namely, that Full Self-Driving Capability would be delivered via the internet as an automatic software update to Young's vehicle "later this year" or language substantially to that effect." | of Tesla's website with "substantially the same" statements, but does not indicate that Plaintiff ever heard or saw any of these statements before purchasing his vehicle. |
| 43. "Substantially the same representation was repeated verbally to Young by the manager of Tesla's Littleton, Colorado dealership, Francisco Partida, whom Tesla had charged with ensuring the vehicle's safety before it was released to Young, whereupon Partida excitedly extolled the 2019 Model 3's features, pointedly including Full Self-Driving Capability." | Again, the allegation does not indicate what specific "representation" was "repeated" to Plaintiff "verbally." The only description of the alleged verbal statement indicates Mr. Partida referred to FSDC as one of "the 2019 Model 3's features," but does not indicate any reference or promise that Plaintiff's Model 3 would be able to drive autonomously without human intervention by the end of 2019. |
| 49 "Before entering into the Agreement on May 20, 2019, Tesla solicited Young via the wires on its website and through the representations of CEO Musk to pay the company $60,100 in exchange for a car equipped with a specific product that Tesla labeled Full Self Driving Capability, and Young acted in justifiable and detrimental reliance on the company's public, highly specific, imperative, and repeated representations that: <br><br> (i) the product was an autonomous self-driving system equivalent to SAE Level 4 or 5 automated driving, as a plain language reading of the term implies and as CEO Musk specifically represented on numerous occasions including but not limited to during February, April, November, and December of 2019 as alleged herein; | This allegation refers to Plaintiff's purported "justifiable and detrimental reliance" and lists certain alleged Tesla statements, but does not make the required connection of alleging that Plaintiff actually was exposed to and relied on any of the referenced statements. For example, Plaintiff refers to podcasts involving Mr. Musk but states no facts to show he actually listened to or was even aware of them before purchasing his vehicle. |

| Paragraph | Deficiencies |
|---|---|
| (ii) Young's 2019 Model 3 would come with all computer hardware and other<br><br>equipment necessary to enable Full Self-Driving Capability and thereby achieve SAE Level 4 or 5 automated driving;<br><br>(iii) Full Self-Driving Capability was "available at the time of order[,]" Exhibit A;<br><br>(iii) SAE Level 4 or 5 automated driving would be delivered by the end of 2019 as CEO Musk had promised in specific and imperative language: 'I am certain of that. That is not a question mark.'" (*See also* Compl. ¶¶ 49, 76, 88, 98, 102, 109, and 131) | |
| 64. "Accordingly, the software that Tesla released in 2019 to Young's 2019 Model 3 would request—through an auditory signal and colorful depiction of a steering wheel—that the driver must "take over immediately." But according to the SAE's criteria, that is a defining characteristic of SAE Level 3 automated driving—which, as Tesla admitted to the California DMV in December of 2020, it had not achieved." | This allegation does not state that Plaintiff actually heard and saw the "auditory signal and colorful depiction," and, in any case, these signals could not have induced Plaintiff to purchase his vehicle because they were made available through a software update *after* Plaintiff's purchase. |

While Plaintiff makes various other conclusory assertions of what he was purportedly led to believe, they are similarly devoid of the facts needed to demonstrate reliance. In short, Plaintiff's rote recitations of reliance fall far short of Rule 9(b)'s heightened pleading requirements, and his fraud claim fails as a matter of law. *See Sandau*, 2021 WL 3403644, at *1.

Further, even if Plaintiff had demonstrated that he in fact relied on the Tesla statements referenced in the Complaint, those statements contain no promise that Plaintiff's Model 3 would

be able to drive autonomously without human intervention by a date certain, as discussed in detail above. *See* Section III supra. Indeed, the statements that Plaintiff points to in the Complaint— that Tesla would deliver certain features "later this year," "before the end of the year," or "this year," *see, e.g.*, Compl 17, 42, 45, 71(vi), 88(i), and 124(iv), —are predictions of future developments that generally cannot support a fraud claim. *See State ex rel. State Highway & Transp. Dep't v. Garley*, 111 N.M. 383, 389 (1991) (a "misrepresentation … must be one of fact, in the sense that [predictions] about the future or promises about the future will not be deemed actionable." (citation omitted)).[7]

Lastly, Plaintiff does not allege with particularity, as he must, that Tesla intended to deceive him into purchasing a Model 3 based upon the promise of fully autonomous driving by the end of 2019. Instead, Plaintiff merely regurgitates a legal conclusion without any supporting factual allegations. (Compl. ¶¶ 3, 4, 20(i), 132, and 135.) For instance, Plaintiff just asserts, with no supporting factual allegations, that Tesla "intended to keep Young's $60,100 indefinitely regardless of whether . . . it had actually developed Full Self-Driving Capability[.]" (*Id.* 20(i).) This is simply not enough. Plaintiff's failure to allege any intent to deceive is fatal to his fraud claim. *See Lucero v. HSBC Bank USA, N.A.,* 2020 WL 2329476, at *4 (D.N.M., 2020) (dismissing fraud claim where Plaintiff had failed to plead that Defendant "intended to deceive him about the $3,000.")

---

[7] The Complaint also alleges that "[s]ubstantially the same representation [as that on the website] was repeated verbally to [Plaintiff] by the manager of Tesla's Littleton, Colorado dealership." *Id.* ¶ 43. The Complaint does not explain what it means by "substantially the same," but suggests that the manager merely "extolled the 2019 Model 3's features, … including Full Self-Driving Capability." *Id.* This does not allege a false statement of fact at all, nor does it allege one with sufficient particularity under Rule 9(b). But even if the manager had literally parroted the website, a forward-looking statement like the one on the website is not an actionable. *See Garley*, 111 N.M. at 389.

Ultimately Plaintiff fails to allege with particularity that he relied on any of the allegedly misleading statements. A cause of action for fraud, requires at a minimum, that a plaintiff explain what statements he relied upon. Plaintiff's failure to do so here is glaring and requires dismissal.

## IV.   THE COMPLAINT ALSO INDEPENDENTLY FAILS TO STATE A NEGLIGENCE *PER SE* CLAIM

Plaintiff's negligence claim must be dismissed because it is premised solely on a theory of negligence *per se*, yet fails to allege the violation of any statute to which negligence *per se* principles apply. In support of the negligence *per se* claim, the Complaint alleges that Tesla violated New Mexico's criminal fraud statute (NMSA 1978 § 30-16-6(F)), New Mexico's criminal embezzlement statute (NMSA 1978 § 30-16-8(F)), the federal wire fraud statute (18 U.S.C. § 1343), and the federal money laundering statute (18 U.S.C. § 1956). Complaint ¶ 113. To defense counsel's knowledge, no court has ever permitted a plaintiff to pursue a negligence *per se* claim based on the alleged violation of these four statutes, nor should the Court allow that here.

New Mexico law applies a four-part test for determining whether negligence *per se* applies: "(1) [T]here must be a statute which prescribes certain actions or defines a standard of conduct, either explicitly or implicitly, (2) the defendant must violate the statute, (3) the plaintiff must be in the class of persons sought to be protected by the statute, and (4) the harm or injury to the plaintiff must generally be of the type the legislature through the statute sought to prevent." *Heath v. La Mariana Apartments*, 143 N.M. 657, 659 (2008) (building code provision prohibiting conditions "dangerous to life" was not sufficiently specific for negligence *per se* to apply). With respect to the first requirement, the Court explained:

> [W]here [statutory] duties are undefined, or defined only in abstract or general terms, leaving it to the jury to evaluate the factual circumstances of the particular case to determine whether the defendant acted reasonably, then a negligence per se instruction is not warranted.

*Id.* (emphasis added); *see also Abeita v. Northern Rio Arriba Elec. Co-op*, 124 N.M. 97 (1997) (regulations requiring electric line maintenance to reduce hazards to life "as far as practicable" and provide "adequate clearance" did not set standard beyond ordinary duty of care).[8]

Here, the statutes cited in the Complaint do not articulate specific standards of conduct. Instead, they prohibit "fraud" and other broad categories of conduct described in "abstract or general terms." *Heath*, 143 N.M. at 659. *See* NMSA 1978 § 30-16-6 (prohibiting "misappropriation … by means of fraudulent conduct, practices or representations"); NMSA 1978 § 30-16-8 (prohibiting "embezzling … with fraudulent intent"); 18 U.S.C. § 1343 (prohibiting "scheme or artifice to defraud" or "false or fraudulent pretenses, representations, or promises"); 18 U.S.C. § 1956 (prohibiting financial transactions "with the intent to promote the carrying on of specified unlawful activity"). These general statutory proscriptions "lack[] the specificity necessary to provide any meaningful 'substitute' for common law duties of reasonable care." *Ross v. Univ. of Tulsa*, 2015 WL 4064754, *3 (N.D. Okla. July 2, 2015) ("Unlike a regulatory standard that sets forth a specific requirement or best practice relevant to the fact pattern of a given case— such as avoiding leaving foreign substances on a medical implant—the 'standard' set by Title IX is simply to avoid sex discrimination in educational programs or activities.").

Furthermore, a criminal statute that does not create a private cause of action cannot serve as the basis for negligence *per se* liability. *See Ing Bank, FSB, v. First Cont'l Mortg., Inc.*, 2010 WL 11626857, at *10 (M.D. Fla. Aug. 11, 2010) (a "plaintiff cannot ground a negligence *per se*

---

[8] In fact, some courts have found that "a claim of negligence *per se* may be supported **only** by statutes and regulations relating to public safety, such as health regulations and rules of the road." *Scarborough v. Brown Grp., Inc.*, 935 F. Supp. 954, 964 (W.D. Tenn. 1995) (emphasis added) (dismissing negligence *per se* claim premised on violation of non-discrimination statute).

claim in a federal criminal statute unless Congress has clearly evinced its intent to create a private cause of action for violations under the applicable statute."). Here, the statutes cited in the Complaint give rise to criminal liability, but they do not create private causes of action. *See Kingsley v. Ashworth*, 139 F.3d 905 (9th Cir. 1998) ("18 U.S.C. § 1343 does not give rise to a private cause of action"); *Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659, 668 (S.D.N.Y. 2000) ("Because 18 U.S.C. § 1956 … does not give rise to a private cause of action, [plaintiff's] negligence *per se* claim fails"); *cf. Stern v. Epps*, 464 F. App'x 388, 393 (5th Cir. 2012) ("Embezzlement and money laundering are crimes under Mississippi law, not private causes of action."); *Estes v. ECMC Grp., Inc.*, 2020 WL 5549103, at *8 (D.N.H. Sept. 16, 2020) (finding no private cause of action under New Hampshire's criminal fraud statute).

Because Plaintiff alleges Tesla violated statutes that do not define specific affirmative duties or create private causes of action, these statutes cannot form the basis for a negligence *per se* claim. And because Plaintiff does not allege the elements of an ordinary negligence claim, including the breach of a duty based on a reasonable standard of care, *see Zamora v. St. Vincent Hosp.*, 335 P.3d 1243, 1249 (N.M. 2014), the negligence claim must be dismissed.

## CONCLUSION

Plaintiff's Complaint fails in its entirety because his claims are based on a purported contractual obligation that does not exist, on tort duties that are precluded as a matter of law, and on fraud allegations that are not pled with specificity. Accordingly, Tesla respectfully requests that the Court grant Tesla's Motion and dismiss the Complaint in its entirety.

Dated: November 9, 2021

Respectfully submitted,

COOLEY LLP

By: /s/ Whitty Somvichian
Whitty Somvichian (Admitted *Pro Hac Vice*)
Colin S Scott. (Admitted *Pro Hac Vice*)
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-2000
wsomvichian @cooley.com
cscott@cooley.com

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.
Tyler M. Cuff
201 Third St. NW, Suite 2200
Albuquerque, NM 87102
(505) 768-7267
tcuff@rodey.com

*Counsel for Defendant Tesla, Inc*

.

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2021, I filed the foregoing document electronically through the CM/ECF system, which caused all parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

Joel M. Young
P.O. Box 424
Placitas, NM 87043
(505) 243-5696
jmyoung@swcp.com

*Plaintiff pro se*

COOLEY LLP


By: */s/ Whitty Somvichian*
     Whitty Somvichian

257962131