## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JOEL M. YOUNG,
an individual,

      Plaintiff,

v.                                               Case No. 1:21-cv-00917-JB-SCY

TESLA, INC.,
a Delaware Corporation,

      Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

This matter comes before the Court on Defendant's Motion to Dismiss the Complaint. Doc. 14; *see also* Docs. 21 (response), 29 (reply). Plaintiff is proceeding *pro se*. Pursuant to 28 U.S.C. §§ 636(b)(1)(B), (b)(3), and *Va. Beach Fed. Sav. & Loan Ass'n v. Wood*, 901 F.2d 849 (10th Cir. 1990), the Honorable James O. Browning referred this matter to me to perform any legal analysis required to recommend to the Court an ultimate disposition of the case. Doc. 31. For the reasons discussed below, I recommend that the Court deny in part Defendant's motion to dismiss as to Plaintiff's breach of contract claim regarding features promised "later this year", and grant in part the motion to dismiss as to the remainder of the breach of contract claim as well as to Plaintiff's claims for unjust enrichment, civil conversion, negligence per se, and fraud.

## BACKGROUND

On this motion to dismiss, the Court takes as true the following facts from Plaintiff's complaint (Doc. 1). Plaintiff purchased a Tesla Model 3 electric vehicle on May 20, 2019. Doc. 1 at 9 ¶ 1. Plaintiff agreed to pay Defendant $60,100, including a $6,000 charge for "Full Self-Driving Capability." *Id.* ¶ 2. The contract itself does not include a formal definition of this term,

*see id.* at 62-67, but the complaint refers to the description of this feature on Defendant's

website, *id.* at 27-28 ¶ 50. That description reads as follows:

> Full Self-Driving Capability
>
> All new Tesla cars have the hardware needed in the future for full self-driving in almost all circumstances. The system is designed to be able to conduct short and long distance trips with no action required by the person in the driver's seat.
> All you will need to do is get in and tell your car where to go. If you don't say anything, the car will look at your calendar and take you there as the assumed destination or just home if nothing is on the calendar. Your Tesla will figure out the optimal route, navigate urban streets (even without lane markings), manage complex interactions with traffic lights, stop signs and roundabouts, and handle densely packed freeways with cars moving at high speed. When you arrive at your destination, simply step out at the entrance and your car will enter park seek mode, automatically search for a spot and park itself. A tap on your phone summons it back to you.
> The future use of these features without supervision is dependent on achieving reliability far in excess of human drivers as demonstrated by billions of miles of experience, as well as regulatory approval, which may take longer in some jurisdictions. As these self-driving capabilities are introduced, your car will be continuously upgraded through over-the-air software updates.

*Id.* at 28 ¶ 50. Elsewhere, the website stated:

> Full Self-Driving Capability
> • Navigate on Autopilot: automatic driving from highway on-ramp to off-ramp including interchanges and overtaking slower cars.
> • Auto Lane Change: automatic lane changes while driving on the highway.
> • Autopark: both parallel and perpendicular spaces.
> • Summon: your parked car will come find you anywhere in a parking lot. Really.
> Coming later this year:
> • Recognize and respond to traffic lights and stop signs.
> • Automatic driving on city streets.
> […]
> The currently enabled features require active driver supervision and do not make the vehicle autonomous. The activation and use of these features are dependent on achieving reliability far in excess of human drivers as demonstrated by billions of miles of experience, as well as regulatory approval, which may take longer in some jurisdictions. As these self-driving features evolve, your car will be continuously upgraded through over-the-air software updates.

Doc. 15-1 at 2.[1]

Plaintiff argues that Defendant's description generated false impressions that the vehicle could drive itself without human intervention. Doc. 1 at 10 ¶ 2. At the time he purchased the vehicle, it could not; it contained driver-assist features but did not have the software necessary for fully autonomous self-driving without human intervention because Defendant had not yet developed this technology. *Id.* at 18 ¶ 23, 36 ¶ 69.

Notwithstanding the fact that the car could not autonomously drive itself at the time of purchase, communications from Tesla CEO Elon Musk and information on Defendant's website led Plaintiff to believe that the car would attain these abilities by the end of 2019. Plaintiff cites to a December 19, 2019 tweet by Musk, the contents of the website "[o]n the day that [Plaintiff] responded to [Defendant's] solicitation via the wires", and a February 29, 2019 interview between Musk and a money management firm in support of this belief. *Id.* at 11 ¶ 5, 17 ¶ 17, 19 ¶ 24. Because Plaintiff's vehicle could not drive itself autonomously without human intervention by December 31, 2019, Plaintiff sued Defendant for breach of contract, unjust enrichment, civil conversion, negligence per se, and fraud. *Id.* at 9.

---

[1] Defendant requests that the Court take judicial notice of its website at the time Plaintiff ordered his vehicle, a transcript of Tesla CEO Elon Musk's February 19, 2019 interview with the Ark Investor podcast, and a series of Musk's tweets on December 19, 2019. Doc. 15. I recommend that the Court grant this request because Plaintiff's complaint explicitly references all three of these sources. Doc. 1 at 17, 44 ¶¶ 17, 88 (website), 19 ¶ 24 (interview), 11 ¶ 5 (tweets). A court may consider documents referred to in the complaint without converting a motion to dismiss into a motion for summary judgment "if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Hampton v. root9B Tech., Inc.*, 897 F.3d 1291, 1297 (10th Cir. 2018) (citation omitted). Although Plaintiff refers to these sources as parol evidence, *see* Doc. 21 at 21, 23, they are central to Plaintiff's claims in terms of establishing his purported expectation that his car would become fully self-driving without human intervention by December 31, 2019. Therefore, I consider them in this PFRD and recommend that the Court do the same.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint for failure to state a claim upon which the court can grant relief. "[T]o withstand a Rule 12(b)(6) motion to dismiss, a complaint must contain enough allegations of fact, taken as true, to state a claim to relief that is plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a complaint does not require detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

"A claim is facially plausible when the allegations give rise to a reasonable inference that the defendant is liable." *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016). The court's consideration, therefore, is limited to determining whether the complaint states a legally sufficient claim upon which the court can grant relief. *See Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999). The court is not required to accept conclusions of law or the asserted application of law to the alleged facts. *See Hackford v. Babbitt*, 14 F.3d 1457, 1465 (10th Cir. 1994). Nor is the court required to accept as true legal conclusions that are masquerading as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must, however, view a plaintiff's allegations in the light most favorable to him. *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013).

## DISCUSSION

Plaintiff's complaint includes five causes of action and Defendant moves to dismiss them all. I will address each in turn.

## I.      Breach of Contract

In count I of his complaint, Plaintiff alleges that he paid $6,000 for an optional feature called "Full Self-Driving Capability" which was to be delivered by the end of 2019. Doc. 1 at 44-45 ¶¶ 90, 94. Defendant, he argues, breached that agreement by failing to provide self-driving automation by the end of 2019. *Id.* at 45 ¶ 93. In the present motion, Defendant argues that Plaintiff has failed to state a claim for breach of contract because it delivered exactly what was included in the contract and it never promised a fully autonomous self-driving car. Doc. 14 at 9. It adds that the contract is fully integrated, so the extracontractual statements Plaintiff references are not relevant, and that even if they were relevant, Plaintiff does not allege that he read or listened to those statements before purchasing the vehicle. *Id.* at 9-10. Plaintiff responds that the only reasonable interpretation of the complaint as a whole is that he did see or hear the extracontractual statements before agreeing to the contract. Doc. 21 at 4-5. Plaintiff also addresses the plain language in the contract, "Full Self-Driving Capability," and emphasizes the argument in the complaint that this language implies a vehicle fully capable of driving itself without human intervention. *Id.* at 6, 17-18. In reply, Defendant argues that Full Self-Driving Capability is capitalized in the agreement because it is a proper noun referring to a suite of driver-assist features and hardware that will be necessary for future self-driving capabilities, so a word-by-word dictionary definition is insufficient to determine the term's true meaning. Doc. 29 at 3-4.

The parties' various arguments all lead to the following question: What does "Full Self-Driving Capability" mean? It is the answer to this question that the parties dispute. In resolving this dispute, at this stage of the case, the Court is required to accept Plaintiff's allegations of fact unless those facts are contradicted by the very documents (such as the contract) on which

Plaintiff relies. But the Court is not required to accept Plaintiff's legal conclusions—his interpretation of the contractual terms. To determine if Plaintiff plausibly states a claim that Defendant failed to fulfill the terms of the contract it entered with Plaintiff, therefore, I first consider the terms by which the parties are contractually bound.

A contractual term is ambiguous when it is "reasonably and fairly susceptible of different constructions." *United Nuclear Corp. v. Allstate Ins. Co.*, 2012-NMSC-032, ¶ 10, 285 P.3d 644, 648. The ordinary meaning of the words generally controls, but if an ambiguity exists—particularly in a contract of adhesion—the language will be construed against the drafter. *Id.* In determining the meaning of a word, dictionary definitions are not absolute: the "common and ordinary meaning" among individuals may not be identical to the dictionary definition. *Battishill v. Farmers Alliance Ins. Co.*, 2006-NMSC-004, ¶ 10, 127 P.3d 1111, 1114.

As alleged in the complaint, the contract does not define the term "Full Self-Driving Capability." Instead, the term appears on an itemized list of optional features for the Model 3 vehicle that the contract covers. Doc. 1 at 62 (Exhibit A to complaint). In his complaint, Plaintiff includes a word-by-word dictionary definition of "Full Self-Driving Capability". Doc. 1 at 15-16 ¶¶ 14-15. This is a legal conclusion that the Court is not required to accept as true and that I recommend the Court not accept.

The context in which the term "Full Self-Driving Capability" is used indicates that the term is used to describe a specific feature of the vehicle. This conclusion is supported by the fact that each word in the phrase is capitalized. Other capitalized phrases in the same section of the contract clearly refer to names for vehicle features rather than their dictionary definitions. For example, it would be difficult to believe that the "Pearl White Multi-Coat" exterior is made of real pearls, as a discrete word-by-word analysis might suggest. Instead, the context makes clear

6

that "Pearl White" is an adjective used to describe a color. The term "Pearl White Multi-Coat," taken as a whole, is a noun signifying a particular type of vehicle coating. The best way to determine exactly what "Pearl White Multi-Coat" means is to look at a vehicle with this coating or to look at a sample of this coating.

Similarly, the best way to determine what "Full Self-Driving Capability" means is to look at the context in which Defendant uses that term. As Plaintiff notes in his complaint, Defendant's website provides a description of the term "Full Self-Driving Capability." This definition includes the "hardware needed in the future for full self-driving" and explains that "[a]s these self-driving capabilities are introduced, your car will be continuously upgraded through over-the-air software updates." Doc. 1 at 28 ¶ 50. The website also identifies the need for regulatory approval. *Id.* This description therefore makes it clear that cars with Full Self-Driving Capability are not currently capable of driving themselves without human intervention. Nor does the website provide a date as to when cars with this feature will be capable of driving themselves without human intervention. What the website does make clear, however, is that cars with the Full Self-Driving Capability will have access to software updates necessary to provide self-driving capabilities as they develop and attain regulatory approval. This term is not reasonably susceptible to multiple interpretations; its only reasonable interpretation is that it is a name referring to the collection of features described on Defendant's website.

Plaintiff argues that even under Defendant's construction of the contractual language, the contract still obligated Defendant to provide Full Self-Driving Capability before December 31, 2019. His logic is that the contract left the time Defendant would provide Full Self-Driving Capability (in his view, fully autonomous self-driving without human intervention) ambiguous—

it could have been interpreted to require Full Self-Driving Capability either at the time of purchase or before the end of 2019.

When a contract ambiguously allows for a range of options, a party may breach by failing to meet the lowest part of the range, and the party seeking enforcement may recover the lowest agreed-upon amount. For example, if an employer contracts with an employee to pay a salary between $75,000 and $100,000 and the employer breaches the contract by paying the employee nothing, the parties are bound to the lowest amount to which they have agreed, and the employee may recover $75,000. *Padilla v. RRA, Inc.*, 1997-NMCA-104, ¶¶ 13-15, 946 P.2d 1122, 115-16. Therefore, Plaintiff argues, even if the contract was ambiguous as to the time it would require Defendant to provide Full Self-Driving Capability, the latest possible date the contract permitted this feature to be available was December 31, 2019.

In support of his contention that Defendant promised a vehicle with Full Self-Driving Capability no later than December 31, 2019, Plaintiff's complaint cites to several statements Defendant allegedly made. First, he cites a February 19, 2019 podcast interview by Tesla CEO, Elon Musk, in which Musk stated, "I think we will be 'feature-complete' on full self-driving this year, meaning the car will be able to find you in a parking lot, pick you up, take you all the way to your destination without an intervention this year. I am certain of that. That is not a question mark." Doc. 1-1 ¶ 24; *see also* Doc. 15-2 at 14 (transcript of interview). But the interview, to the extent that it was applicable to Plaintiff's purchase at all, was superseded by the terms of the contract signed on May 20, 2019. The contract explicitly states, "Prior agreements, oral statements, negotiations, communications or representations about the Vehicle sold under this Agreement are superseded by this Agreement." Doc. 1 at 65; *see DeFranco v. Storage Tech. Corp.*, 622 F.3d 1296, 1303 (10th Cir. 2010) (contract stating that the current agreement

"supersedes, terminates, and otherwise renders null and void any and all prior agreements or contracts" between the parties superseded any earlier guarantees one party received from the other).

Second, Plaintiff points to Elon Musk's December 19, 2019 tweet, which was part of a series in which Musk stated, "Tesla holiday software package has FSD sneak preview, Stardew Valley, Lost Backgammon & a few other things".[2] Doc. 15-3 at 2. Another Twitter user asked Musk whether he could release the software package early and Musk responded, "Needs a few more days of validation, then early access, then wide release". *Id.* But this tweet does not help Plaintiff's breach of contract claim. The tweet took place *after* the contract had been formed, so the tweet cannot have induced Plaintiff into purchasing the vehicle from a simple chronological standpoint. Count I, alleging breach of contract, states that Plaintiff "would not have purchased a 2019 Model 3 at all but for his reasonable and justifiable reliance on Tesla's repeated, highly specific, and imperative representations about the efficacy of Full Self-Driving Capability, and about its certain delivery before the end of 2019." Doc. 1 at 45 ¶ 94. Musk's tweet, made after Plaintiff signed the contract, therefore could not have influenced Plaintiff's decision to purchase the Model 3 vehicle.

The tweet also cannot fairly be read as an addendum to the contract or a promise about when fully autonomous self-driving capabilities would reach Plaintiff's vehicle. These tweets refer to a "sneak preview" of full self-driving functionality, not the capacity Plaintiff sought in its entirety, and even that sneak preview was subject to validation and a gradual release. In sum, the extracontractual statements from the interview and Twitter did not affect the terms of

---

[2] FSD presumably refers to "full self-driving."

agreement and did not obligate Defendant to provide fully autonomous self-driving capacity to Plaintiff's vehicle by the end of 2019.

In addition to these extra-contractual statements, Plaintiff's complaint alleges that the language of the contract itself supports his case. He alleges the contract stated that certain features would be available "later this year"—that is, later in 2019. *See* Doc. 1-1 ¶¶ 17, 42 (referencing Defendant's website); Doc. 15-1 at 2 (an excerpt of Defendant's website at the time Plaintiff ordered his vehicle, of which Defendant asks the Court to take judicial notice). Although Plaintiff's citation is to Defendant's website rather than an actual signed contract between the parties, I agree that Plaintiff fairly cites Defendant's website (as it existed at the time Plaintiff ordered his vehicle) as evidence of the contract. Taking Plaintiff's allegations as true, Plaintiff ordered his vehicle through Defendant's interactive website. Doc. 1 at ¶ 12. The portion of the website which the Defendant requests the Court take judicial notice of (and which I agree is appropriate) contains a check-box a customer can mark to order "Full Self-Driving Capability" in exchange for $6,000. Doc. 15-1 at 2. Thus, this portion of Defendant's website appears to function as an ordering form—it provides an option Plaintiff can select or reject and a price for that option.

This portion of the website breaks the Full Self-Driving Capability function into two categories: (1) features listed directly under Full Self-Driving Capability, including navigate to autopilot, auto lane change, autopark, and summon; and (2) features listed under the subheading "coming later this year:" including "recognize and respond to traffic lights and stop signs" and "automatic driving on city streets". Doc. 15-1 at 2. I will address the two categories of features separately.

Although the first category of features does describe various automatic features of the vehicle, those features do not combine to describe an autonomous self-driving vehicle that requires no human intervention. To the contrary, as explained above, Full Self-Driving Capability refers to a collection of driver-assist features, the hardware necessary for future autonomous self-driving without human intervention, and a promise that any future software updates in this area that attain regulatory approval will be delivered over-the-air to the vehicle purchased.

Making all reasonable inferences in Plaintiff's favor, by listing the four features in this first category under the heading "Full Self-Driving Capability" and above the sub-heading "Coming later this year", the website can be fairly read to describe features that existed at the time Plaintiff purchased his vehicle. But, Plaintiff does not allege in his complaint that Defendant breached the contract by failing to provide any of the four features listed in the first category. Further, this page of the website also clearly states, "The currently enabled features require active driver supervision and do not make the vehicle autonomous." Doc. 15-1. Thus, Plaintiff has no viable complaint that, because these four features did not actually make the vehicle fully autonomous, Defendant breached the contract. Although it likely would be a breach if, for example, Defendant had developed fully autonomous self-driving software and attained the necessary approvals but still refused to provide it to Plaintiff, Plaintiff makes no such allegation.

The second category of features, however, presents a different story. The definition for Full Self-Driving Capability did set a deadline ("coming later this year") for two features: recognize and respond to traffic lights and stop signs and automatic driving on city streets. Doc. 15-1. Plaintiff asserts "Tesla's Model 3 ordering page contained substantially the same representation repeatedly made by CEO Musk that Full Self-Driving Capability was 'coming

later this year.'" Doc. 1-1 ¶ 17. To the extent Plaintiff alleges this language promised by the end of the year a fully autonomous vehicle that could safely operate without human intervention, I disagree with Plaintiff.

First, the two features promised "later this year" (automatic driving on city streets and responding to traffic lights and stop signs), do not promise to make the vehicle fully autonomous and able to operate without human intervention. Second, after listing these two "coming later this year" features on its webpage, Defendant writes, "The activation and use of these features are dependent on achieving reliability far in excess of human drivers as demonstrated by billions of miles of experience, as well as regulatory approval, which may take longer in some jurisdictions." Doc. 15-1. Thus, the page makes clear that the "activation and use" of "these features" are subject to "regulatory approval". Plaintiff does not allege that "regulatory approval" has been obtained. This condition precedent having not been met, Plaintiff has no viable claim that Defendant breached the contract by not activating these features and making them usable.

Read in the light most favorable to Plaintiff, however, in describing what Plaintiff would get in exchange for the $6,000 Full Self-Driving Capability option, Defendant did promise that by year's end the vehicle would be able to "recognize and respond to traffic lights and stop signs" and "automatic driving on city streets". Doc. 15-1. Even if this webpage did not promise the "activation and use" of these features, it at least promised that these features would be developed. In other words, in defining the term "Full Self-Driving Capability" on its website, Defendant promised these features by year-end.[3] In his complaint, Plaintiff alleges Defendant

---

[3] When the complaint discusses automated driving, it often references a Society of Automotive Engineers chart classifying different types of driver-assist and automated driving technology. Doc. 1 at 16. Defendant's website and the contract do not refer to this chart. Thus, I disagree with Plaintiff's contention that Defendant promised to deliver by year's end a vehicle that was equivalent to SAE Level 4 or 5 automated driving. *See* Doc. 1 ¶ 18. Although Plaintiff frequently

"fail[ed] to deliver Full Self-Driving Capability on December 31, 2019[.]" Doc. 1-1 ¶ 39.

Plaintiff also alleges Defendant did not deliver any automated driving features by December 31,

2019. Doc. 1-1 ¶¶ 5(i), 44. Plaintiff claims, "Tesla thereby duped Young into sympathizing with

the company's feigned inability to deliver a non-existent feature that it had fraudulently led him

to believe it *had in fact* developed and *would in fact* deliver by December 31, 2019 . . ." Doc. 1-1

¶ 53. He further alleges that Tesla fraudulently solicited and received $6,000 from him for a

"product" the company failed to deliver by December 31, 2019, as promised. Doc. 1-1 ¶ 78. And,

in the "Count 1-Breach of Contract" portion of his complaint, Plaintiff generally alleges that

"$6,000 of the $60,100 consideration paid by Young is expressly for an optional feature called

'Full Self-Driving Capability'" and that by not providing a vehicle with Full-Self Driving

Capability before the end of 2019, Defendant breached its obligation in the Agreement.  Doc. 1-1

at ¶¶ 90, 94-95.

　　Reading the complaint in the light most favorable to Plaintiff, considering Plaintiff's *pro*

*se* status, and drawing reasonable inferences in Plaintiff's favor, I read Plaintiff's complaint as

alleging that Defendant failed to deliver the two features promised in category two. Although

Defendant made no promises as to when its vehicles would be fully automated such that they

could operate safely without human intervention, in connection with the $6,000 Full Self-Driving

---

refers to "SAE Levels", he points to no contractual provision in which Defendant promised a
vehicle measured using this scale. Further, although Plaintiff does allege that Tesla's CEO "had
promised on February 18, 2019 to deliver Full Self-Driving *Capability*, which he characterized
as equivalent to SAE Level 4 or 5 automated driving by the end of 2019 . . .", as set forth above,
any promise Musk made on February 18, 2019 was superseded by the terms of the contract
signed on May 20, 2019. The contract explicitly states, "Prior agreements, oral statements,
negotiations, communications or representations about the Vehicle sold under this Agreement are
superseded by this Agreement." Doc. 1 at 65; *see DeFranco*, 622 F.3d at 1303 (contract stating
that the current agreement "supersedes, terminates, and otherwise renders null and void any and
all prior agreements or contracts" between the parties superseded any earlier guarantees one
party received from the other).

Capability option, it did promise to stay on a certain track; namely, that by year end the Full Self-Driving Capability Plaintiff paid for would at least include recognizing and responding to traffic lights and stop signs and automatic driving on city streets. Allegations that Defendant did not deliver on those two features by the end of the year as promised states a claim for breach of contract.

As such, I recommend that the Court find that the complaint states a claim for breach of contract as to the two features "coming later this year" (recognizing and responding to traffic lights and stop signs and automatic driving on city streets). As to the reminder of Plaintiff's breach of contract claim regarding Full Self-Driving Capability, I recommend that the Court grant the motion to dismiss.

## II.     Unjust Enrichment

Count II of Plaintiff's complaint alleges, in the alternative to breach of contract, that Defendant fraudulently induced Plaintiff to pay $60,100 for a vehicle equipped with Full Self-Driving Capability but never delivered such a vehicle and has refused to refund Plaintiff. Doc. 1 at 46 ¶¶ 98, 100. Defendant argues that because Plaintiff pleads that a valid contract exists between the parties, an unjust enrichment claim is improper. Doc. 14 at 13. Plaintiff responds that he is permitted to advance alternative theories, and in the event the factfinder determines that the contract is not valid or enforceable, he brings an unjust enrichment claim. Doc. 21 at 10-11.

"New Mexico law strongly disfavors unjust enrichment claims when remedies exist under contract law." *Armijo v. FedEx Ground Package Sys., Inc.*, 285 F. Supp. 3d 1209, 1217 (D.N.M. 2018) (citation omitted). As Plaintiff notes, however, when the existence of an enforceable contract is at issue, a plaintiff may plead unjust enrichment as an alternative to breach of contract. *Strobel v. Rusch*, 431 F. Supp. 3d 1315, 1330-31 (D.N.M. 2020). Unjust

14

enrichment is an equitable doctrine meant to address circumstances where a contract is for some

reason inviable. *Armijo*, 285 F. Supp. 3d at 1218; *see also Elliott Indus. Ltd. P'ship v. BP Am.

*Prod. Co.*, 407 F.3d 1091, 1117 (10th Cir. 2005) ("Elliott's unjust enrichment claim fails, like

Elliott's other extracontractual claims addressed above, because the claim for underpayment of

royalties is grounded in the parties' contractual relationship.").

       In the case *United States for the use of Sierra Canyon Construction, LLC v. Markel*

*Insurance Company*, the Tenth Circuit permitted an unjust enrichment claim to make it past the

pleading stage alongside a breach of contract claim because dismissing the unjust enrichment

claim would be "premature" when recovery on the contract was uncertain. No. 1:21-cv-00974,

2022 WL 541032, at *2 (10th Cir. Feb. 23, 2022). It makes sense that in the early stages of

litigation, when the parties may dispute the existence of a contract as well as its contents,

dismissing an unjust enrichment claim is premature. After all, the court may well find down the

line that the contract does not exist and an unjust enrichment claim would have been appropriate.

But here, the parties do not dispute the existence of the contract. They agree that they entered

into a contract where Plaintiff would pay, and did pay, Defendant $6,000 for the Full Self-

Driving Capability option at the time Plaintiff bought a vehicle from Defendant. Instead of

disputing that they entered a contract, the parties dispute what Defendant promised in connection

with the Full Self-Driving Capability option and whether Defendant delivered what it promised.

       Plaintiff argues the Court should not dismiss his unjust enrichment claim because it is

possible the Court will conclude that a promise to perform in the future is "illusory" and not

enforceable in contract. Doc. 21 at 11. Yet, neither party asserts that the contract was illusory or

somehow invalid. Defendant, for its part, does argue that "predictions of future developments []

generally cannot support a fraud claim." Doc. 14 at 18. However, Defendant does not argue, and

could not credibly argue, that a contract to pay today for something that will be delivered in the future is unenforceable. Plaintiff's concern (that the Court will find the agreement unenforceable because a promise to perform in the future is illusory) is unfounded. Because both parties agree they entered into a contract and because New Mexico law strongly disfavors unjust enrichment claims under such circumstances, I recommend that the Court dismiss Plaintiff's unjust enrichment claim.

### III.    Civil Conversion and Negligence Per Se

Counts II and IV of Plaintiff's complaint allege tort claims: civil conversion and negligence per se. Defendant argues that Plaintiff's tort claims essentially re-plead his contract claim and that allegations in tort are improper when a contract governs the relationship between the parties. Doc. 14 at 11. Plaintiff responds that, at this stage of the litigation, he may bring alternative claims based on the possibility that the contract is invalid. Doc. 21 at 9.[4]

Plaintiff does have the right to bring claims and make arguments in the alternative. *See* Fed. R. Civ. P. 8(d)(2). However, when a contract governs the relationship between parties, it does not create independent duties to comply with the terms of that contract under tort law; rather, the contract is what establishes the parties' rights and remedies. *See Fogelson v. Wallace*, 2017-NMCA-089, ¶ 86, 406 P.3d 1012, 1032 (rejecting a conversion claim based on money paid under a contract because the contract's elements govern this conduct). Although *Fogelson*

---

[4] Plaintiff refers to the doctrine of election of remedies. Doc. 21 at 9. "The doctrine of election of remedies applies when a plaintiff has made a specific choice between inconsistent remedies." *Salazar v. Torres*, 2007-NMSC-019, ¶ 23, 158 P.3d 449, 456. When a plaintiff has made this choice, the defendant may use the doctrine as a defense to prevent repetitive litigation. *McKinney v. Gannett Co., Inc.*, 817 F.2d 659, 671 (10th Cir. 1987). Here, Defendant states that it does not invoke this defense; rather, it argues that the tort claims are improper based on the existence of a valid contract. Doc. 14 at 11. Therefore, this specific equitable doctrine does not apply. Instead, I address Plaintiff's more general underlying argument that he is entitled to plead alternative theories of recovery.

involved a case much farther along in its procedural posture than this one, Doc. 21 at 9 n.5, its logic applies just as well to cases at the motion to dismiss stage when tort claims do not plead a breach of duty beyond the requirements of the contract. *See Anderson Living Tr. v. ConocoPhillips Co., LLC*, 952 F. Supp. 2d 979, 1044-45 (D.N.M. 2013) (granting motion to dismiss the tortious portion of a claim for breach of good faith and fair dealing when plaintiffs did not plead a breach of duty beyond the requirements of the contract itself).

Here, too, the tort claims are plain attempts to enforce the contract: the conversion claim is that Defendant "wrongfully and unlawfully exercised dominion and control over" the $60,100 that Plaintiff paid in consideration for the vehicle, and the negligence per se claim is that Defendant embezzled, laundered, or defrauded Plaintiff out of the money he paid under the contract. Doc. 1 at 48 ¶ 105, 50-51 ¶ 113. These claims are different methods of vindicating the same purported wrong: that Defendant did not provide what Plaintiff believes the contract promised. Plaintiff does not argue otherwise. Therefore, if the purchase agreement between Plaintiff and Defendant is valid, tort claims are an inappropriate method of enforcing the contract's promises.

Plaintiff's cursory arguments that Defendant drafted the contract unilaterally and Plaintiff was a consumer do not affect the contract's validity. *See Padilla v. State Farm Mut. Auto. Ins. Co.*, 2003-NMSC-011, ¶ 14 n.3, 68 P.3d 901, 907 (contracts of adhesion, without more, are not inherently unconscionable or invalid). Plaintiff does not allege that the contract terms were unconscionable. His allegations of ambiguity are unavailing. He gives no reason to believe that the contract is not binding. As a result, I recommend that the Court dismiss Plaintiff's conversion

and negligence per se claims, which are simply a reformulation of Plaintiff's breach of contract claim.[5]

Lastly, almost six months after the parties finished briefing the motion to dismiss, Plaintiff filed a Notice of Supplemental Authorities regarding his negligence per se claim. Doc. 38; *see also* Doc. 39 (Defendant's response). Under this Court's local rules, "[i]f pertinent and significant authorities come to a party's attention after the party's brief has been filed, or after oral argument but before decision, a party may promptly file a 'Notice of Supplemental Authorities,' setting forth the citations." D.N.M. LR-Civ. 7.8(b). Plaintiff cites seven cases which generally discuss the elements of negligence per se. All the cases were published well before Plaintiff filed his response to the motion to dismiss and therefore were available to Plaintiff when he filed his response. Additionally, I have reviewed them and they do not change the above recommendation. That is, none of the cited cases change the conclusion that Plaintiff's negligence per se claim is a repleading of his breach of contract claim.

## IV.   Fraud

Plaintiff's fraud claim is that Defendant fraudulently induced Plaintiff to pay the $60,100 contract price for a vehicle that did not have the features Plaintiff expected it to have. Doc. 1 at 55 ¶ 131, 57 ¶ 134. To the extent this claim re-pleads breach of contract, I recommend that the Court dismiss it for the same reasons as the tort claims above. That is, to the extent Plaintiff alleges that the terms of the contract (including the definition of Full Self-Driving Capability)

---

[5] Because I recommend dismissing Plaintiff's civil conversion and negligence per se claims as inappropriate methods of enforcing the contract, I recommend that the Court need not reach Defendant's other argument that the negligence per se claim cannot stand because it is based on violations of criminal law statutes that no New Mexico court has ever found to support such a claim.

were fraudulent because he did not receive a fully autonomous vehicle by the end of 2019, such a claim just restates his breach of contract claim.

However, to the extent the complaint frames its fraud allegations based on events outside the contract itself—such as Musk's tweet and podcast interview—I discuss these issues separately. First, Musk's tweet, which he published on December 19, 2019, post-dated the contract and therefore could not have fraudulently induced Plaintiff to enter the contract.

Musk's interview, however, took place before Plaintiff entered the contract and so I consider it more thoroughly. Fraud is subject to heightened pleading standards under Federal Rule of Civil Procedure 9(b). *Two Old Hippies, LLC v. Catch the Bus, LLC*, 784 F. Supp. 2d 1200, 1207-08 (D.N.M. 2011). More detail is necessary, including the "who, what, when, where and how of the alleged fraud." *Id.* (quoting *United States ex rel. Schwartz v. Coastal Healthcare Group, Inc.*, 232 F.3d 902, at *3 (10th Cir. 2000) (unpublished disposition)). Here, although the complaint alleges that "Tesla deliberately continued during 2019 to make the false, reckless, and misleading representations or promises alleged herein via the wires [podcast]", Doc. 1-1 at 56 ¶ 133, the complaint does not allege that Plaintiff actually listened to Musk's interview before entering the contract. Nor does the complaint allege that he relied on the contents of the interview when making his purchase. Such connecting facts are far from "redundant," as Plaintiff argues, *see* Doc. 21 at 14, because if Plaintiff did not discover the interview until after he entered the contract, the interview could not have fraudulently induced him to enter the contract.

Further, even if Plaintiff did rely on Musk's statement, Musk's statement in the interview goes on to say that "[t]hen, when will regulators allow us even to have these features turned on with human oversight. That's a variable which we have limited control over," Doc. 15-2 at 14-

15, indicating that Musk was not making the absolute representation Plaintiff asserts he was.[6] In other words, to the extent Plaintiff claims that Musk promised by year's end a fully-approved self-autonomous vehicle, a review of Musk's complete statement refutes this claim, rendering it futile. I do not read Plaintiff's complaint as simply alleging that Defendant, through Musk, fraudulently promised by year's end technology it knew at the time of Musk's statement it could not actually deliver by years end (namely, that "the car will be able to find you in a parking lot, pick you up, take you all the way to your destination without an intervention this year."). As such, I recommend finding that Plaintiff has failed to state a claim for fraud.

## V.      Leave to Amend

If the Court grants the motion to dismiss, Plaintiff requests leave to amend. A court should generally grant leave to amend freely, but it need not do so if the amended complaint would also be subject to dismissal, in which case the amendment would be futile. *Bradley v. Val-Mejias*, 379 F.3d 892, 900-01 (10th Cir. 2004). As to Plaintiff's claims for breach of contract (regarding the fully autonomous driving features), unjust enrichment, negligence per se, and civil conversation, I recommend denying Plaintiff's request to amend as futile. As discussed above, I find that the text of the complaint and the definition of Full Self-Driving Capability on Defendant's website are dispositive. It is not a pleading error on Plaintiff's part that leads me to recommend dismissal of these claims; rather, it is the terms of the contract itself, which will not differ in an amended complaint.

---

[6] As discussed above, Defendant asks the Court to take judicial notice of the transcript of Musk's interview (which I recommend granting) because Plaintiff's complaint explicitly references the source and a court may consider documents referred to in the complaint without converting a motion to dismiss into a motion for summary judgment "if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Hampton*, 897 F.3d at 1297 (citation omitted).

As to his claim for fraud regarding the extracontractual claims Musk made in the February 2019 podcast interview, I recommend granting leave to amend. Should Plaintiff have more facts to support the heightened pleading standard regarding reliance, and that Defendant knowingly made false statements to fraudulently induce customers like Plaintiff to purchase its vehicles, amendment might not be futile.

## CONCLUSION

For the reasons discussed above, I recommend GRANTING IN PART AND DENYING IN PART Defendant Tesla, Inc.'s Motion to Dismiss the Complaint (Doc. 14) as follows:

- Dismiss the breach of contract count for all claims except for the allegations that Defendant failed to provide the features promised "later this year": recognize and respond to traffic lights and stop signs and automatic driving on city streets;

- dismiss the counts for unjust enrichment, civil conversion, negligence per se, and fraud; and

- allow leave to amend only as to the fraud count for allegations related to Musk's extracontractual statements made during the February 2019 podcast interview.

UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**